**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSEPH PRAGAY, Derivatively on Behalf of Nominal Defendant PINTEREST, INC.,<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM READY, JULIA BRAU DONNELLY, CHIP BERGH, LESLIE KILGORE, JEREMY LEVINE, GOKUL RAJARAM, FREDRIC REYNOLDS, SCOTT SCHENKEL, BENJAMIN SILBERMANN, SALAAM COLEMAN SMITH, MARC STEINBERG, and ANDREA WISHOM,<br><br>Defendants,<br><br>and<br><br>PINTEREST, INC.,<br><br>Nominal Defendant. | Case No.:<br><br>**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

# VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Joseph Pragay ("Plaintiff"), by Plaintiff's undersigned counsel, derivatively and on behalf of nominal defendant Pinterest, Inc. ("Pinterest" or the "Company"), files this Verified Shareholder Derivative Complaint against individual defendants William Ready ("Ready"), Julia Brau Donnelly ("Donnelly"), Chip Bergh ("Bergh"), Leslie Kilgore ("Kilgore"), Jeremy Levine ("Levine"), Gokul Rajaram ("Rajaram"), Fredric Reynolds ("Reynolds"), Scott Schenkel ("Schenkel"), Benjamin Silbermann ("Silbermann"), Salaam Coleman Smith ("Smith"), Marc Steinberg ("Steinberg"), and Andrea Wishom ("Wishom") (collectively, the "Individual Defendants") for breaches of their fiduciary duties as directors and/or officers of Pinterest, unjust enrichment, and waste of corporate assets under Delaware law, and for violations of Sections 10(b), 20(a) and 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and against Defendants Ready and Donnelly for contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiff's counsel, which included, among other things, a review of Pinterest's and the Individual Defendants' public documents, conference calls and announcements made by Pinterest and the Individual Defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Pinterest, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought by Plaintiff on behalf of nominal defendant Pinterest against certain of its current and former officers and directors for breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act

committed between February 6, 2025 and February 12, 2026, inclusive (the "Relevant Period"). Plaintiff seeks to remedy the harm the Individual Defendants caused the Company by representing that Pinterest's advertising business was insulated from tariff-related pressures on its retail advertisers when, in fact, those advertisers were already reducing their spending on the platform.

2. Pinterest is a visual discovery platform through which users locate, save, and organize content relating to their interests, including recipes, home décor, fashion, and travel. Because Pinterest charges its users no fees, the Company derives substantially all of its revenue from advertising, which it generates by delivering promoted content to users based on their search and planning activity. At all relevant times, a substantial portion of that revenue was derived from a small number of large advertisers concentrated in the retail and consumer packaged goods ("CPG") verticals.

3. During the Relevant Period, the Individual Defendants made, or caused the Company to make, materially false and misleading statements regarding the ability of Pinterest's advertising business to withstand macroeconomic headwinds. Defendant Ready, Pinterest's Chief Executive Officer ("CEO"), represented that advertisers were allocating increasing portions of their budgets to Pinterest, including continuous ("always-on") and lower-funnel, conversion-oriented budgets, and attributed strong advertiser returns and engagement to the Company's AI-driven products, principally its flagship Performance+ suite. Defendant Donnelly, Pinterest's Chief Financial Officer ("CFO"), characterized Performance+ as the beginning of a multi-year product cycle and emphasized the durability of the Company's revenue growth. Throughout the Relevant Period, the Individual Defendants further assured stockholders that Pinterest's revenues remained strong notwithstanding the tariffs imposed by the new U.S. administration, and described the risks posed by tariffs and other macroeconomic conditions as merely hypothetical.

4. In truth, throughout the Relevant Period, Pinterest's advertisers were reducing, pausing, or reallocating their spending because the platform failed to deliver adequate value and because Performance+ and the Company's other AI products failed to generate the advertiser returns the Individual Defendants publicly represented. As tariffs compressed advertisers'

margins, Pinterest's inability to demonstrate value caused it to lose advertising spend. The Company was particularly vulnerable to these reductions because approximately 85% of its revenue was derived from its largest advertisers, such that a reduction in spending by even one or two of them materially affected the Company's results.

5. The Individual Defendants caused the Company to conceal these facts from stockholders, and they came to light only through the subsequent accounts of former employees[1] and the Company's later admissions. As a result, the Individual Defendants' misrepresentations artificially inflated the price of Pinterest common stock throughout the Relevant Period. For example, on February 6, 2025, Defendant Donnelly represented that the Company was "at the beginning of a multi-year product cycle for Performance+" and that "[w]e're seeing really good results, but more of the opportunity is in front of us than behind us." On the same day, Defendant Ready represented that Performance+ had "compounding effects over not just multiple quarters, but multiple years," that the Company had "created immense value for advertisers in 2024 through our lower funnel innovation," and that the platform was "delivering great return for advertisers."

6. As tariffs and related macroeconomic conditions increasingly affected the Company, the Individual Defendants continued to mislead stockholders. On March 6, 2025, in response to a question concerning trade and tariff uncertainty, Defendant Ready represented that "we don't currently see advertisers overreacting" and that "we're not seeing signs of overreaction," and described the Company's large advertisers as a "consistent source of strength" that were "really leaning in."

7. On May 8, 2025, Defendant Ready again assured stockholders that Pinterest was "more resilient than ever," that "the fundamentals in the business are strong," and that the Company was "driving performance for advertisers and winning market share." That same day, Defendant Donnelly represented that the Company's business and top-line growth remained healthy and that management was confident in the "long-term durability" of its strategy.

---

[1] The operative complaint in the Securities Action refers to allegations from former employees ("FE") of the Company, (referred to herein as "FE-__").

8. Notwithstanding deteriorating market conditions, the Individual Defendants continued to misrepresent Pinterest's performance and risk exposure. On August 7, 2025, Defendant Donnelly touted the "resilience" and "durability" of the Company's growth drivers, and Defendant Ready stated that he had "never been more confident" in Pinterest's ability to deliver for advertisers, citing AI-driven improvements and deeper lower-funnel actionability. Thereafter, on September 9, 2025, in intra-quarter remarks at an investor conference, Defendant Ready was asked to address "the advertising environment" and the "key messages [Pinterest] [is] receiving as a company broadly from advertisers about the operating environment today." Defendant Ready responded that Pinterest was "able to drive performance increasingly through AI-enabled tools like Pinterest Performance+," that "the macro, particularly for advertising is more constructive than it was at sort of peak tariff uncertainty," and that, although the Company had "face[d] a bit of tariff uncertainty last quarter," it had "play[ed] through that, I think, quite well . . . And a big part of that was because we have multiple levers [], where even with a little bit of pressure in the US from tariffs, we saw advertisers redistributing spend to international and international really picking up steam for us."

9. Throughout the Relevant Period, securities analysts relied upon and repeated the Individual Defendants' representations. In February 2025, Guggenheim reported that Pinterest's "Strong Guide Inspires Optimism" and that AI investments would drive the "Next Leg of Growth," and Goldman Sachs cited momentum in platform-growth initiatives, healthy revenue growth, lower-funnel ad revenue, and positive Performance+ trends. In May 2025, Citi reported that Pinterest's AI and ad investments were capturing "a larger share of durable, always-on, performance ad budgets," and Morningstar reported the same day that ad spending was "remaining quite resilient."

10. The truth began to emerge through a series of partial corrective disclosures commencing in late 2025. On November 4, 2025, the Individual Defendants caused the Company to issue fourth-quarter guidance below market expectations, which Defendant Donnelly attributed to "pockets of moderating ad spend in [United States and Canada ("UCAN")] in Q3, as larger

U.S. retailers navigate tariff-related margin pressure." Defendant Donnelly further acknowledged a "pullback from some US retailers" and a year-over-year decline in spending by Asia-based e-commerce advertisers, and disclosed for the first time that smaller and mid-market advertisers represented only "15% of our revenue," a concentration risk that analysts linked to Pinterest's inability to withstand tariff headwinds.

11. On this news, the price of Pinterest common stock declined $7.16 per share, or nearly 22%, to close at $25.75 per share on November 5, 2025. Analysts attributed the decline to the Company's previously undisclosed advertiser concentration and tariff exposure. RBC reported that tariff-related weakness "showed up for the first time in our digital ads universe," that reductions by large advertisers drove the lowered guidance, and that the Individual Defendants' prior "intra-qtr communications on tariffs" had contributed to the market's reaction because they had "intentionally provided additional color regarding the impact of tariffs, emphasizing that they were not updating guidance." Wells Fargo concluded that Pinterest lacked the advertiser breadth and depth to withstand weakness in its endemic categories, and Morgan Stanley stated, "We were wrong about PINS' ability to drive durable, faster than expected revenue growth" and "PINS failed to deliver," explaining that Pinterest could not fully backfill revenue when tariffs disrupted its large CPG and retail advertisers.

12. The Individual Defendants nevertheless continued to issue misleading reassurances. Defendant Ready represented that "advertisers are increasingly counting on Pinterest" and that the Company was seeing "good results" with return on ad spend "bidding from Performance+," and Defendant Donnelly reaffirmed the Company's mid-to-high-teens revenue-growth targets. The Individual Defendants, however, were unable to conceal the truth indefinitely.

13. On January 27, 2026, the Individual Defendants caused the Company to file with the SEC a Form 8-K announcing a "global restructuring plan" to support its AI transformation, pursuant to which the Company would eliminate approximately 15% of its workforce and reallocate resources to AI-focused roles and products. On this news, the price of Pinterest common stock declined $2.49 per share, or nearly 10%, to close at $23.41 per share that day.

Analysts viewed the announcement as evidence of previously undisclosed deterioration in revenue trends, continuing tariff pressure, and weakness in the Company's AI initiatives. RBC characterized the announcement as foreshadowing a 2026 revenue shortfall "potentially stemming from customer concentration and/or tariff-related headwinds"; BofA concluded that tariff-related pressure on ad spend had likely continued into the first quarter; and Jefferies stated that the reallocation signaled that Performance+ was "underperforming expectations."

14. The truth was fully revealed on February 12, 2026, when the Individual Defendants caused Pinterest to report disappointing fourth-quarter and full-year 2025 results reflecting decelerating revenue growth, together with guidance indicating continued margin pressure. On the related earnings call, Defendant Ready admitted that the Company had "absorbed an exogenous shock this year related to tariffs, disproportionately affecting ad spend from our top retail advertisers," that large retailers were reducing ad spend to protect their margins, and that the Company's "higher mix of large retailers" caused it to bear a greater share of the adverse impact than its competitors. Defendant Donnelly likewise admitted that Pinterest's "largest retail advertisers created a more meaningful headwind than we expected" and that the reduction "impacted our platform to a higher degree, given our current revenue mix." Defendant Ready further conceded that the Company's dependence on a small number of large retailers required it to accelerate growth across a broader advertiser base, admitting that growth from mid-market, small and medium business ("SMB"), and international advertisers was "not enough to offset the headwinds" facing the largest retailers and that the Company was "a long way from having bids and budgets against advertisers' full product catalogs."

15. On this news, the price of Pinterest common stock declined $3.12 per share, or nearly 17%, to close at $15.42 per share on February 13, 2026. Analysts concluded that Pinterest's growth thesis had failed. Evercore stated that "[f]undamentals are clearly deteriorating"; RBC described the results as emblematic of "a more consistent pattern of adverse concentration" and noted that the Performance+ "inflection has not followed suit"; HSBC stated that the decelerating

revenue and margin pressure had caught it off guard; and BofA acknowledged that its thesis that "Performance+ would translate into better performance has not played out."

16. As a result of the Individual Defendants' false and misleading statements, Pinterest common stock traded at artificially inflated prices during the Relevant Period, enabling Company executives and other insiders, including Defendant Donnelly, to sell millions of shares at those inflated prices. Defendant Donnelly alone sold 143,449 shares, representing 82.9% of her Pinterest holdings, for proceeds of more than $4.7 million, at prices as high as $34.85 per share.

17. During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties to Pinterest, willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, inter alia, that: (1) Pinterest understated the adverse effect of macroeconomic headwinds on its advertising clients; (2) as a result, Pinterest's advertisers reduced their spending, causing the Company's revenues to decline; (3) Pinterest's lower-funnel products did not deliver sufficient value to advertisers; (4) the Company's AI-based products did not increase advertiser demand; and (5) as a result of the adverse effect on its advertising revenues, Pinterest undertook a restructuring. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

18. Accordingly, throughout the Relevant Period, the Individual Defendants breached their fiduciary duties to Pinterest by willfully or recklessly making, and/or causing the Company to make, false and misleading statements, and by failing to correct, and/or causing the Company to fail to correct, those misstatements and omissions of material fact, rendering them personally liable to the Company. In further breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

19. By reason of the foregoing, Pinterest, together with Defendants Ready and Donnelly, now stands accused of securities fraud in a federal class action pending in the United States District Court for the Northern District of California, captioned In re Pinterest, Inc. Securities Litigation, No. 3:26-cv-02745 (N.D. Cal.) (the "Securities Action"). The Company will be forced to devote many millions of dollars to defending the Securities Action, conducting

internal investigations, and remediating its deficient internal controls, and has further been harmed by the waste of its corporate assets and by the unjust enrichment of those Individual Defendants who received excessive compensation or otherwise profited from the misconduct alleged herein.

20. The Individual Defendants' knowing or highly reckless breaches of fiduciary duty, together with the other misconduct described herein, have inflicted substantial harm on the Company.

21. Plaintiff has not made a pre-suit demand on the Company's current Board of Directors (the "Board") because a majority of its members cannot impartially evaluate whether to consider a demand on themselves and their fellow Individual Defendants on the Company's behalf. Most of the Individual Defendants continue to sit on the Board, and each of them breached his or her fiduciary duties by participating in the misconduct alleged herein. These directors face a substantial likelihood of liability in this action; Defendants Ready and Donnelly face additional exposure in the Securities Action; and the directors' longstanding business and personal ties to one another deprive them of the independence and disinterestedness required to consider a demand. Demand is therefore futile and excused.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act (17 C.F.R. § 240.14a-9), Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a) and 78t-1), SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder, and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Action based on violations of the Exchange Act.

23. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

25. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

26. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

27. Plaintiff Joseph Pragay is a current shareholder of Pinterest. Plaintiff has continuously held Pinterest common stock at all relevant times.

28. Nominal Defendant Pinterest is a Delaware corporation with principal executive offices located at 651 Brannan Street, San Francisco, California 94107. Founded in 2009, Pinterest went public on April 18, 2019, and its Class A common stock began trading on the New York Stock Exchange ("NYSE") under the ticker symbol "PINS." Pinterest common stock trades in an efficient market. Pinterest had 584,866,000 shares of Class A common stock issued and outstanding as of December 31, 2025.

29. Defendant Ready served as Pinterest's CEO and as a member of the Board throughout the Relevant Period. Ready became CEO following Pinterest co-founder defendant Silbermann, who transitioned to the role of Executive Chairman.

30. Defendant Donnelly joined Pinterest as CFO in 2023 and remained in that position throughout the Relevant Period until her resignation was announced on August 26, 2026. Previously, Donnelly served as Vice President and Global Head of Finance & Accounting at Wayfair Inc. When announced as Pinterest's new CFO, Defendant Donnelly stated that she was "thrilled to join the team and help drive Pinterest's next phase of growth."

31. Defendant Bergh has served as a Company director since 2024. Defendant Bergh also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Talent Development and Compensation Committee.

32. Defendant Kilgore has served as a Company director since 2019. Defendant Kilgore also serves as the Chair of the Talent Development and Compensation Committee.

33. Defendant Levine served as a Company director from 2011 until September 18, 2025. While on the Board, Defendant Levine served as the Chair of the Nominating and Corporate Governance Committee.

34. Defendant Rajaram has served as a Company director since 2020. Defendant Rajaram also serves as a member of the Talent Development and Compensation Committee.

35. Defendant Reynolds has served as a Company director since 2007. He also serves as a member of the Audit and Risk Committee.

36. Defendant Schenkel has served as a Company director since 2023. He also serves as the Chair of the Audit and Risk Committee.

37. Defendant Silbermann co-founded Pinterest and has served as a Company director since 2008. He previously served as the Company's CEO from 2008 until June 2022 and as the Company's President from 2012 until June 2022. He currently serves as the Non-Executive Chair of the Board.

38. Defendant Smith has served as a Company director since 2020. She also serves as a member of the Audit and Risk Committee and the Nominating and Corporate Governance Committee.

39. Defendant Steinberg has served as a Company director since 2022. Defendant Steinberg also serves as a member of the Audit and Risk Committee.

40. Defendant Wishom has served as a Company director since 2020 and as the Company's Lead Independent Director since 2021. She also serves as a member of the Nominating and Corporate Governance Committee and the Talent Development and Compensation Committee.

41. Emily Reuter ("Reuter") has served as a Company director since September 2025 and serves as a member of the Audit Committee.

42. Kecia Steelman ("Steelman") has served as a Company director since February 16, 2026 and serves as a member of the Talent Development and Compensation Committee.

43. Defendants Ready, Bergh, Kilgore, Rajaram, Reynolds, Schenkel, Silbermann, Smith, Steinberg, and Wishom are collectively referred to as the "Director Defendants," and together with relevant non-parties Reuter and Steelman, referred to as the "Directors."

## SUBSTANTIVE ALLEGATIONS

**Background**

44. Pinterest reports more than 600 million monthly active users worldwide who, according to the Company's SEC filings, "come to Pinterest to find new ideas, curate and refine their tastes, and turn those ideas into reality." Users save and organize visual content, called "Pins," on "boards" that serve as digital scrapbooks or mood boards for interests including home design, fashion, food, travel, and hobbies. Because Pinterest charges no user or membership fees, it earns substantially all of its revenue from advertisements in various formats across the platform.

45. Advertising is Pinterest's principal source of revenue, a small number of advertisers account for the vast majority of that revenue, and the Company's entire business model depended on their continued spending.

46. Pinterest frequently noted that advertising was core to its revenue and success. For example, Pinterest's 2024 Annual Report on SEC Form 10-K states: "We generate substantially all of our revenue from advertising." This, or nearly identical language, is repeated in other of Pinterest's SEC filings, including its 2024, 2025 and 2026 Quarterly Reports on Form 10-Qs, and its 2025 Form 10-K.

47. FEs' accounts in the Securities Action confirm the centrality of advertising to Pinterest's operations and revenue throughout the Relevant Period. For example, FE-7[2] added

[2] FE-7 was employed by Pinterest from January 2022 until July 2026, initially as an Account Manager until he was promoted in March 2026 to Senior Account Manager, a role he occupied

that the Company's revenue "continues to almost exclusively come from advertising." FE-6[3] stated that advertising sales represented Pinterest's primary source of revenue and that sales employees were viewed as the Company's "principal revenue generators."

48. As discussed in the operative complaint in the Securities Action and in greater detail below, the reduction in ad spending from advertisers was widely discussed throughout the Company. For example, FE-5[4] noted that he had observed tariff-related cuts to advertiser spending, including amongst Pinterest's top 5 advertisers, which was "widely known" amongst the sales team. According to FE-11,[5] the tariffs were a "very big conversation" at the Company. FE-7 stated that he attended an All-Hands meeting in February or March 2026 where a new leadership hire noted that it was "so concerning" that the Company's approximate top 10 advertisers were responsible for a disproportionate portion of the Company's advertising revenue, potentially as high as 90%. FE-10[6] remembered how the subject of advertisers reducing their ad spending due to the tariffs was "talked about a lot around the office." FE-10 heard information

---

until his departure from the Company in July 2026. FE-7 explained that he was focused on advertisers in the "Tech and Telco" space until the end of 2025 when he transitioned to omni retail. According to FE-7, teams at Pinterest are arranged into "pods," and there were pods for the various advertiser groups, such as Retail, Financial Services, Tech, and Telco, and so on. FE-7 explained that each pod consisted of four Account Managers and four Client Partners that reported to a manager. FE-7 continued to say that the pods reported to an industry manager, who reported to a managing director that oversaw multiple pods. FE-7 further recalled that managing directors reported to a Vice President who then reported to current Chief Business Officer Lee Brown, who reported to Defendant Ready.

[3] FE-6 was an Account Manager at Pinterest from before the Relevant Period and transitioned to the Senior Client Account Manager at Pinterest during the Relevant Period. He held that position until he departed Pinterest in October 2025.

[4] FE-5 was employed by Pinterest as a senior member of the sales team from before the Relevant Period until the end of 2025. FE-5 was responsible for a selection of advertisers that were responsible for millions of dollars in revenue.

[5] FE-11 was employed by Pinterest through Accenture as Global Agency Account Manager from May 2023 through July 2026.

[6] FE-10 was employed by Pinterest, through Accenture, as Account Manager from September 2023 through April 2026. FE-10 recalled that there was one Pinterest executive who acted as the main correspondent between Accenture and Pinterest that would be present in the office named JJ Greco.

about tariffs around the office that "trickled down from the top." According to FE-10, "everyone knew the tariffs were affecting business." These FE accounts establish that advertising revenue was the core—revenue driver of Pinterest's business.

49. Pinterest promotes its platform as a space where users discover new products and brands and therefore describes "commercial content from brands, retailers, and advertisers" as "central" to the platform. Pinterest notes that "consumers on Pinterest tend to be early in their journey toward a purchase decision and do not yet know exactly what they want to purchase," and that users "are open to discovering new products and brands on Pinterest rather than merely navigating to brands they already know," setting it apart from "traditional search engines and e-commerce platforms." Essentially, Pinterest's business model is to monetize what the Company calls the user's "inspiration to action journey."

50. As Pinterest states, it drives revenue by "delivering ads on our website and mobile application. Advertisers purchase ads directly with us or through their relationships with advertising agencies." The Company also notes that the nature of Pinterest's users "creates a unique flywheel where relevant ads can not only enhance the user experience but also drive more value for advertisers in the form of increased views, clicks and conversions."

51. Pinterest markets itself as a "full-funnel" advertising platform. In the digital advertising industry, a consumer's path is tracked from initial awareness of a product to ultimate purchase through a framework known as the "funnel." This reflects the progressively narrowing pool of consumers at each stage of the funnel where many may become aware of a product, but only a portion of these will make a purchase. This funnel is divided into "upper-funnel," "mid-funnel," and "lower funnel." Upper-funnel advertising focuses on building brand awareness and generating interest; mid-funnel advertising aims to deepen consideration and engagement; and lower-funnel advertising is performance-oriented, in that its success is measured by direct, quantifiable outcomes like clicks, conversions, and return on ad spend ("ROAS"). A "full funnel" advertising platform is one that can serve advertisers at every stage of the customer journey—from first awareness all the way down to the actual purchase.

52. Pinterest acknowledged that a "substantial portion of [its] revenue is derived from a small number of advertisers and is currently concentrated in certain verticals, particularly retail and CPG." On November 4, 2025, near the end of the Relevant Period, Pinterest disclosed that mid-market and smaller advertisers represented "approximately 15% of our revenue," meaning that roughly 85% of Pinterest's revenue came from its largest advertiser accounts.

53. Pinterest's advertiser base was built on purpose around large CPG and retail advertisers as the Company disclosed that "[w]e initially built our business with large consumer packaged goods ('CPG') and retail advertisers in the United States." Retail advertisers sell products directly to consumers and utilized Pinterest primarily to drive product discovery, clicks, and direct purchase conversions through shopping ads, direct links, and mobile deep links. CPG refers to consumer packaged goods, i.e., household brands in food, beverage, personal care and similar product categories. CPG advertisers do not sell directly to consumers but instead through third-party retail channels and use Pinterest primarily for brand awareness, product consideration, and upper-funnel marketing objectives.

54. Retail and CPG are the most substantial verticals for Pinterest's advertising business with Bernstein Research approximating that U.S. retail alone constituted approximately 50-60% of Pinterest's global revenue. Within Bernstein's coverage, which includes Pinterest's competitors—Google, Meta, Snapchat, and Reddit— Pinterest has the largest exposure to the retail vertical. Barclays also estimated that Pinterest derived "upwards of 2/3rd of its revenue from retails and CPG" combined.

55. The accounts in the Securities Action from the Company's former employees confirm the identities of some of Pinterest's largest customers. FE-5 noted that Pinterest was having a "very top heavy" advertiser base that lacks diversity and stated that the Company's top five advertisers are responsible for the majority of the revenue and all are within the retail sector, including Temu, Amazon, Wal-Mart, and Target. FE-7 relayed that Walmart, Amazon, Chase, and Wayfair were some of Pinterest's largest advertisers.

56. On September 19, 2023, Pinterest held its first Investor Day as a public company ("2023 Investor Day"). The event served in part to introduce the Company's new executive leadership: Defendant Ready had just completed his first year as CEO, and Defendant Donnelly had joined as CFO only months earlier.

57. In the months leading up to Pinterest's 2023 Investor Day, stockholders' prevailing view of the Company was one of cautious skepticism where analysts observed that operational improvements had not yet translated into meaningful revenue growth. For example, on August 2, 2023, Bernstein Research noted that Pinterest's results were a "[g]reat story" but "OK fundamentals… again," noting that while the Company could "[m]ark down another quarter of improvements across the board," Bernstein Research posed a question regarding the Company's growth: "the progress is there, but when will the shoppable inflection happen?" Additionally, J.P. Morgan observed on September 14, 2023, that the Company's shares were only "+8% YTD, underperforming [] the S&P 500 +16%," and the J.P. Morgan acknowledged "investor frustration that these improvements are not yet translating into more material revenue growth."

58. The market's tempered expectations for Pinterest's business were further reflected in the preponderance of neutral or hold-equivalent ratings from major analysts. On August 2, 2023, J.P. Morgan maintained a Neutral rating with a December 2024 price target of $30, writing that it would "continue to look for stronger Revenue acceleration & consistent execution from the new mgmt team to get more constructive on shares." Roth Capital Partners likewise rated the stock Neutral, characterizing the second quarter as a "small beat & small raise" and describing Pinterest's trajectory as "Progress in Baby Steps." D.A. Davidson also reiterated a Neutral rating, raising its price target modestly to $25, which was notably still below the stock's then-current trading price of $28.96.

59. Further, Pinterest's 2023 Investor Day was seen as a significant impetus for the Company's growth. On August 2, 2023, Roth Capital Partners described the Company's 2023 Investor Day as a potential "catalyst." On August 2, 2023, D.A. Davidson issued its report titled

"Pinning an Investor Day for September," in which the analyst firm wrote that "we were encouraged by the company's announcing of a date for a much-anticipated analyst day, September 19th." D.A. Davidson flagged its anticipation for: "1) hearing from senior management (including its new CFO), 2) learning more about its third-party ad partnerships plans . . . 3) receiving additional details on its AI-related efforts, 4) getting an update on its ad-measurement tools…"

60. At the 2023 Investor Day, Defendants Ready and Donnelly and other Pinterest senior executives delivered what stockholders wanted: a sweeping story of transformation, growth, and durability. That story included a three-to-five-year outlook projecting a mid-to-high-teens revenue Compound Annual Growth Rate ("CAGR") and adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") margin improvement to the low-30s percent range, along with a raised Q3 2023 outlook (with revenue growth now expected at the high end of the prior range rather than the midpoint), confirmation of 4 points of EBITDA margin expansion for 2023, and a new $1 billion share buyback authorization.

61. In revealing Pinterest's guidance, Defendant Ready described a new Company focus, stating that "[o]ver the last 15 months since I joined, our team has changed the trajectory of our business." Defendant Ready characterized as Pinterest as "uniquely positioned at the intersection of search, social, and commerce, unlike any of our competitors," and asserted that the Company had "the potential to reaccelerate growth and monetization." Defendant Ready added: "[L]et me be clear, while that's what we are committing to today and what we have confidence and conviction in today, our aspirations are beyond that. We see this as a business that clearly has the potential for 20%-plus growth as we go forward, but this is what we have confidence in today and what we're committing to today even as our internal aspirations are much higher than that."

62. Defendant Donnelly reinforced these targets, telling stockholders: "We are a growth company. We believe we can grow revenue faster than the overall market with multiple ways to get there, resulting in mid to high-teens revenue CAGR over the next three to five years." Defendant Donnelly specified that "the low end of that range" was "roughly 15%."

63. This new guidance was tied to lower-funnel ad initiatives, referring to marketing efforts targeted at consumers who are near the end of their purchasing journey, i.e. ready to take an action such as clicking through to a retailer's website, adding an item to a cart, or completing a purchase. Unlike upper funnel advertising, its success is measured by direct, quantifiable outcomes like clicks, conversions, and return on ad spend.

64. The Company has historically been strong at the top of the funnel but weak on translating that intent into actual purchases. At the 2023 Investor Day, lower-funnel ad initiatives were featured in multiple presentations and discussed by several senior executives with Defendant Ready describing lower funnel capability as a previously missing "puzzle piece" that had stopped Pinterest from delivering on its promise as a full funnel platform but noted that "[n]ow, lower funnel solutions are our fastest-growing products[.]"

65. The 2023 Investor Day resulted in a wave of market enthusiasm and substantial analyst expectations that would continue into the Relevant Period at the beginning of 2025, marketing the Company's narrative from one of stagnation to one of driving growth. On September 20, 2023, Hedgeye was "more confident in Pinterest's ability to accelerate growth," praising management's focus on lower-funnel ad formats and viewing the long-term revenue target as "realistic and attainable with room for upside," and that "we think the model has potential to support revenue growth well above even the +20% aspirational/internal goal discussed." Similarly, D.A. Davidson increased its rating from Neutral to Buy and its price target from $25 to $35 (about 34% above the prior close), stating "our upgrade is a reflection of our confidence in management's ability to achieve those financial targets" by increasing engagement on the platform, improving its monetization and "sustaining financial discipline."

66. In the months that followed and throughout 2024, the Individual Defendants continued to reaffirm the 2023 Investor Day guidance. For example, during the Company's Q3 2024 earnings call on November 7, 2024, the last earnings release before the Relevant Period began, Defendant Ready told stockholders that Pinterest was "driving progress against the strategy we laid out at Investor Day."

67. These and other representations regarding the Company's growth outlook throughout 2024 occurred against a notable backdrop: the U.S. presidential election, including in particular the campaign promises throughout the year by then-candidate Donald J. Trump to implement substantial tariffs, including tariffs over 60% on goods from China and universal increases of 10%-20% on other imports from trading partner countries, including Canada and Mexico.

68. Not long after the presidential inauguration, President Trump issued a series of Executive Orders under the International Emergency Economic Powers Act (50 U.S.C. § 1701 et seq.) ("IEEPA") implementing, inter alia, a 25% tariff on imports from Canada and Mexico and a 10% tariff on all goods from China, effective February 4, 2025 which were the subject of substantial media coverage throughout 2025.

69. In anticipation of these tariffs, companies, including the CPG and retail companies on which Pinterest depended for advertising revenue, reduced ad spending to hedge for anticipated increases in costs of manufacturing and importing.[7]

**The Individual Defendants Tout the Company's Ability to Grow Despite Tariffs**

70. The Relevant Period begins on February 6, 2025, just days after the new U.S. administration assumed control and implemented its first sweeping series of tariffs. Throughout the Relevant Period, the Individual Defendants continuously assured stockholders that the tariffs would not impact the Company's projected growth, and that, even in the face of macroeconomic uncertainty, Performance+ and the Company's other AI-driven initiatives delivered quality results

---

[7] See Megan Poinski, How Tariffs Could Impact Advertising Budgets, FORBES (Apr. 9, 2025), https://www.forbes.com/sites/cmo/2025/04/09/how-tariffs-could-impact-advertising-budgets (As President Trump's tariffs went into effect, "companies are preparing to pay more for products and components that are imported. Some of those costs will be passed on to consumers, but some will be internalized by companies—and many fear it will take a bite out of marketing dollars." A study in March 2025 from the Interactive Advertising Bureau found that "94% of advertisers are worried about the impact tariffs will have on ad spending. More than one in five expected an 11% to 20% drop, and 60% anticipate budget cuts of 6% to 10%. Advisory firm Madison and Wall cut its projection for U.S. advertising revenue growth this year to 3.6%, down from 4.5% predicted in December.")

that would attract and retain customers and accelerate advertising revenue. These representations concerned the purported ability of Pinterest's business model to withstand these macroeconomic headwinds.

71. After the close of the market on February 6, 2025, the first day of the Relevant Period, the Individual Defendants caused Pinterest to issue the Company's Q4 and year-end 2024 earnings release, which quoted Defendant Ready as stating that "[o]ur strategy is paying off. People are coming to Pinterest more often, the platform has never been more actionable, and our lower funnel focus is driving results for users and advertisers."

72. Likewise, during the Q4 2024 earnings call on the same day, Defendant Ready again reiterated the Investor Day guidance, saying that the Company's Investor Day 2023 "pillars . . . remain unchanged" and that the Company's results represented "considerable progress against our stated longer-term goals"—i.e. the 2023 Investor Day outlook. Defendant Ready stated that Pinterest "feel[s] good about sustainability of the revenue growth we've been driving." Defendant Donnelly echoed this sentiment during this same call, stating that "[w]e continue to feel confident in the sustainability of our current trajectory and the steady ongoing execution of our plans." Notably, on this same call, Defendant Ready stated that "there's tremendous benefit yet to come and more benefit in front of us than behind us."

73. These assurances were compounded by describing the Company's purportedly AI-powered advertising automation suite, branded "Performance+," as a transformative driver of Pinterest's growth and advertiser retention. First introduced in 2024, Performance+ was Pinterest's signature AI-driven advertising product, an automated campaign suite encompassing bidding, budgeting, targeting, and creative optimization tools designed to simplify campaign creation and improve advertiser returns, and the Company and Individual Defendants expressed sustained and emphatic optimism about Performance+ and Pinterest's use of AI throughout the

Relevant Period. According to FE-3[8], Performance+ was directly linked to the lower funnel solutions meant to drive growth.

74. Also, during the Q4 2024 earnings call on February 6, 2025, Defendant Ready detailed Performance+ as having "compounding effects over not just multiple quarters, but multiple years." Defendant Ready further stated that "we created immense value for advertisers in 2024 through our lower funnel innovation" and that the Company had achieved "our first $1 billion quarter in Q4." In a CNBC interview the following day, Defendant Ready stated that "2024 was a really transformative year for our business" given "the advancement of our ad platform as a performance ads platform that's delivering great return for advertisers."

75. Similarly, at the Morgan Stanley Technology, Media & Telecom Conference just weeks later, on March 6, 2025, Defendant Ready responded to a question regarding "macro source of uncertainty . . . whether it's trade [or] tariffs," by noting that "[w]e don't currently see advertisers overreacting or those kinds of things" and "we're not seeing signs of overreaction." Instead, Ready claimed that the Company's large advertisers are a "consistent source of strength for us," and further stated that Pinterest has "seen them really leaning in."

76. As the year continued, the U.S. administration continued to implement and expand tariffs over the following months, and observers noted that the tariffs seemed to be impacting advertising spend in the U.S.[9] For example, effective May 2, 2025, the U.S. ended the duty-free de minimis treatment for covered goods from China. Previously, goods valued at $800 or less

---

[8] FE-3 was employed by Pinterest as Senior Partner Manager from August 2022 through February 2026 and as Partner Manager, Travel from February 2020 through August 2022. FE-3 explained that he worked exclusively in the travel verticals, and explained that his clients were all in the travel space.

[9] See Arriana McLymore, Temu, Shein slash digital ads as tariffs end cheap shipping from China, data show, REUTERS (Apr. 16, 2025), https://www.reuters.com/business/retail-consumer/Temu-shein-slash-digital-ads-tariffs-end-cheap-shipping-china-data-show-2025-04-16 (As of April 16, 2025, "Temu's daily average U.S. ad spend on Facebook, Instagram, TikTok, Snap, X and YouTube declined a collective average of 31% in the two weeks from March 31 to April 13 compared with the previous 30 days" and "Shein's daily average U.S. ad spend on Facebook, Instagram, TikTok, YouTube and Pinterest [] fell a collective average of 19% over the same period, it added.")

could enter the U.S. without customs duties, a provision that benefited retailers shipping inexpensive products directly from China to U.S. consumers. Under the new policy, all goods that would otherwise qualify for the de minimis exemptions became subject to a duty rate of either 30% of their value or $25 per item. The U.S. administration subsequently expanded this policy to all countries effective August 29, 2025, meaning qualifying low-value imports generally became subject to applicable duties rather than automatically receiving duty-free treatment. This change in policy mattered to Pinterest because many Asia-based e-commerce retailers ship inexpensive products directly to U.S. consumers. Removing the exemption raises the cost of those sales, potentially making U.S. customer acquisition less profitable and causing those retailers to reduce U.S. advertising spend.

77. Although the elimination of the de minimis exemption and other macroeconomic developments led some analysts to question whether Pinterest was especially vulnerable to tariff-related disruption given its well-known concentration in retail advertising, the Individual Defendants repeatedly sought to allay and minimize those concerns.

78. For example, on May 8, 2025, in Pinterest's Q1 2025 earnings press release, Defendant Ready stated that Pinterest had "continued momentum in revenue," and added that "[a]s the macroeconomic and digital ad landscape evolves, our strategy and consistent execution has made Pinterest more resilient than ever." He added that Pinterest is "driving performance for advertisers and winning market share, giving us a solid foundation for long-term sustainable growth." On the earnings call, Defendant Ready described Performance+ as "giving [advertisers] great return on their ad spend" and noted "we consistently see that Performance+ outperforms traditional campaigns."

79. The Individual Defendants particularly assured stockholders about the tariffs, with Defendant Ready stating that day that Pinterest's "strategy and consistent execution has made Pinterest more resilient than ever" even as "the macroeconomic and digital ad landscape evolves"—which the market understood referred to tariffs. Defendant Donnelly even more directly downplayed the negative impact from tariffs later during the call, stating that "[t]here

have been small pockets of spend that have been impacted by tariffs in recent weeks. For example, like other platforms, we have observed a reduction in spend from Asia-based e-commerce retailers in the US given the change in the de minimis exemption," but Pinterest has "also seen a geographic diversification from some of those Asia-based retailers to our European and Rest of World user regions. And that's a theme that has continued to play out over multiple quarters now and continues today." As such, Defendant Donnelly reassured stockholders that even during "the current macro environment we're operating in," Pinterest's "business, including our top-line revenue growth remains healthy." Defendant Donnelly also stated that Pinterest's leadership "are confident in the long-term durability of our strategy and the continuation of our steady execution of that strategy," and emphasized that "the fundamentals of our business remain strong."

80. In the following months, the U.S. continued to implement and expand its tariff policies, including significant increases on goods made effective on August 1.[10] Nonetheless, in their earnings announcement just days later, on August 7, 2025, the Individual Defendants again doubled down and continued to steadfastly assure stockholders of the Company's continued growth and durability despite the tariffs.

81. That day, Defendant Donnelly confidently assured stockholders that Pinterest's business was resilient and durable even in the face of "tariff-related and broader market uncertainty," stating, "[W]e think the consistency of our revenue growth year-to-date really highlights the resilience of our business and more importantly, the durability of our many revenue growth drivers as we're continuing to execute on our strategy."

82. Likewise, that same day, Defendant Ready referenced "countless discussions that I have had directly with the CEOs and CMOs of our top advertisers," and stated that "[t]hree years into our business transformation, I've never been more confident in Pinterest's ability to deliver for our users and advertisers. We've found our best product fit ever by becoming a personalized shopping destination for users and an AI-powered performance platform for advertisers. With this

[10] See generally Donald J. Trump, TRUTH SOCIAL (July 31, 2025, 11:03 AM), https://truthsocial.com/@realDonaldTrump/posts/114948452793702817.

focus, we believe we're well-positioned to further capture market share." Defendant Ready further asserted that the Company was "seeing continued revenue growth from our efforts to drive greater performance through AI-driven ad stack improvements and automation, along with deeper actionability through our lower funnel ad formats."

83. In a report issued the following day, Barclays observed that these disclosures had "reflect[ed] a slight deceleration as some large accounts face tariff pressure"—however, given the assurances, nonetheless concluded that "[t]his doesn't seem to be a near term headwind" and further noted that "PINS is doing a solid job of growing faster than the digital ad industry," including in particular that "Performance+ is driving a doubling of ad revenue among mid-sized and smaller accounts."

84. Just weeks later, Defendant Ready expressly reemphasized the downplaying of tariff impact during their August earnings call and even further assuaged concerns regarding the impact of tariffs. During the Goldman Sachs' Communacopia+ Technology Conference on September 9, 2025, Defendant Ready received a question regarding "the advertising environment" and the "key messages [Pinterest] [is] receiving as a company broadly from advertisers about the operating environment today?" In response, Defendant Ready stated that Pinterest was "able to drive performance increasingly through AI-enabled tools like Pinterest Performance+ that's making it so that we cut their campaign creation time in half, make it easier for them to come on board, those things are working well," and further responding:

> . . . I think some of what was embedded in your question also was just you talked about the operating environment, sort of the macro and those things. And my comments here will be very consistent with what Julia and I talked about on our most recent earnings call, which is, I think, the macro, particularly for advertising is more constructive than it was at sort of peak tariff uncertainty… And I think one of the things that we've continued to demonstrate back to that consistent mid-to high teens growth is that we laid out at our Investor Day multiple ways to win. And so when we did face a bit of tariff uncertainty last quarter, you saw us play through that, I think, quite well coming in ahead of top of our guidance ahead of expectations or at least the analyst expectations anyway it doesn't mean everybody's expectations. And a big part of that was because

> we have multiple levers there, where even with a little bit of pressure in the US from tariffs, we saw advertisers redistributing spend to international and international really picking up steam for us.

85. Defendant Ready's assurances gained the attention of analysts, specifically with respect to his statements that the Company could "play through" tariff uncertainty and that the Company had in fact already done so. For example, in an RBC Capital Markets report published on November 4, 2025, RBC Capital noted Ready's "intra-qtr communications on tariffs" (i.e. his comments at the Goldman Sachs conference). Similarly, a UBS report published on October 9, 2025 cited an "advertising expert" as stating that "[l]ast quarter was bad for Pinterest because of the tariff drama but that has now calmed down and it seems to be helping."

86. Then, in connection with the Company's Q3 2025 earnings release on November 4, 2025, Defendant Ready touted Pinterest's strong quarter, stating that "advertisers are increasingly counting on Pinterest." Defendant Ready also referred back to the Company's 2023 Investor Day outlook, emphasizing to investors that Pinterest has "been quite consistent in our growth and in line with the long-term targets for revenue and margin." Similarly, Defendant Donnelly reiterated management's confidence in Pinterest's ability to continue growing and that the Company "still feel[s] really good about our mid to high teens kind of revenue growth targets over the medium and long term and the durability of our revenue growth."

**Pinterest's Growth Had Slowed Compared to Competitors**

87. Notwithstanding the Individual Defendants' repeated public assurances during the Relevant Period, the accounts of FEs of Pinterest and of Accenture (the firm to which Pinterest outsourced much of its sales operation), as alleged in the Securities Action, show that the Company was neither as durable nor as resilient against tariff-related headwinds as it claimed. In fact: (1) throughout the Relevant Period, the Company's clients reduced their advertising spend in response to tariffs, undercutting the growth narrative; (2) the Company's advertising products, including its AI-driven offerings, failed to deliver the lower-funnel value needed to sustain

advertising spend and retain customers; and (3) Pinterest routinely missed internal revenue targets that bore no relationship to achievable advertising spend.

88. These conditions left Pinterest especially vulnerable to tariffs. Tariffs forced the large advertisers on which Pinterest depended to scrutinize their margins and cut discretionary advertising, and Pinterest's lower-funnel offerings, including its AI products, could not show the measurable results needed to keep a place in those advertisers' budgets.

**Pinterest's Advertiser Clients Reduced Ad Spend In Response To Tariffs**

89. Multiple FEs of both Pinterest and Accenture, as alleged in the Securities Action, independently confirm that the Company's advertising clients cut back their spending in response to tariffs throughout the Relevant Period.

90. The negative impact became evident as soon as the tariffs were announced. FE-12 noted that when the tariffs were announced in early 2025, FE-12 began to hear from advertisers about reducing their ad spending. FE-12 also noted that the advertisers specifically stated they were reducing their advertising spending due to tariffs. FE-12 also noted that he relayed this to his direct report at Accenture about this being an issue, but according to FE-12, it was not taken seriously. He also recalled attending a meeting in early 2025 where a co-worker brought up concerns about the tariffs impacting advertiser spend. According to FE-12, the concern was "brushed off" and Pinterest executives tried to downplay the potential impact. FE-12 recalled that Heather Haney was in attendance along with other executives from Pinterest.

91. FE-6 noted that advertisers relayed that they were worried about tariffs, and many reduced advertising budgets due to tariff-related business conditions. FE-6 noted that Pinterest routinely circulated internal reports regarding tariffs discussing their impact on ad spending and the macro business environment. The adverse effects of tariffs were so significant to leadership that they even created a specialized task force to address the issue and FE-6 believed these reports were prepared by a sales organization specialized task force to monitor the issues regarding tariffs.

92. FE-10 also relayed that he heard information about tariffs around the office that "trickled down from the top." He further explained that Pinterest senior management would have meeting to discuss these issues and that "everyone knew the tariffs were affecting business."

93. FE-7 noted he was aware of the tariff impact for advertisers such as Samsung and Apple and stated that Bath & Body Works, Sephora and Ulta were impacted by tariffs. FE-7 explained that essentially any company that sold a product with components from overseas was impacted by the tariffs. FE-7 remembered that this was then reported up to leadership and increased emphasis was placed on tariffs when internally discussing spend. FE-7 also noted that managers determined expected advertising spend by each account based on conversations with advertisers and brought that figure to leadership.

94. FE-13 explained that agencies and advertisers informed him that they were seeing better results elsewhere. FE-13 continued to say that this was brought up to leadership.

95. The decline in advertiser spending was the subject of meetings attended by senior Pinterest personnel with direct access to the C-Suite. According to FE-3, there was a decline in ad spending happening in 2025 because of the tariffs and the overall economy. FE-3 recalled having meetings about the decline in ad spending and according to FE-3, "management definitely knew" about the issue. FE-3 recalled Katie Porter, former Senior Industry Manager, US Enterprise, Travel and Jenny Callen, Managing Director, US Enterprise Sales, Travel being present during the meetings. According to FE-3, Callen reported directly to the C-Suite.

96. FE-1[11], notes both the speed and magnitude of the pull back in ad spending and that a handful of the Company's advertisers, particularly those based in Asia, entirely or nearly entirely cut advertising expenditures as a result of the tariffs. FE-1 noted that Temu[12] being a

---

[11] FE-1 was employed by Pinterest from August 2022 through October 2025, and held several titles during his tenure. FE-1 concluded his tenure as Manager of Technical Program Management.

[12] Temu is a discount retailer owned by PDD Holdings, Inc., one of China's largest e-commerce companies. Temu launched in the United States in late 2022 and grew rapidly by offering a wide variety of consumer goods, primarily manufactured in China, at deeply discounted prices.

notable one, as they were previously one of Pinterest's largest advertising clients, before cutting advertising spend to very low levels of spending over a very short period. FE-1 stated that these advertisers went from being top of near top advertisers to negligible, and that it was a significant change. FE-1 also noted that the impression conveyed to him by members of the sales team was that the abrupt reduction in advertising spending was directly attributed to the tariffs.

97. Other Pinterest employees independently corroborated the loss of spending from Temu and other major advertisers. For example, FE-2[13] noted that when Temu pulled its U.S. advertising spend, the impact was significant, as it was one of the Company's biggest advertisers. FE-2 estimated that Temu U.S. spent somewhere between 1-2% of their overall revenue to the U.S.

98. FE-5, also identified the acceleration in advertiser reductions to the implementation of tariffs. FE-5 noted that retailers began cutting advertising spend in approximately Q1 2025, coinciding with the introduction of tariffs. FE-5 stated that this impacted Temu. FE-5 explained that Pinterest was an "easy target" for advertisers to decrease spending as it did not provide the same value as other popular platforms like Google, TikTok, and Meta.[14] FE-5 noted that Pinterest's performance versus other competitors was a "very common" reason for advertisers to cut spending prior to the implementation of tariffs, but spend reduction was "accelerated" once tariffs were imposed.

99. These tariff-based reductions were not isolated. FE-5 recalled observing tariff-related cuts to advertiser spending amongst the cohort he was directly responsible for and noted that reduction in spend beyond his cohort, including amongst Pinterest's top 5 advertisers, was

[13] FE-2 was employed by Pinterest from September 2023 through February 2026 as a lead data scientist on the ads delivery team and the ads ranking model team. He also worked with the marketplace team, which balanced the number of ads shown with user and advertiser considerations. FE-2 resigned in February 2026, shortly before layoffs occurred.

[14] Pinterest's SEC filings state that it primarily competes with "consumer internet companies that are either tools (search, e-commerce, creator tools) or media (newsfeeds, video social networks)" including Amazon, Facebook/Meta (including Instagram), Google (including YouTube) and Snap, TikTok, and X.

"widely known" amongst the sales team. FE-5 further recalled being aware of advertisers outside of his direct responsibility reducing spend through conversations with coworkers and discussions during All Hands Meetings for Pinterest's sales personnel. FE-5 noted that these meetings occurred once or twice per quarter and there was a global version led by former Chief Revenue Officer ("CRO") Bill Watkins and a U.S. version led by VP, North America Enterprise Sales Katie Hamill. FE-5 added that tariffs were discussed at both meetings given how important the U.S. market was to Pinterest.

100. The decline in ad spend also extended to the travel vertical, where economic and tariff-related uncertainty translated to further spending reductions. According to FE-3, who was employed by Pinterest as Senior Partner Manager from August 2022 through February 2026 and as Partner Manager, Travel from February 2020 through August 2022, there was a decline in ad spending happening in 2025 because of the tariffs and the overall economy. FE-3 explained that he worked exclusively in the travel vertical, which decreased their ad spending. FE-3 explained that his clients were all in the travel space, and they got "skittish" around economic concerns because the first thing people stop spending money on in an economic downturn is travelling.

101. Some of FE-3's clients included Delta Airlines, Royal Caribbean, Carnival Cruise Line, and IHG. He recalled noticing a decline in his clients' ad spending around summer 2025. He recalled that Delta Airlines decreased their ad spending for the entirety of the 2025 calendar year, and he estimated around a one million dollar reduction in annual spend by Delta. FE-3 also recalled IHG did not spend with Pinterest at all during 2026. According to FE-3, other verticals like CPG were also adversely impacted by the tariffs.

102. The spending decline within the travel vertical was discussed internally, and management gave directives regarding how sales personnel should address reluctant clients. FE-3 recalled having meetings about the decline in ad spending, and according to FE-3, "management definitely knew" about the issue. FE-3 stated that Katie Porter, former Senior Industry Manager, US Enterprise, Travel, and Jenny Callen, Managing Director, US Enterprise Sales, Travel being present during the meetings with Jenny Callen reported directly to the C-Suite. FE-3 described

2025 as “a challenging year” and that directives from Katie Porter about how to handle conversations with clients about ad spending and how to push clients to continue spending.

103. Pinterest employees who handled CPG advertisers saw the same pattern: their accounts reduced spending because of tariffs, and the resulting shortfalls left employees unable to meet their growth targets.

104. FE-4[15] noted that he was a member of a “pod” within CPG that focused on Food advertisers. FE-4 further explained that he and his colleagues were responsible for three to four clients at a time. FE-4 stated that there were internal discussions regarding the impact of tariffs in CPG and Food specific All Hands Meetings. FE-4 relayed that leadership tried to be “sales positive,” however when there was acknowledgement that targets were not being achieved, employees were aware that the impact tariffs were having was a contributing factor. FE-4 further recalled seeing a dip in ad spending by his accounts due to tariffs.

105. FE-4 explained that specifically pertaining to CPG that in 2025 “most people” were not meeting their quotas and that there was “no science” behind the quotas that employees were provided and they were primarily based on the performance during the same quarter during the previous year and conversations that had taken place with clients regarding future spend.

106. According to FE-4, he met his target in approximately two out of four quarters in 2025 with the quarters that he failed to hit his quotas were “near misses.” However, other employees “definitely” missed their quotas by a “wide margin.”

107. Pinterest made information concerning these shortfalls available internally, first with CPG and later across North American verticals. FE-4 noted that employees had access to a Google Doc which included employees in CPG and how close they were reaching their targets and that this document was available to employees. According to FE-4, beginning in early 2026

---

[15] FE-4 was employed by Pinterest as a Client Account Manager – US Enterprise from April 2021 until April 2023 before transitioning to a Client Account Manager II – US Enterprise from that point until his departure in May 2026. FE-4 explained that he was a member of a “pod” within CPG that focused on Food advertisers. FE-4 further explained that he and his colleagues were responsible for three to four clients at a time.

a document was made available to employees to see the performance across all verticals in North America.

108. Advertisers themselves repeatedly identified tariffs as a reason for reducing their budgets. FE-6 stated that Pinterest's advertisers often expressed their worry about tariffs, and many reduced advertising budgets due to tariff-related business conditions, while leadership simultaneously increased pressure on the sales organization to secure additional spending.

109. FE-6 explained that advertisers often initially attributed budget reductions to general business needs, but after management instructed sales representatives to seek additional explanations, many disclosed that tariff-related conditions contributed to the reductions. As one example, FE-6 identified a specific home improvement advertiser, explaining that certain imported products from Canada were affected by tariffs, which in turn impacted the company's marketing expenditures. According to FE-6, this was one of several accounts where tariff-related business conditions influenced advertising spending decisions.

110. Senior management was aware of the effects that tariffs had on its business as FE-6 noted that Pinterest routinely circulated internal reports regarding tariffs and their impact on advertiser spending and the broader macro environment. He believed these reports were prepared by a specialized task force within the sales organization dedicated to monitoring tariff-related issues.

111. Notably, the tariff-related ad spending reductions occurred against a broader backdrop in which advertisers increasingly questioned the value of spending on Pinterest compared with other platforms. Indeed, FE-7 stated that advertisers in general are "very finicky" and when the market is good there is a willingness to spend and when it is not advertisers need to become more strategic. FE-7 also explained that the market was not in a place where it was seeing the value with Pinterest.

112. Regarding tariffs, FE-7 explained that he was aware of the impact for advertisers such as Samsung and Apple. FE-7 further explained that advertisers also used tariffs as an excuse to reduce spending with Pinterest. FE-7 recalled that another excuse regularly used by advertisers

was that it was "just not a good time to be spending" and "constantly" saying they did not have enough money to advertise with Pinterest when in reality the advertisers just were not seeing the results they wanted.

113. The same conditions were visible to employees of Accenture, the outside consulting firm through which Pinterest staffed portions of its advertising operation. Those employees described tariff-related spending reductions as a pervasive subject within the workplace and confirmed that information flowed between Pinterest executives, Accenture managers, and client-facing personnel.

114. FE-9,[16] stated that spending across his cohort was not consistent throughout his tenure but noted that the implementation of tariffs did not help and tariffs were a topic of conversations with advertisers on multiple occasions, including with one advertiser who expressed that they were going to preemptively decrease their spending due to the expectation of tariff-related impacts on their business. FE-9 noted that it was his perspective that tariffs also served as a convenient excuse for Accenture to explain a lack of advertising spending to Pinterest.

115. Additionally, FE-10 relayed that there was one Company executive who acted as the main correspondent between Accenture and Pinterest that would be present in the office named JJ Greco. FE-10 noted that Pinterest was "hit hard" by the tariffs. FE-10 stated how the subject of reduced ad spending due to the tariffs was "talked about a lot around the office." FE-10 stated that managers at Accenture never offered any solutions to the advertisers pulling back but recalled managers discussing how they were losing a lot of money.

116. FE-10 noted that leadership would meet and discuss the issues, and the information would make its way to the managers at Accenture, and then to the Accenture employees. FE-10

[16] FE-9 was employed by Pinterest, through Accenture, as a Digital Advertising Analyst from Spring 2023 through Summer 2025. FE-9 explained that his role was that of an Account Manager and he was responsible for approximately 30 SMB accounts that varied across industries. According to FE-9 he reported to a direct manager at Accenture and senior employees at Accenture spoke directly with their counterparts at Pinterest. FE-9 recalled a head from Pinterest did periodically visit Accenture and had conversations with employees, himself included.

stated that "everyone knew the tariffs were affecting business" and that Pinterest created a toxic work environment and put a lot of pressure on Accenture employees.

117. FE-11 also noted that tariffs and declining revenue were prominent subjects within the organization. During FE-11's time at the company, he reported to Cynthia Pruitt, Molly McLeod, and Rob Turcic at Accenture and that the points of contact at Pinterest were JJ Greco, Emma Herling, and Madi McClenney.

118. According to FE-11, the tariffs were a "very big conversation" at the Company. FE-11 noted that he noticed advertisers decreasing their spending around the second half of 2025. In his opinion, many advertisers reduced ad spending due to the introduction of AI along with the state of the economy.

119. Pinterest also supplied Accenture personnel with materials and directives for responding to advertisers' tariff concerns. FE-11 noted that there were meetings to discuss the tariffs more frequently when the tariffs were first introduced. FE-11 also stated that there was a presentation deck being circulated to all the employees by either Molly McLeod or Rob Turcic and the presentation included information about how to handle conversations with clients about the tariffs. FE-11 explained that while the information was sent by his managers at Accenture, all materials and directives came from the Company and contained the same information that direct employees of Pinterest received.

120. At the same time, Pinterest intensified the pressure on Accenture personnel to preserve advertiser spending and achieve revenue targets that employees viewed as unattainable. FE-11 explained that there was a lot of pressure from management at Pinterest for employees to reach revenue goals and to make sure advertisers kept spending up. According to FE-11, employees were encouraged to find other ways to ensure revenue goals were reached and were expected to keep clients active by setting up different campaign strategies and presenting different opportunities for them. According to FE-11, revenue decline was a big conversation. FE-11 explained that revenue goals were "unattainable."

121. FE-11 recalled bringing up concerns about revenue goals and advertisers cutting back to his managers at Accenture - Molly McLeod and Cynthia Pruitt. McLeod and Pruitt reported to Pinterest directly and FE-11 believes they relayed employee concerns to JJ Greco at Pinterest. According to FE-11, concerns were met with optimistic outlook and encouragement to continue pushing to get clients to remain active.

122. FE-12[17] provided a consistent account of the reporting structure through which Accenture employees communicated advertiser feedback to Pinterest. FE-12 was employed by Pinterest through Accenture. His last role was as Senior Partner Manager from July 2024 through March 2026. Prior to that role, FE-12 was Partner Manager from May 2023 through July 2024. FE-12 explained that Pinterest used Accenture to handle all their advertising and marketing needs. In his role, FE-12 reported to a Team Lead at Accenture. FE-12 then explained that the Team Lead reported to the Head of Projects at Accenture, who reported directly to Pinterest's Head of New Business, Heather Haney. According to FE-12, Heather Haney was the contact at Pinterest who oversaw advertising and marketing.

123. According to FE-12, as soon as the tariffs were announced in early 2025, he began to hear from advertisers about pulling back their ad spending. FE-12 recalled that the advertisers specifically said they were reducing their advertising spending because of the tariffs. FE-12 recalled giving feedback to Pinterest through his direct report at Accenture about this being an issue, but according to FE-12, it was not taken seriously. According to FE-12, Pinterest wanted him and his colleagues to push advertisers to spend $500 per day in what FE-12 described as a "corporate tactic."

124. In short, Pinterest executives were confronted directly with concerns that tariffs would reduce advertiser spending, and rather than acknowledge the risk, they downplayed it, even as advertisers began reducing, pausing, or ending their spending.

[17] FE-12 was employed by Pinterest, through Accenture. FE-12's last role was as Senior Partner Manager from July 2024 through March 2026. Prior to that role, FE-12 was Partner Manager from May 2023 through July 2024. FE-12 explained that Pinterest used Accenture to handle all its advertising and marketing needs.

125. FE-12 recalled attending a meeting in early 2025 where a co-worker brought up concerns about the tariffs impacting advertiser spend. According to FE-12, the concern was "brushed off" and Pinterest executives tried to downplay the potential impact by comparing the tariffs to the Covid pandemic, saying that they were not impacted by the pandemic, so they were not concerned about the tariffs. FE-12 recalled that Heather Haney was in attendance along with other executives from Pinterest. According to FE-12, advertisers began to reduce their ad spending as soon as the tariffs were announced and some advertisers were leaving Pinterest altogether, but in his opinion that was not just because of the tariffs, but because other platforms like Meta, Google, and TikTok were outperforming Pinterest. According to FE-12, advertisers did not have a contract with Pinterest and could pause, reduce, or end their advertising with Pinterest at any time.

126. Moreover, FE-7 explained that he attended an All-Hands meeting in approximately February or March 2026, in which a new leadership hire noted that it was "so concerning" that the Company's approximate top 10 advertisers were responsible for a substantial portion of the Pinterest's advertising revenue, potentially as high as 90%.

127. Even beyond standing quarterly meetings, the tariff issues caused an even more urgent internal response. FE-1 explained that during his last nine to twelve months of employment the company spent approximately two out of three months every quarter operating in what he described as "code red war rooms" which became increasingly dire and were looked at as a perpetual thing that never went away.

128. FE-1 stated that these meetings often occurred daily and involved the Chief Technology Officer ("CTO") and CRO. FE-1 relayed that related materials were created and maintained and that these materials were accessible to VP level executives and managers, including himself.

129. Through additional reports and reporting platforms, senior management knew, or should have known, of the impact of tariffs and the resulting reduction in advertising spend.

130. FE-12 noted a quarterly meeting in early 2025, where top performers were recognized for the quarter and a co-worker raised concerns regarding tariffs and advertisers reducing spend. In his opinion, the concerns were dismissed and the directive was to "just go and do your job."

131. Internal tracking tools painted a similarly granular picture. FE-4 recalled that employees had access to a Google Doc which included employees in CPG and how close they were to goal. FE-4 explained that this document was available to employees. According to FE-4, beginning in early 2026 a document was made available to employees to see the performance across all verticals in North America.

132. FE-14 recalled that he used Salesforce to document his sales and had the same types of credentials that direct Pinterest hires had.

133. According to FE-13, internally Pinterest used Tableau as their database for insights and benchmarks to report to advertisers or prospective advertisers.

134. Accordingly, through meetings, reports, reporting tools, and internal communications that Pinterest leadership attended or could access, senior management had information that directly contradicted the Individual Defendants' public statements. Senior management was informed of the impact of tariffs through, or at a minimum had ample opportunity to review, the programs and reports available to them, including Pathmatics, Tableau, and widely circulated Google Docs, as well as meeting spreadsheets, slide decks, agendas, and notes.

**Pinterest's Advertising Clients Reduced Advertising Spend In Response To The Company's Underperforming Lower-Funnel And AI-Driven Products**

135. The FEs' accounts show that Pinterest's AI-driven products consistently underperformed and drove advertising clients away. As set forth below, multiple FEs of Pinterest and Accenture describe a pattern of advertiser disappointment and attrition that reduced ad spending on Pinterest's platform.

136. FE-6 noted that Pinterest provided sales employees with internal measurement studies and marketing resources intended to demonstrate the effectiveness of its lower-funnel advertising capabilities. However, FE-6 stated that many advertisers did not believe these studies accurately reflected the performance metrics they used to evaluate advertising success.

137. FE-6 noted that one of his clients, a consumer electronic advertiser, mostly looked to last-click attribution, to track whether a consumer clicked an advertisement and completed a purchase. FE-6 noted that Pinterest repeatedly failed to demonstrate meaningful last-click conversions which made it harder to convince clients to increase advertiser spending. Ad Campaigns were often reduced or cut early as the Company could not demonstrate sufficient return on investment to clients, a pattern FE-6 observed with this client and numerous others.

138. FE-6 also relayed that there was frequent feedback from advertisers about reallocating budgets from Pinterest to competitors as those platforms produced stronger measurable results. Using a consumer electronic advertiser as an example, FE-6 noted that Pinterest could not demonstrate successful last-click conversions, while platforms like Instagram and TikTok were always able to show measurable purchases resulting directly from advertising campaigns. FE-6 also stated that if competing platforms could demonstrate dozens of purchases, while Pinterest could not verify a single purchase after a two-week campaign, advertisers would understandably reduce or eliminate Pinterest's advertising budget. FE-6 noted that this occurred not with numerous other advertiser clients.

139. FE-6 disclosed that rather than changing strategy, leadership instead put more pressure on sales teams to "double down," increase sales quotas, expanding incentive programs, encouraging greater reliance on alternative measurement tools, and directing representatives to spend more time meeting with clients to preserve advertising budgets.

140. Other FEs corroborated the same pattern of lower-funnel underperformance. FE-3 noted that advertisers were more interested in lower funnel solutions, rather than upper funnel solutions. According to FE-3, advertising customers prefer lower funnel solutions to be able to "prove their ROI" and platforms like TikTok, Google, and Meta were much stronger at lower

funnel solutions. FE-3 opined that Pinterest was "struggling to stay on par" with competitors' performance.

141. FE-3 noted that his client, IHG left Pinterest completely in 2026 and estimated around a one million reduction in annual ad spending by Delta Airlines. FE-3 also noted that Delta reduced spend to move to other competitors.

142. FE-7 noted that the Company's data was "always skewed," and advertisers were aware of this and that discussions of advertisers seeing more value in advertising with Google and Meta was a "constant conversation." FE-7 also relayed that over time "more and more" put more ad spend to platforms such as Meta and Google instead of Pinterest.

143. FE-7 recalled that advertisers in general are "very finnicky" and when the market is good there is a willingness to spend and when it is not advertisers need to become more strategic. FE-7 further recalled that the market was not in a place where it was seeing the value with Pinterest.

144. FE-7 noted that Pinterest wanted to know where these advertisers were spending and that was available through Pathmatics, a third-party platform that tracked where advertisers were spending their marketing budgets. FE-7 noted that when an account reduced or cut spending that leadership reviewed the advertisers' spending in Pathmatics. FE-7 stated that the use of Pathmatics was a "big push" by leadership.

145. Other FEs also confirmed persistent advertiser disappointment with FE-2 explaining that competing in the industry was challenging because it was difficult to attract advertisers to the platform and, once there, to then show value against competitors like Facebook and Google. Specifically, FE-2 noted two broad campaign approaches: cost-based bidding, in which an advertiser establishes a bid or cost control, and automatic bidding, in which the advertiser provides a budget and Pinterest's algorithms determine how to bid. FE-2 further stated that advertisers complained regarding automated bidding performance and that data science teams and engineers conducted continual investigations based on advertiser feedback. Investigations included studies, root-cause analyses, campaign migrations, or restructuring. FE-2 recalled a

specific instance involving Wayfair, where the company considered leaving due to automatic bidding issues. FE-2 believes this occurred in the fourth quarter of 2024 or 2025, and that Wayfair had multiple issues that were escalated within Pinterest. FE-2 also recalled that, during this period, a principal engineer was assessing similar escalations for a client, Walmart. FE-2 clarified that advertiser investigations were relatively continuous. He recalled that this occurred at the beginning of 2025.

146. Additionally, former employees of Accenture confirmed advertiser dissatisfaction with Pinterest. For example, FE-13[18] stated that the Company was "constantly in a state of delusion" that advertisers wanted to spend money on Pinterest. According to FE-13, throughout his tenure it was a "huge uphill battle" to get advertisers to spend with Pinterest while competing with Meta, Google, YouTube, and TikTok. FE-13 also explained that it was a "huge challenge," and agencies were regularly relaying to him that advertisers were reducing spending or turning off campaigns altogether. According to FE-13, once an advertiser had stopped running campaigns entirely, they were a lost cause and at best may come back to Pinterest during the holiday season or for a special promotion.

147. According to FE-13, Pinterest was viewed more as an "upper funnel" advertising platform rather than being about ROAS and being a vehicle to generate sales. FE-13 stated that the Company "never really cared" about the feedback contracted employees were receiving from agencies and advertisers.

148. FE-13 noted that internally Pinterest used Tableau as its database for insights and benchmarks to report to advertisers or prospective advertisers. FE-13 explained that the numbers "made no sense," were "so far off," and "not realistic." FE-13 continued to say that ultimately,

[18] FE-13 was employed by Pinterest via Accenture from May 2023 until June 2026 and held several roles including Direct Partner Manager (05/23 – 06/24); Agency Partner Manager (06/24 – 08/25); and Agency Partner Manager – Priority Accounts (09/25 – 06/26). FE-13 explained that as an Agency Partner Manager, he was responsible for at most 75 agencies and their respective clients before changing teams and becoming an Agency Partner Manager – Priority Accounts in September 2025, at which time he was responsible for 23 agencies that consisted of clients with a higher average spend.

he did not feel comfortable using Pinterest's internal metrics in conversations with accounts and "almost no one was using them" as employees knew they were not accurate. FE-13 explained that when accounts asked where the numbers came from it was a "really hard question" to answer because employees themselves did not know.

149. FE-13 also stated that there was some metric related to account health included in Salesforce but it was mostly ignored as it had never been explained or made a point of focus for employees.

150. According to FE-9, advertisers most commonly reduced advertising spend as they did not see the value of advertising on Pinterest. FE-9 noted that there were lots of other platforms, specifically TikTok and Meta, which were "progressing quicker" and "offered more" to advertisers than Pinterest did. FE-9 stated that advertisers struggled to get purchase conversions on Pinterest and used the website more as a "testing ground."

151. FE-9 also relayed that when his accounts experienced turnover or loss of advertisers that it was "very rare" to get new advertisers to replace them. FE-9 also noted that one or two customers that stopped spending altogether in 2025 and were not replaced with new accounts.

152. FE-9 stated that, including those from Pinterest, offered solutions that were not viewed as helpful or realistic. According to FE-9 the top spender in his book of business had told him multiple times not to contact them with other promotions or opportunities but he continued to receive pressure to get them to increase their spending. FE-9 noted a conversation with the head from Pinterest during one of their periodic visits where he was instructed to e-mail his top spender every week. FE-9 noted that Pinterest's sales approach was to "just hassle people repeatedly" and when that did not work employees were told that they were not trying.

**Pinterest's AI Initiatives Failed to Generate Meaningful Results and Failed to Retain Advertisers**

153. In addition to lower-funnel advertising failures, the touted AI-driven products were described by FEs as ineffective and poorly received. Regarding Pinterest's AI initiatives,

FE-6 stated that the company introduced several AI-powered advertising tools but did not believe they created any meaningful advertiser interest. FE-6 noted that one AI product that automatically generated backgrounds for advertiser product images, however advertisers frequently criticized the results as unrealistic or "wonky," requiring manual editing before use. FE-6 also did not observe AI increasing advertiser participation or platform usage.

154. FE-14,[19] stated that Pinterest built AI into its platforms in October 2024. The Company was in a rush to get AI to market before its competitors and began heavily pushing AI to advertisers but rolled out a "sloppy" product. Moreover, the sales team were not properly trained and were selling a product they did not fully understand.

155. FE-14 identified the two main features as AI background generation tools and Performance+. The AI background generation tools automatically generated backgrounds to uploaded images whereas Performance+ utilized AI to set up and package campaigns for different marketing efforts such as opening a new office, releasing new products, etc.

156. FE-14 stated that the sales team also promoted AI to advertisers as part of the campaign and presented it as a new tool that could improve results. FE-14 noted that advertisers

[19] FE-14 was employed as a Partner Manager by Accenture and worked as a contractor for Pinterest from December 2023 until April 2025 when he voluntarily left Accenture. He worked remotely and at Pinterest's office in Atlanta, Georgia two or three days each week. FE-14 advised that Accenture employees were tasked with a project aimed at getting more advertisers and increasing revenue on the Pinterest platform. He recalled that there were hundreds of Accenture salespeople in the Atlanta office and his leads were received from Sales Development Representatives who handled the cold calls. He reported to two managers, Sagar Thakker, Accenture's Sales Lead, and Alicia Pendry. FE-14's role was to manage an established book of business in the United States and sell Pinterest to creative agencies. He sold the full suite of Pinterest products and assisted the agencies with their client's social media content including advertising space and campaigns. He would also advise on new offerings, budget allocations, and what types of creative content to run. FE-14 further advised that there were several teams which consisted of Pinterest and Accenture employees and that each team lead would report to upper management. He identified "Eric" as the Accenture Manager responsible for Pinterest sales and stated that there was also a Pinterest Manager who was collaborating with "Eric" and leading the project. FE-14 stated that both managers reported to Pinterest executives. According to FE-14, the majority of Pinterest's revenue was generated from advertising. He stated that "Eric," the Pinterest Manager, Thakker, and Pendry had access to revenue projections based on KPI reporting.

were told that using the AI tool could lead to a 20% increase in ROI and increase the number of clicks for the product.

157. FE-14 explained that he observed a decline in his sales and user engagement in February 2025 and connected the decline to AI-related features and led to advertisers going elsewhere because AI was growing and becoming available on other platforms. When asked what basis there was, if any, for the representation of a "pipeline of value" for advertisers and "more of that value in front of us than behind us," FE-14 concluded that that statement sounded "like complete bullshit" because the Company was clearly losing advertisers to AI.

158. FE-7 noted that the Company was heavily pushing AI, but it was "not good at all." FE-7 further the Company had not invested well when it came to AI. FE-7 also noted that the Company was pushing Performance+ or P+ campaigns as a part of its AI push. According to FE-7, P+ campaigns removed customization options and was a "set it and forget it" campaign, which was not dissimilar to how some campaigns had been previously run. FE-7 stated that internally Pinterest's AI offerings were humorously referred to as "AI slop."

159. According to FE-7, the Company did not care about its advertisers and for example, the Company pushed the use of AI campaigns even when they were not the best option for the client. FE-7 also noted that the Company was "all about sales goals."

160. The failures of Pinterest's AI strategy were most pronounced in its flagship AI product, Performance+. FE-15, noted that "a lot" of advertising clients were not happy with it. FE-15 explained that there were drops in return on investment for advertisers when comparing Performance+ campaigns to campaigns run previously without it. FE-15 also relayed that lack of return on investment was the primary theme amongst advertisers and "a lot" were moving to competitors as a result.

161. FE-4 also noted that the Company's internal AI tools were "overkill" in how it tracked how much employees were using them. FE-4 stated that at the beginning of 2025, the use of Performance+, a suite of tools for AI campaigns, was being pushed by the Company. According to FE-4, for the Food segment this was stopped very quickly in the first half of 2025 as the

Company was not happy with the performance of these campaigns. FE-4 added that it was his understanding that the Retail segment was being pushed to use the full suite of offerings of Performance+.

162. Taken together, these allegations show that multiple former employees with direct, contemporaneous knowledge of Pinterest's advertising operations and AI product rollouts independently confirmed that the Company's lower-funnel advertising products consistently lagged competitors, and that its AI initiatives, including Performance+, were poorly received by advertisers and recognized internally as deficient.

**Former Employees of Pinterest Noted that Pinterest Leadership Was Aware of Platform Underperformance**

163. Pinterest senior management had access to, and was informed through, reports, reporting platforms, and meetings showing that advertisers were dissatisfied with Performance+ and that clients were shifting their spend to competing social media platforms with stronger offerings. Leadership had access to Pathmatics, Tableau, and Google documents reflecting advertiser spend and the use of AI products.

164. FE-7 noted that [sales] meetings were tracked through Salesforce and employees' calendars and were one of employees' OKRs,[20] which impacted their compensation. FE-7 stated that OKRs around this same time shifted from revenue focus to also including objectives related to meetings, use of CAPI, and the percentage of campaigns that were using AI.

165. FE-15 explained that Salesforce included budget information and Ads Manager included actual spend information and data from those sources needed to be input into Google Sheets, and then a dashboard was generated from there. Since Performance+ is an AI powered campaign product, it would have been available to the Company's leadership through Ads Manager and the Google Sheets dashboard.

[20] "OKRs" refers to Objective and Key Results.

166. FE-7 also stated that when an account reduced or pulled spending, that leadership reviewed the advertisers' spending in Pathmatics, a third-party platform that tracked where advertisers were spending their marketing budgets. FE-7 noted that the use of Pathmatics was a "big push" by leadership.

167. FE-4 stated that employees had access to a Google Doc which included employees in CPG and how close they were to their targets. Starting in early 2026 a document was made available to employees to see the performance across all verticals in North America.

168. FE-13 also relayed that internally Pinterest used Tableau as their database for insights and benchmarks to report to advertisers or prospective advertisers.

169. FE-2 noted that issues with automatic bidding were communicated to engineering directors, product-management directors, and sales leadership. He stated that these investigations were discussed in team meetings and war rooms.

170. The FE's accounts show that Pinterest leadership was closely tracking how many advertising campaigns were adopting Pinterest's AI programs and that Defendants had ample access to, and were made aware of, this information. Indeed, this tracking was a "big push" by leadership.

171. Further, FEs noted that Pinterest's AI products underperformed, advertisers communicated their dissatisfaction directly to Pinterest personnel, significant customer complaints were raised to leadership, and senior management became increasingly concerned as advertiser dissatisfaction intensified.

172. FE-14 stated that management seemed stressed, became stricter about sales targets, and the office environment "became more panicked" as time went on, "likely due to leadership realizing that AI was negatively impacting the Company." He also relayed that the Company's Account Managers were getting negative feedback from customers about the AI features that were being rolled out.

173. FE-4 stated that at the beginning of 2025, the use of Performance+, a suite of tools for AI campaigns, was being pushed by the Company and for the Food segment this was stopped

swiftly in the first half of 2025 as Pinterest was not happy with the performance of these campaigns.

174. FE-12 relayed that he received feedback that Performance+ couldn't handle highly certain types of advertising campaigns, like a worldwide campaign, and was better for generic campaigns, leaving many advertisers unhappy. FE-12 explained that other social media platforms like Meta, Google, Instagram, TikTok, would outperform Pinterest with customers making more money from those platforms. He reported this to Heather Haney at Pinterest at a Round Table meeting in early 2025.

175. FE-2 noted that it was difficult to make a blanket assurance to advertisers that using automatic bidding would necessarily result in better campaign performance. FE-2 discussed two broad campaign approaches including cost-based bidding, where an advertiser establishes a bid or cost control, and automatic bidding, where the advertiser provides a budget and Pinterest's algorithms determine how to bid. FE-2 further stated that advertisers often complained about automated bidding performance and that data science teams and engineers conducted continual investigations based on advertiser feedback. Investigations included studies, root-cause analyses, campaign migrations, or restructuring. FE-2 recalled a specific instance involving Wayfair, where the company considered leaving due to automatic bidding issues. FE-2 believes this occurred in the fourth quarter of 2024 or 2025, and that Wayfair had experienced multiple issues which were escalated within Pinterest. FE-2 also stated that, at this time, a principal engineer was assessing similar escalations for another advertiser, Walmart. FE-2 explained that advertiser investigations were relatively continuous. FE-2 recalled that this occurred at the beginning of 2025.

176. FE-2 stated that the issues with automatic bidding were relayed to engineering directors, product-management directors, and sales leadership. He stated that these investigations were discussed in team meetings and war rooms and that Pinterest eventually established a dedicated team, known as advertiser experience or advertiser performance, focused on supporting these complaints. He could not recall the precise date but stated about a year and a half ago i.e., approximately Spring 2025.

177. Several FEs recalled clients specifically leaving Pinterest and taking their business elsewhere due to the underperforming AI. For example, according to FE-15, Pinterest rolled out Performance+ in approximately early 2025 and “a lot” of clients were not happy with it. FE-13 explained that agencies and advertisers informed him that they were seeing better results elsewhere. FE-13 continued to say that this was brought up to leadership.

178. Similarly, FE-6 reported receiving frequent feedback that advertisers were reallocating budgets from Pinterest to competing platforms because those platforms produced stronger measurable results. Using a specific consumer electronic advertiser as an example, FE-6 explained that Pinterest could not demonstrate successful last-click conversions, while platforms such as Instagram and TikTok were reportedly able to show measurable purchases resulting directly from advertising campaigns. According to FE-6, this occurred not only with the consumer electronic advertiser, but with numerous other advertiser accounts.

179. FE-3 recalled his client, IHG leaving Pinterest completely in 2026 and Delta Airlines significantly pulling back on ad spending. FE-3 further recalled that Delta pulled back to move to other platforms that were outperforming Pinterest. FE-3 explained that advertisers were more interested in lower funnel solutions, which FE-3 described as a user being able to click on an ad and make a purchase, rather than upper funnel solutions, which FE-3 described as an ad like a video that just promotes awareness without the ability to make a purchase. According to FE-3, clients prefer lower funnel solutions to be able to “prove their ROI” and platforms like TikTok, Google, and Meta performed much better when it came to lower funnel solutions. In his opinion, Pinterest was “struggling to stay on par” with competitors in terms of performance.

180. FE-7 explained that he attended an All-Hands meeting approximately February or March 2026 in which a new leadership hire stated that it was “so concerning” that the Company’s approximate top 10 advertisers were responsible for a disproportionate portion of the Company’s advertising revenue, potentially as high as 90%.

**Pinterest Consistently Missed Internal Revenue Targets**

181. The FEs' accounts show that Pinterest set unrealistic internal revenue targets that bore no relationship to achievable advertising spend, even as employees repeatedly fell short of them. A consistent theme emerges: the Company imposed ever more aggressive growth expectations without regard to actual advertiser demand and increased the pressure on its sales team as revenue shortfalls persisted.

182. FE-7 noted that teams at Pinterest are arranged into "pods" and there were pods for the various advertiser groups, such as Retail, Financial Services, Tech and Telco. FE-7 explained that Defendant Ready determined the revenue targets for the year and then made determinations on how to split that target up amongst the pods. FE-7 also relayed that the growth goals at Pinterest were "so extreme." FE-7 noted that during the final portions of his tenure it became difficult to achieve growth targets especially considering that they were typically set at 20% growth year-over-year. FE-7 explained that every pod was expected to come in at over goal each quarter.

183. FE-7 stated that managers determined expected advertising spend by each account based on conversations with advertisers and brought that figure to leadership. FE-7 continued to say that he could not recall a situation where there was not a gap in what his manager brought to leadership and what leadership returned with in terms of revenue targets. FE-7 recalled that he failed to meet his revenue target during the final quarter of his tenure and barely hit them the quarter prior to that after having always done so during his early years at the Company.

184. Other FEs also described the same disconnect between Pinterest's internal targets and actual advertiser demand. FE-13 pointed out that the growth goals at Pinterest were "astronomical" and "so unobtainable" and that this led to a very stressful environment. FE-13 also reiterated that his revenue target in Q1 2026 was approximately $140,000 per team member and that increased in Q2 2026 to $190,000. FE-13 stated that Q2 is a notoriously slow quarter which made this goal even more difficult to achieve.

185. Pinterest did not meaningfully adjust internal goals even when advertisers declined to increase their spending and employees fell materially short of their targets. FE-9 recalled that overall, Pinterest had "very little" success in getting advertisers to increase their ad spend, and for his book of business specifically he had "none." FE-9 noted that despite difficulties in generating additional ad spend that goals were never revised downward and remained "very unobtainable." FE-9 continued to say that it did not appear that goals were based on forecasts of previous performance and felt "made up." FE-9 added that goals were not negotiated or explained to employees.

186. FE-9 noted that the conversations around targets not being met or advertising spend levels were not taken seriously by employees. Thus, rather than recalibrating its expectations to reflect actual advertiser demand, Pinterest continued to impose goals that its employees viewed as detached from the realities of the market.

187. As employees struggled to meet these targets, Pinterest escalated the duration and intensity of its efforts to extract additional revenue before the close of each quarter. FE-1 stated that management held "code red war rooms" or recurring meetings focused on driving any last drop of revenue by identifying ways to increase advertiser spending before quarter-end. FE-1 described these meetings as a revenue push near the end of each quarter, which gradually increased in duration and intensity. FE-1 noted that these efforts intensified throughout 2025.[21] During his last nine to twelve months of employment, the company spent approximately two out of three months every quarter operating in what he described as "code red war rooms." According to FE-1, these meetings became more and more dire and were looked at as a perpetual thing that never went away.

188. Pinterest imposed performance expectations that placed unrealistic pressure on employees to meet revenue and account-engagement goals, even after advertisers already expressed resistance to the platform. FE-13 stated that his management were "hounded" by

[21] Pinterest's efforts to drive for additional revenue at the end of each quarter intensified precisely as tariffs were introduced and took effect.

Pinterest asking what is coming next for various accounts in terms of spend. FE-13 explained that in addition to revenue, employee goals also included a contact component. FE-13 noted that employees were expected to have five calls with accounts per week and have 50% engagement, i.e. having a call or getting an e-mail response from at least half of the accounts they were responsible for. FE-13 stated that this target increased beginning in April 2026 and employees were now expected to have 12 calls per week with accounts.

189. FE-13 explained that agencies and advertisers informed him that they were seeing better results elsewhere and FE-13 noted that when this was brought up to leadership and he asked how to counteract those points, he was told to suggest a "Brand Lift Study," which was a way for advertisers to see the impact Pinterest was having and cost at minimum $100,000. FE-13 relayed that it was a difficult sell to convince advertisers to spend that sum of money to find out information they were already seeing through the lack of return on investment and internal metrics, which was that Pinterest was not the best option for their advertising spending.

190. Pinterest further attempted to overcome advertiser resistance by incentivizing both its sales force and its customers to increase lower-funnel advertising spend. FE-6 explained that management routinely encouraged the sales team to "double down" on selling Pinterest's lower-funnel advertising products despite widespread resistance from clients. Leadership utilized incentive programs to try and accelerate growth. For example, members of the sales pod generating the highest amount of lower-funnel revenue were eligible to receive a $2,000 bonus for both the sales representative and their manager.

191. FE-14 advised that Accenture employees were tasked with a project aimed at getting more advertisers and increasing revenue on the Pinterest platform. FE-14's role was to manage an established book of business in the United States and sell Pinterest to creative agencies. He sold the full suite of Pinterest products and assisted the agencies with their client's social media content including advertising space and campaigns. FE-14 would also advise on new offerings, budget allocations, and what types of creative content to run.

192. FE-14 went on to say that selling advertising became more difficult, revenue seemed to be going down, and employees were not performing as well and getting laid off. FE-14 also observed that leadership seemed stressed, became stricter about sales goals and that the Company environment "became more panicked" as time went on likely due to leadership realizing that AI was negatively impacting the Company.

193. FE-14 noted that the lower-funnel demand was measured by closed deals, and there was low demand for the product, it was becoming more difficult to sell and there were less inbound leads coming in. He recalled that customers ultimately went to a competitor.

194. FE-14 said that it seems the Company is attempting to "rig the system and the outcome of the ads" by making customers campaigns seem more successful than they actually were. FE-14 relayed that he would not be surprised as there was "a lot of [expletive] that went on" at Pinterest.

195. Pinterest also offered advertisers incentives designed to encourage additional spending, including complimentary measurement studies, prioritized reporting, and added value referred to as "cash-on-the-dollar" promotions. FE-6 noted that under these promotions, an advertiser committing approximately $1 million in advertising spend would receive an additional $1 million in advertising credits, essentially doubling its lower-funnel advertising budget. While some advertisers accepted these offers, FE-6 believes only about 10% actually accepted. According to FE-6, even with these incentives, many advertisers maintained that executive leadership evaluated advertising performance primarily through last-click attribution and thus these incentives often failed to persuade advertisers to increase their advertising investments.

196. Despite Pinterest's escalating efforts to retain advertisers and increase their spend, some employees resorted to improperly recording ad spend to appease management's unrealistic goals.

197. FE-14 stated that there were hundreds of Accenture employees working for Pinterest, many of whom did not know what they were doing and were not properly vetted. He recalled that several Accenture employees were getting fired for reporting sales that were not

actually being made and entering fake opportunities into the pipeline. FE-14 recalled that one of the Accenture employees showed him how the false entries were being done.

198. FE-14 stated that the "fraudulent reporting" was easy for both Pinterest and Accenture employees because Pinterest was extremely disorganized and there were no checks and balances in place. FE-14 recalled that the fake numbers pertained to both the sales and pipeline numbers that were reported up the management chain and ultimately to leadership.

199. FE-14 explained that revenue would be recognized on the day that the campaign launched and then projected forward and that revenue would be pushed out for three to four months if an advertiser launched a campaign intended to run for several months. FE-14 explained that the client would keep a credit card on file and would only pay for when the campaign was activewould not be responsible for paying the remaining months if terminated early.

200. FE-14 stated that Pinterest's operation "was bogus" and the Company would continue to report projected revenue even though the revenue did not come in because advertisers stopped the campaigns after two or three months.

201. In sum, these FEs describe a Company facing weakening advertiser demand while imposing ever-higher revenue targets and mounting pressure on its sales force. Far from showing durable and resilient performance, these allegations reveal growing internal strain and an increasingly strained effort to maintain the appearance of continued advertising growth during the Relevant Period.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

202. By virtue of their positions as officers, directors, and/or fiduciaries of Pinterest, and their ability to control its business and corporate affairs, the Individual Defendants owed Pinterest and its shareholders fiduciary duties of trust, loyalty, good faith, and due care, and were and are obligated to use their utmost ability to control and manage Pinterest in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in the best interests of Pinterest and its shareholders so as to benefit all shareholders equally.

203. Each of the Company's directors and officers owes Pinterest and its shareholders a fiduciary duty to act with good faith and diligence in administering the Company and in using and preserving its property and assets, as well as the highest obligations of fair dealing.

204. Because of their positions of control and authority as directors and/or officers of Pinterest, the Individual Defendants were able to, and did, directly and/or indirectly exercise control over the wrongful acts alleged herein.

205. To fulfill their duties, Pinterest's officers and directors were required to exercise reasonable and prudent supervision over the Company's management, policies, controls, and operations.

206. By virtue of his or her position as a director and/or officer, each Individual Defendant owed the Company and its shareholders the highest fiduciary duties of loyalty, good faith, and due care and diligence in managing and administering the Company's affairs and in using and preserving its property and assets. The misconduct alleged herein reflects a knowing and culpable violation of the Individual Defendants' obligations as directors and officers of Pinterest, an absence of good faith, or a reckless disregard of their duties to the Company and its shareholders that the Individual Defendants knew or should have known posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company was ratified by the remaining Individual Defendants, who together comprised the Company's Board at all relevant times.

207. As senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this

complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

208. To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Pinterest were required to, among other things:

(a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, California, and the United States, and pursuant to Pinterest's Code of Business Conduct and Ethics (the "Code of Ethics");

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how Pinterest conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of Pinterest and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Pinterest's operations would comply with all applicable laws and Pinterest's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f) exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

209. Each Individual Defendant also owed Pinterest and its shareholders a duty of loyalty, which required each of them to place the interests of Pinterest and its shareholders ahead of their own in conducting the Company's affairs and to refrain from using their positions, influence, or knowledge of the Company's affairs for personal gain.

210. At all times relevant hereto, the Individual Defendants were the agents of each other and of Pinterest and were at all times acting within the course and scope of such agency.

211. Because of their advisory, executive, managerial, directorial, and controlling positions at Pinterest, each Individual Defendant had access to adverse, nonpublic information about the Company.

212. Because of their positions of control and authority, the Individual Defendants were able to, and did, directly or indirectly exercise control over the wrongful acts alleged herein and over the content of Pinterest's public statements.

**The Code of Ethics**

213. Pinterest's Code of Ethics notes that it applies "to Pinterest, Inc. and its subsidiaries and controlled affiliates ('Pinterest') and to Pinterest employees, officers and Board members located anywhere in the world."

214. In Section, "Compliance with applicable law," the Code of Ethics notes:

> Our Pinner community shares ideas and experiences and seeks inspiration from all corners of the world. As a global company, we respect all applicable law, including local laws and regulations that apply to Pinterest's business. One part of your journey that's not negotiable is this: comply with applicable law and follow

> Pinterest's policies and procedures. Ask the Legal team if you have any questions about whether or how the law applies.

215. In Section, "Conflicts of interest," the Code of Ethics notes:

> We all work hard to drive Pinterest's success, and this means we act in Pinterest's best interests and never allow personal interests to interfere with or influence the work we do. Avoiding conflicts of interest, and even the appearance of a conflict, ensures we use good judgment and make unbiased decisions. Avoid circumstances in which a personal financial interest, a professional opportunity, a close personal relationship or other situation creates a conflict between what's best for you personally and what's best for Pinterest. Even situations that could create a conflict in the future or may appear to be a conflict to others can be problematic.
>
> Before you take action, you must promptly disclose to Pinterest any activity, transaction or relationship that may create an actual, potential or perceived conflict of interest with Pinterest. Common examples of conflicts include outside employment, self-employment, business activity, board positions, advisory roles, significant unpaid/volunteer activity, academic positions including graduate-level research and close personal relationships with other employees, contingent workers, candidates for employment, suppliers, partners, advertisers, content providers or public officials. Senior leaders, keep in mind that you may have heightened obligations under our Relationships at Work Policy. This allows us to ensure our workplace is respectful, welcoming and fair.
>
> Pinterest will review your disclosure and let you know whether any action is needed. Check out the Conflict of Interest Policy for more information.

216. In section, "Insider trading," the Code of Ethics notes:

> Comply with all insider trading laws—don't trade stock or other securities of Pinterest or any other company or make bets or wagers on the basis of material nonpublic information ("MNPI"), including confidential information, and don't pass on such information to other people so they can trade. MNPI is any information that has not been disclosed to the public and that a reasonable investor might use to buy or sell stock in a company. You can find examples of MNPI and more definitions in our Insider Trading Policy and FAQs You (and members of your family and

> household) are solely responsible for confirming that the trading window is open and you are not in possession of MNPI before trading in Pinterest securities. This applies to trades that you make yourself or that anyone else (like a broker or tool) makes on your behalf. The trading window is closed four times a year, aligned with when Pinterest releases its quarterly results, and may also be closed for certain other significant events like a potential acquisition. Before making any sort of trade, confirm 1) whether the window is open or closed, 2) that you aren't in possession of any MNPI and 3) the transaction type is permitted (see the Insider Trading Policy for more details). Certain transactions in Pinterest stock are prohibited even when the trading window is open.
>
> We understand it can be complicated, so if you have any questions, ask the Corporate Legal team for help.

217. In section, "Speaking for or about Pinterest," the Code of Ethics notes, in pertinent part: "If you are not a designated individual and are asked to speak on behalf of Pinterest, you must seek preapproval from your manager and the Comms team."

218. In Section, "Accurate books and records," the Code of Ethics notes, in pertinent part:

> Pinterest is legally obligated to keep records that are complete, accurate and fairly reflect our business. We also must make fair, accurate, timely and understandable disclosures to the public and to our stockholders about our operations, strategies, risks and performance. We maintain corporate controls that help us satisfy these requirements and provide reasonable assurances about the reliability of our financial reporting. This means we all have to do our part to:
>
> • follow our company policies and procedures on financial reporting;
>
> * * *
>
> • submit accurate and truthful certifications about matters within your area of responsibility when requested; and
>
> • promptly report any suspected fraud or policy violations through our established reporting channels. You can find those reporting channels in this Code.

219. In section, “We lead by example,” the Code of Ethics notes, in pertinent part:

> Managers and leaders play a critical role in reinforcing this Code by living our values, acting ethically and using good judgment.
>
> * * *
>
> As a manager, you’re expected to:
>
> • Embody Pinterest’s values in your day-to-day work, both in the work itself and in how you approach it, and encourage those around you to do the same;
>
> * * *
>
> • Listen carefully, provide guidance and seek help from available resources for yourself and others to address questions or concerns related to the Code; and
>
> • Promptly escalate issues through the appropriate channels if someone reports a concern to you or if you become aware of a potential violation of the Code, the law or company policy.

220. In section, “We speak up,” the Code of Ethics notes, in pertinent part:

> If you have a question or see something wrong, trust your intuition and speak up.
>
> Just ask Sometimes ethical issues are not clear-cut. If you aren’t sure how to comply with the letter and spirit of this Code or any of our other policies, before taking action, talk to your manager, the People Care team or Compliance—they’re here to help.
>
> Raising concerns We want everyone to feel comfortable doing their best work. To maintain a culture of accountability and ethical decision making, we each have a shared responsibility to speak up and report any suspected violations of this Code, our policies and any suspected unethical behavior or illegal conduct. This allows Pinterest to identify issues early and take appropriate action. If you’re a manager, you’re required to report. Where allowed by local law, you can make a report anonymously through our Helpline, though it is helpful if you are willing to speak with the investigator. The Helpline is confidential, operated by an independent third party and available in multiple languages, 24 hours a day, 7 days a week, 365 days a year.

221. In section, "Compliance with this Code," the Code of Ethics notes:

> Violations can be serious.
>
> Being accountable for our decisions and actions is another critical part of acting ethically, and failing to adhere to this Code or other Pinterest policies could have serious consequences for you and for Pinterest. In addition to hurting our reputation, in some cases non-compliance may violate the law and could result in litigation, civil and/or criminal penalties, fines and even imprisonment. In addition, your failure to comply with this Code or other Pinterest policies can result in disciplinary action, up to and including termination.
>
> Changes and waivers Pinterest will update this Code from time to time. The current version is available in the Pinterest Policy Center on our company intranet. Material changes must be approved in writing by the Pinterest, Inc. Board of Directors. Any waiver to this Code must be approved in writing by the Chief Legal Officer or their delegate; any waiver for a Pinterest officer or board member must be approved by the full Pinterest, Inc. Board of Directors and promptly disclosed in accordance with legal requirements.

222. The Individual Defendants violated the Code of Ethics by exercising little, if any, oversight over the scheme to issue materially false and misleading statements to stockholders and the public and to facilitate and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty, waste of corporate assets, unjust enrichment, and violations of the Exchange Act. The Individual Defendants further violated the Code of Ethics by failing to keep Pinterest's records and reports accurate, failing to maintain internal controls, and failing to comply with laws and regulations, conduct business honestly and ethically, and properly report violations of the Code of Ethics.

**The Audit and Risk Committee Charter**

223. Pinterest also maintains an Audit and Risk Committee Charter (the "Audit and Risk Committee Charter"). The Audit and Risk Committee Charter states that the purpose of the Audit and Risk Committee is to:

> • Oversee Pinterest's accounting and financial reporting processes, including Pinterest's disclosure controls and procedures, system of

> internal control over financial reporting, internal audit function and audits and review of Pinterest's consolidated financial statements;
>
> • Oversee Pinterest's relationship with its independent auditors, including appointing or changing Pinterest's auditors and assessing their independence, qualifications and performance;
>
> • Provide oversight regarding significant financial matters, including Pinterest's tax planning, treasury policies, financial risk exposures, dividends and share issuances and repurchases; and
>
> • Oversee Pinterest's compliance with applicable legal and regulatory requirements and Pinterest's enterprise risk management program. In carrying out Committee functions, the Committee must maintain free and open communication with Pinterest's independent auditors and management.

224. In the section, "Responsibilities," the Audit and Risk Committee Charter lists the responsibilities of the Audit and Risk Committee, in pertinent part:

> 5. Internal Controls; Oversight. The Committee will discuss with management and the independent auditors, and provide oversight over, the design, implementation, adequacy and effectiveness of Pinterest's internal control over financial reporting and material changes in such controls. The Committee will review any significant deficiencies in the design or operation of internal control over financial reporting or material weaknesses therein and any fraud involving management or other employees who have a significant role in Pinterest's internal control over financial reporting, and any required disclosures regarding Pinterest's internal control over financial reporting.
>
> 6. Risk Assessment. The Committee has responsibility for oversight of risks and exposures associated with financial matters, particularly financial reporting, tax, accounting, disclosure controls and procedures, internal control over financial reporting, investment guidelines and credit and liquidity matters, insurance coverage, programs and policies relating to legal and regulatory compliance and strategy, and operational infrastructure, particularly reliability, business continuity, capacity, information security, cybersecurity, data protection, privacy and artificial intelligence. The Committee shall provide regular reports to the full Board. The Committee will review and assess Pinterest's processes to manage and control risk, except for risks retained by the Board or its other committees.

* * *

9. Quarterly and Annual Financial Statements. The Committee will review and discuss the annual audited financial statements, the quarterly financial statements and the independent auditor's reports related to the financial statements with management and the independent auditors. At any time Pinterest is subject to the requirements of the Exchange Act, the Committee will review and discuss with management and the independent auditors the financial information and related disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and be responsible for making a recommendation to the Board as to whether Pinterest's annual audited financial statements should be included in Pinterest's Annual Report on Form 10-K.

* * *

11. Earnings Announcements. The Committee will review and discuss with management and the independent auditors any earnings press releases, earnings guidance provided to analysts and rating agencies, and other public announcements regarding Pinterest's results of operations.

12. Critical Accounting Policies. The Committee will obtain, review and discuss reports from the independent auditors about (a) critical accounting policies and practices that Pinterest will use, (b) alternative treatments of financial information within generally accepted accounting principles that the auditors have discussed with Pinterest management, (c) other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives, rules and developments that may have a material impact on Pinterest's financial statements and their anticipated impact, compliance programs and policies and (d) other material written communications between the independent auditors and Pinterest management. The Committee will also discuss with the independent auditors and then disclose those matters whose disclosure is required by applicable auditing standards.

* * *

15. Complaint Handling Process. The Committee will be responsible for establishing and overseeing procedures for (a) the receipt, retention and treatment of complaints about accounting, internal control over financial reporting or audit matters, and (b) confidential and anonymous submissions by employees concerning

> questionable accounting, auditing and internal control over financial reporting matters.
>
> * * *
>
> 18. Legal, Regulatory and Compliance. The Committee will be responsible for overseeing legal and regulatory matters that may have a material impact on Pinterest's financial statements and Pinterest's Code of Business Conduct & Ethics (other than with respect to workplace discrimination and harassment, which are the responsibility of the Talent Development and Compensation Committee). The Committee will periodically review Pinterest's compliance policies and procedures, and receive and review complaints, allegations and incidents reported pursuant to the Code of Business Conduct & Ethics or through Pinterest's other hotlines and procedures. The Committee shall have access to management, the Chief Legal and Business Affairs Officer, the Chief Compliance Officer, and internal and independent auditors in connection with such review. The Chief Legal and Business Affairs Officer and the Chief Compliance Officer each have express authority to communicate at any time with the Committee about compliance matters.

225. The Individual Defendants violated the Audit and Risk Committee Charter by exercising little, if any, oversight over the Company's participation in the Individual Defendants' scheme to issue materially false and misleading statements to stockholders and the public and to facilitate and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. They further violated the Charter by failing to keep the Company's records and reports accurate, comply with laws and regulations, act in good faith and with diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Charter.

## THE TRUTH EMERGES

226. The facts concealed by the Individual Defendants' false and misleading statements and omissions came to light through three partial corrective disclosures, on November 4, 2025, January 27, 2026, and February 12, 2026, each of which caused the Company's stock price to fall substantially. In the interim, the Individual Defendants caused the Company to continue

misrepresenting and/or omitting the full truth, so the price of Pinterest common stock remained artificially inflated until the final disclosure on February 12, 2026 revealed the truth in full. Together, these disclosures showed that Pinterest's advertiser demand was eroding because its concentrated base of large retail advertisers was pulling back in response to tariffs, and that Pinterest's lower-funnel and AI-powered advertising capabilities could neither retain those advertisers nor offset the resulting decline in demand.

227. On November 4, 2025, the Individual Defendants caused the Company to publish a press release announcing 3Q 2025 financial results, including weaker-than-expected fourth-quarter guidance that projected a sequential deceleration in year-over-year revenue growth. The press release disclosed a Q4 revenue guidance of between $1.313 billion and $1.338 billion, or 14%-16% year-over-year growth, falling below the Individual Defendants' assurances of growth in the mid-to-high-teens[22]; and (2) a slowdown from the Company's 17% growth in Q3. The midpoint of that range, approximately $1.326 billion, fell below the analyst consensus of approximately $1.337 billion.

228. On Pinterest's earnings call that same day, Defendants Donnelly and Ready noted that the disappointing disclosures were directly related to tariffs, explaining that tariffs disproportionately impacted Pinterest because of its high customer concentration of large retail advertisers. Contrary to the Individual Defendants' public statements throughout the Relevant Period that the Company's business was "durable" and "resilient" in the face of macroeconomic pressures, Defendant Donnelly conceded that Pinterest "face[d] pockets of moderating ad spend in UCAN in Q3, as larger U.S. retailers navigate tariff-related margin pressure in the current environment." Similarly, in response to an analyst question regarding the macro advertising environment, Defendant Ready noted that tariffs were affecting the Company disproportionately relative to its peers due to the Company's greater exposure to large retailers. Defendant Ready stated that:

[22] Defendant Donnelly noted that when the Individual Defendants said that Pinterest expected mid-to-high teens percent growth, that meant a low range of approximately 15%.

> some of our largest retailers in UCAN pulled back spend across the industry [as] they navigated tariff-related margin pressure. And we think that's disproportionately impacting large retailers, but that is a segment that we have more exposure to than other platforms, given our focus on shopping.

229. Moreover, while responding to a Citigroup analyst who asked whether the tariff-related effects had "continued" or "normalized," Defendant Donnelly stated that a "pullback from some US retailers" and that "spend from Asia-based e-commerce players was down year-over-year again in Q3." Defendant Donnelly also noted that "smaller and mid-market advertisers [] represent[ed] only 15% of [Pinterest's] revenue," as the Company's "priority ha[d] been to solve the needs of larger enterprise advertisers first." Defendant Donnelly, however, continued to falsely assure stockholders of the "durability of [Pinterest's] revenue growth."

230. On this news, the Company's stock price fell by nearly 22%, declining $7.16 per share to close at $25.75 per share on November 5, 2025, on unusually high trading volume of nearly 75.5 million shares.

231. Analysts tied the stock price decline directly to the November 4, 2025 disclosures of tariff-related impacts, in particular that tariffs had caused large U.S. retailers, a category of advertisers on which the Company was disproportionately dependent, to reduce their ad spending.

232. Analysts reacted negatively, recognizing that the Individual Defendants had caused the Company to long downplay a known concentration risk, and when that risk materialized, the market was surprised.

233. For example, on November 4, 2025, RBC Capital Markets ("RBC Capital") published a report titled "Tariffs illuminate problematic customer concentration; lowering estimates & targets" which noted that "[t]ariff-related weakness showed up for the first time in our digital ads universe" and would "reinforce PINS' lack of customer diversity for the bears and higher macro sensitivity . . . Pullbacks from some large advertisers owed to home furnishing-related tariffs drove the Q4 guide down."

234. Notably, the RBC report specifically connected the outsized market reaction to the fact that the prior reassurances had misled investors about the actual magnitude of tariff risk. The report noted: “While tariffs was a known risk, intra-qtr communications on tariffs may drive some outsized reaction here.” The report also emphasized Pinterest’s lack of advertiser size diversity as compared to its competitors, contrasting it against “platforms like Meta and Google that have significant exposure to SMBs” showing company-specific, rather than industry-wide impact.

235. RBC went on to identify the Individual Defendants’ prior statements as deliberate efforts to shape market perception. The report noted that Defendant Ready’s statements during the September 9, 2025 Goldman Sachs conference had “intentionally provided additional color regarding the impact of tariffs, emphasizing that they were not updating guidance but offering context regarding the current business environment.” The report concluded, “[t]hese comments were deliberate; they gave more color on it for a reason.”

236. Wells Fargo issued a November 4, 2025 report which included similar sentiments on the Individual Defendants’ disclosures, noting that, “US & Canada growth is the primary culprit of weakness, softening in 3Q to single-digit growth for first quarter since 4Q:23,” and that “[w]hile the advertiser count has expanded materially in the last 24 mos, PINS does not have the breadth or depth of advertisers on the platform to overcome weakness in its endemic categories.” Wells Fargo also back-tracked its prior guidance, stating “We previewed retail ads weakness, but guide suggests more caution was warranted.”

237. On November 5, 2025, BofA Global Research reiterated Pinterest’s vulnerability due to its customer concentration, stating that “[r]esults once again, underscore lack of ad category diversification,” noting that "[l]ast year CPG spend pressure impacted revenues, and this year reduced ad spend by large retailers impacted results,” and quantifying that “SMB spend represents about 15% of total Pinterest ad spend, well below larger peers.”

238. Bernstein’s November 4, 2025 report, aptly titled “Trough of disillusionment,” named some of the pulling-back advertisers: “Pinterest saw pullbacks from some larger US retailers such as Amazon, Wayfair, and Walmart as these companies navigate tariff-related

pressures — note that Pinterest remains heavily exposed to large retail." Similarly, J.P. Morgan identified the home-furnishings tariff as an incremental driver, stating that the pullback "has continued into 4Q and weighs on the 4Q revenue growth outlook of +14%-16%."

239. On November 5, 2025, Morgan Stanley issued an analyst report titled "Putting a Pin in Growth," in which the firm expressed confusion that "PINS' revenue outlook came in softer than expected as the company has been unable to close the gap between product/engagement improvements and top-line re-acceleration." Morgan Stanley wrote candidly that it "honestly [didn't] fully understand" the negative news, but surmised explanations could include that Defendants had not revealed the extent of Pinterest's risk exposures, including "lack of advertiser diversity and bid density" because "when PINS sees disruptions to its large advertiser base (e.g. from tariffs), it is unable to fully backfill revenue." Morgan Stanley also questioned whether "[i]nnovation lagging peers results in limited ability to capture incremental ad dollars…as advertising dollars still follow transactions." Finally, Morgan Stanley listed as another undisclosed risk exposure the possibility of "[a]d pricing/ad load that is still high, putting a limit on ROAS and advertisers' willingness to scale up budgets."

240. These analyst reports confirm that, throughout the Relevant Period, the Individual Defendants repeatedly chose to downplay the impact of tariffs on Pinterest, a choice that misled the market and caused it to react sharply once the Individual Defendants finally revealed that tariffs were, in fact, affecting the Company disproportionately.

241. Even so, the Individual Defendants continued to conceal the full truth about Pinterest's condition and performance. In the Company's November 4, 2025 earnings release, for example, the Individual Defendants told stockholders that their "investments in AI and product innovation are paying off. We've become a leader in visual search and have effectively turned our platform into an AI-powered shopping assistant for 600 million consumers. In turn, global advertisers are increasingly counting on Pinterest as a go-to search platform to reach their customers and drive sales."

242. Further, while the Individual Defendants acknowledged during the November 4, 2025 earnings call that Pinterest "ha[s] more exposure to [largest retailers in UCAN navigating tariff-related margin pressure] than other platforms, given our focus on shopping," Defendant Ready nonetheless minimized the full extent of the Company's tariff-exposure by claiming that the issues are "not specific to us" but instead "a pullback across the industry as a navigated tariff-related margin pressure."

243. Second, the truth gradually continued to emerge on January 27, 2026, when the Individual Defendants caused Pinterest to issue an unscheduled, off-calendar press release disclosing publicly that the Company was implementing a "global restructuring plan" to support its AI transformation, pursuant to which the Company planned to reallocate resources to AI-focused roles and teams, prioritize AI-powered products and capabilities, accelerate the transformation of its sales and go-to-market approach, and reinvest in key development areas and strategic opportunities. In connection therewith, the Individual Defendants stated that Pinterest would eliminate 15% of its global workforce (or approximately 780 jobs, according to the Company's reported workforce as of September 2025) and incur anticipated restructuring charges of $35 million to $45 million.

244. On the news, Pinterest's stock price declined $2.49 per share, or nearly 10%, to close at $23.41 on January 27, 2026, on unusually high trading volume of more than 39 million shares.

245. Analysts and stockholders interpreted these announcements as an indication of weak performance and financial outlook, with several analysts specifically linking the disclosures to deteriorating revenue trends from continuing tariff pressure and the failure of Pinterest's AI-powered advertising initiatives and other "levers" to overcome such headwinds, as the Individual Defendants had previously assured stockholders. For example, RBC Capital reported on January 27, 2026 that the "[b]usiness update doesn't indicate well for 2026 top line . . . [t]he Street is likely to perceive this as foreshadowing a revenue shortfall in 2026, potentially stemming from customer concentration and/or tariff-related headwinds." RBC also flagged the inconsistency with

Pinterest's 8-K, such that "the most curious part in the announcement is in spite of the layoff, the 8k emphasized greater focus on its S&M approach which has been aiming to grow its agency partnerships," and observed that "the announcement likely furthers the decline in investor confidence in management where investors continue to wonder what the next leg of the story is in terms of either product, platform or go-to-market." Likewise, BofA Global Research's analyst report issued that day similarly concluded that the "[a]nnouncement suggests tariff related pressure on ad spend has likely continued into 1Q."

246. Critically, analysts also connected the restructuring announcement directly to the failure of Pinterest's AI-powered advertising initiatives—the very initiatives the Individual Defendants had publicly described as catalysts for sustained growth. Jefferies wrote in a January 27, 2026 analyst report that "the spend re-allocation signals certain initiatives, such as Performance+ [,] are underperforming expectations." Jefferies added that, "the move signals that the current model is not generating enough growth or margin to justify the existing cost base, making this feel defensive rather than offensive." Most pointedly, on January 30, 2026, HSBC bluntly stated "[w]e hate to say it, but it's not working," explaining that: "PINS' renewed AI push, coming without any indication of cost savings or revenue acceleration, and requiring a trade-off in resources, reflects a tier-2 player struggling to keep up with larger and better resourced peers that are running ahead, in our view." HSBC's assessment—that the AI strategy was simply "not working"—directly contradicted the Individual Defendants' repeated Relevant Period assurances that Performance+ was delivering "really good results," that "more of the opportunity is in front of us than behind us," and that Pinterest's AI tools were "driving performance for advertisers and winning market share."

247. The January 27, 2026 disclosure therefore partially revealed what the Individual Defendants had concealed: the AI initiatives they had repeatedly touted as the engine of Pinterest's growth, and as proof of its resilience to macroeconomic headwinds, were not delivering the promised results, and the Company's existing cost structure and business model

could not sustain the growth trajectory to which the Individual Defendants had publicly committed. Stockholders nonetheless remained unaware of the full truth.

248. The truth was fully revealed after the market closed on February 12, 2026, when the Individual Defendants caused Pinterest to report deeply disappointing Q4 and full-year 2025 results that missed consensus expectations, together with a Q1 2026 forecast that not only fell short of expectations but also fell below the performance the Individual Defendants had guided to since the 2023 Investor Day and had reaffirmed throughout the Relevant Period. This final disclosure removed the remaining artificial inflation from Pinterest's stock price by exposing the full scope of the deterioration the Individual Defendants had concealed.

249. Specifically, on February 12, 2026, the Individual Defendants caused Pinterest to announce Q4 2025 revenue of $1.319 billion—below the analyst consensus estimate of approximately $1.331 billion. The Individual Defendants also issued Q1 2026 revenue guidance of $951 million to $971 million, which fell materially short of the $980.6 million consensus midpoint. The Q4 2025 result marked a stark deceleration in year-over-year revenue growth: Pinterest had reported 18% growth in Q4 2024, 16% in Q1 2025, 17% in each of Q2 and Q3 2025, and then just 14% in Q4 2025. Pinterest's Q1 2026 guidance signaled a further slowdown to 11%-14% growth. Additionally, Q4 2025 was the first quarter during the Relevant Period in which Pinterest failed to meet analyst consensus.[23]

[23] Analyst consensus refers to the aggregated earnings and revenue estimates published by research analysts who cover a particular traded company. These analysts issue their estimates of a company's expected financial performance based on their independent analysis of a company's business, public disclosures, guidance, industry trends, and macroeconomic conditions. The consensus figure represents the mean or median of these individual estimates and serves as the market's benchmark expectation for the company's performance. When a company's reported results meet or exceed the consensus, it generally signals to the market that the company is performing in line with or better than expectations. Conversely, when a company's results fall below consensus, it signals underperformance relative to market expectations based on management's representations.

250. The Individual Defendants candidly blamed tariff and the Company's disproportionate exposure to tariffs relative to Pinterest's competitors for the Company's disappointing news, with Defendant Ready stating:

> While we absorbed an exogenous shock this year related to tariffs, disproportionately affecting ad spend from our top retail advertisers, this quarter also underscored where we need to move faster. . . . Many of the largest retailers have been disproportionately impacted by tariffs and have been pulling back on advertising spend across the industry as they seek to protect their margins. Our higher mix of large retailers relative to some of our peers has resulted in us feeling more of an impact. This highlights the need for us to further accelerate our growth with a broader set of mid-market, SMB, and international advertisers with less than $30 billion of GMV.

251. Later on the Company's February 12, 2026 earnings call, Defendant Ready further conceded that the Company's progress growing its business with mid-market, SMB, and international advertisers in 2025 was "not enough to offset the headwinds that the largest retailers faced." In response to a question posed by a JPMorgan analyst concerning revenue drivers for Q4, Defendant Donnelly stated that Pinterest's "largest retail advertisers created a more meaningful headwind than we expected" and that the "pullback on ad spend from larger advertisers [] impacted [Pinterest's] platform to a higher degree, given [the Company's] current revenue mix." Defendant Donnelly also disclosed that Pinterest "expect[s] these headwinds will continue and [that they] may become slightly more pronounced in Q1."

252. Defendant Ready also admitted that the Company did not move swiftly enough to create the lower-funnel measurement and attribution capabilities necessary to show value to advertisers, while competitors had become increasingly aggressive in claiming credit for conversions. On the February 12, 2026 earnings call, Defendant Ready disclosed that the gap between monetization and user engagement was "quite significant," in part because "we haven't moved fast enough" to advance measurement and attribution, including "modeled conversions," as had competing platforms:

> We need to adapt more quickly to grow within the fastest-growing parts of the market that we see contributing more significantly to the overall growth of competing platforms. So we are also doubling down on measurement and technical capabilities within our sales team. . . . [W]e know there is significant opportunity in driving greater performance selling capability across our sales organization and across the segments of the business beyond large advertisers. This is actually really important as the industry has advanced measurement and attribution with large platforms becoming more aggressive and claiming credit for outcomes even when they do not own the click or conversion. You would see this reflected in others talking about "modeled conversions." This is an area where we know we have not moved fast enough.

253. Defendant Ready also acknowledged the Company needed to "accelerate [its] growth," and get to a point where Pinterest's monetization reflects the value of its "full-funnel and performance marketing." Defendant Ready disclosed on the call that "the next step is optimizing our bidding system to become more tightly aligned with the advertiser's measurement source of truth," admitting that measurement and attribution were competitive shortcomings that had constrained Pinterest's ability to retain and grow advertiser spend:

> This quarter made it clear that capturing this opportunity requires a higher level of sales and go-to-market sophistication, with globally scaled selling motions as well as deeper technical expertise, particularly around measurement and attribution.

254. Although the Individual Defendants had previously presented Performance+ as a significant driver of growth, Defendant Ready admitted on the call that Pinterest's AI-driven advertising software was "a long way from having bids and budgets against advertisers' full product catalogs." Defendant Ready further acknowledged that Pinterest's lack of advertiser diversity rendered Pinterest's AI models less effective, noting that "[m]ore diverse advertiser demand allows our models to serve more relevant, highly personalized ads to users. This relevancy not only improves the user experience but drives superior performance for our advertisers and higher yield for Pinterest."

255. The market reacted sharply, as these disclosures contradicted the Individual Defendants' repeated assurances throughout the Relevant Period. Analysts were surprised and specifically connected the news to the full revelation of Pinterest's tariff-exposure and shortcomings in Pinterest's AI-powered advertising capabilities. For example, HSBC Global Research issued a report on February 13, 2026, noting that while Pinterest's "restructuring operations [announced in January 2026] had already set a low bar for earnings expectations . . . the combination of deaccelerating revenues (+13% in 1Q y-o-y) and margin pressure (flat y-o-y in 26Q1) in the 1Q26 guidance still caught us off guard. Management again flagged weakness amongst the large retailers segment as the main culprit . . . which it believes could 'prove more pronounced' in 26Q1."

256. Similarly, in its report dated February 13, 2026, RBC Capital downgraded the Company's stock and self-deprecatingly described Pinterest's performance as "a bullish growth thesis gone awry," stating that "tariffs were the culprit this qtr" and that the Company's results are "emblematic of a more consistent pattern of adverse concentration," and also that Performance+ and Pinterest's "product cycle & improving conversion-based thesis is just not panning out."

257. BofA Global Research issued a report on February 13, 2026, titled "Decelerating while big caps accelerate; Downgrade to Neutral" which noted that "AI driven ROAS improvements at larger platforms appear to be impacting Pinterest's ability to capture incremental ad budgets" and acknowledged that its thesis that "Performance+ would translate into better performance has not played out."

258. On this news, the Company's stock price declined $3.12 per share, or nearly 17%, to close at $15.42 on February 13, 2026, the next trading day, on massive trading volume of more than 69 million shares.

259. The decline in the Company's stock price reflected the market's reaction to Company-specific revelations about Pinterest's deteriorating advertiser relationships, its failed

AI strategy, and its structural inability to make up for the loss of its concentrated base of large retailers.

## FALSE AND MISLEADING STATEMENTS

260. Throughout the Relevant Period, the Individual Defendants caused the Company to make materially false and misleading statements and omissions concerning the effect of tariff headwinds on the Company and the performance of Pinterest's lower-funnel and AI-driven capabilities. Those statements, and the reasons each was false and/or misleading, are set forth below.

**Q4 2024 Earnings Call**

261. On February 6, 2025, the Company held its fourth-quarter and full-year 2024 earnings call where Defendants Ready and Donnelly spoke and responded to analyst questions. Because the call began after the market closed on February 6, 2025, the statements made on that call were first absorbed by the market (and impounded into the price of Pinterest common stock) when trading opened on February 7, 2025. Pinterest common stock traded as high as $40.90 per share on February 7, 2025, the highest intraday price during the Relevant Period.

262. Defendant Donnelly noted on the call that the Company was "at the beginning of a multi-year product cycle for Performance+," and represented as to then-existing results: "We're seeing really good results, but more of the opportunity is in front of us than behind us."

263. Defendant Donnelly's representation that the Company was then "seeing really good results" from Performance+ was false and misleading when made, because the Company was already suffering from reduced demand and a consistent pattern of flat or below-target growth, reduced or paused campaigns, and significant pullbacks by key accounts.

264. Defendant Donnelly further stated on February 6, 2025: "We still have more value capture to go as advertisers increasingly turn to Pinterest to drive performance," and that Pinterest was "seeing nice adoption of newer ad formats and capabilities."

265. Defendant Donnelly's representation that advertisers were "increasingly turn[ing] to Pinterest to drive performance" was false and misleading when made, because the Company

was already suffering from reduced demand and a consistent pattern of flat or below-target growth, reduced or paused campaigns, and significant pullbacks by key accounts.

266. Subsequently on the call, Defendant Ready made three representations regarding the Company's position with its biggest advertisers, in response to a question from a Citigroup analyst:

> • that Pinterest was "getting to 5% of their total ad budgets, 10%-plus of their digital ad budgets" for "some of the largest, most sophisticated advertisers";
>
> • that Pinterest was doing so "with focus on durable low funnel budgets . . . getting to 80%-plus of their spend in that lower funnel"; and
>
> • that the "next tranche" of advertisers in the "$1 billion to $30 billion range" was "recogniz[ing] the immense value creation that we've driven," such that Pinterest "continue[s] to see room to grow share of wallet with both of these cohorts."

267. These representations were false and misleading when made, because the Company was already suffering from reduced demand and a consistent pattern of flat or below-target growth, reduced or paused campaigns, and significant pullbacks by key accounts.

268. Analysts relied on these misrepresentations, based on their reports in response. on February 6, 2025, Guggenheim issued a report titled "Strong Guide Inspires Optimism; AI Investments to Fuel Next Leg of Growth," noting that Q1 2025 revenue guidance of 13%-15% was above consensus at the midpoint, raising its price target to $39. On February 7, 2025, TD Securities indicated that "PINS Performance+ ad suite, which launched in Oct. '24 and should have a multi-year adoption cycle, with mgmt. noting strong initial performance gains for advertisers alongside plans to roll out new features throughout'25." Wedbush Securities noted that "management expects a multi-quarter product adoption curve similar to previous lower funnel product launches." Benchmark Equity Research noted that "Net-net, PINS' AI initiatives are steadily fully monetizing its billions of unique 1P data," and that "developed market engagement is clearly improving, which of course has a more direct line to monetization." On

February 7, 2025, Goldman Sachs published a reported titled "Q4'24 Review: Entering 2025 With Momentum Around Platform Growth Initiatives," characterizing the quarter as solid, caused by healthy revenue growth, lower-funnel ad revenue, early positive Performance+ trends, and an outlook for the following above investor expectations with Goldman raising its price target for Pinterest to $47. These analysts reports evince that the market relied on the characterization of AI, lower-funnel tools, and advertiser demand as the next leg of durable growth.

269. Donnelly's comments that advertisers were "increasingly turn[ing] to Pinterest to drive performance," J.P. Morgan recited that "Performance+ is delivering improvements for advertisers through lower CPAs/CPCs & campaign setup automation" and that PINS was "tightening the value creation to value capture gap." Citi published a report entitled "Expanding Engagement and ROAS as PINS' Emerging Lower Funnel Ad Product Benefits Compound" and noted that "Ad Innovations like Direct Links, Performance Plus, & ROAS Bidding Create Platforms for LT Growth . . . each of these ad products create a multi-year runway for continued growth as PINS operationalizes newer functionality." BofA Global Research also noted that "CEO highlighted growing traction of Pinterest's DR capabilities and noted advertisers are allocating a higher percentage of their performance budget to the platform."

270. Analyst reports confirm the market reacted strongly and positively to the Individual Defendants' statements and raised their price targets following the February 6, 2025 earnings call. For example: Bernstein raised its price target from $34 to $47, an upward adjustment of +38%; Wells Fargo similarly raised its target from $39 to $47; Oppenheimer increased its target from $40 to $50; J.P. Morgan raised its target from $35 to $42; and HSBC raised its target from $36.30 to $46.30.

**Morgan Stanley's Technology, Media & Telecom Conference**

271. On March 6, 2025, Defendant Ready spoke at the Morgan Stanley Technology, Media & Telecom Conference where he was questioned regarding macroeconomic headwinds: "[A]re there areas either from a micro execution perspective or from a macro perspective, whether it's trade tariffs, name your latest macro sources of uncertainty that are sort of behind where you

thought they'd be or holding back growth[?]" Defendant Ready responded by making representations concerning what the Company was seeing from advertisers: (a) "[A]t least in terms of what we currently see, we don't currently see advertisers overreacting or those kinds of things"; and (b) "But we're not seeing signs of overreaction at the moment."

272. These statements were false and misleading when made, because the Company was already suffering from reduced demand and a consistent pattern of flat or below-target growth, reduced or paused campaigns, and significant pullbacks by key accounts.

273. At the same March 6, 2025 Morgan Stanley Technology, Media & Telecom conference, Defendant Ready claimed as to then-existing advertiser behavior: "[W]e do see consistently that as advertisers are able to see and measure the clicks, it's easy to take action. They shift share of wallet to us, and we think there's a lot more of that to go." Ready made the same representation earlier, noting that "as people can measure it, they shift share of wallet to us."

274. These statements were likewise false and misleading when made, because advertisers were not shifting share of wallet to Pinterest; the Company was already suffering from reduced demand and a consistent pattern of flat or below-target growth, reduced or paused campaigns, and significant pullbacks by key accounts.

275. Also at the same March 6, 2025 conference, Defendant Ready responded to a question regarding the Company's advertisers and noted the following regarding its large advertisers: "And we've seen them really leaning in. They've been a consistent source of strength for us."

276. This statement was false and misleading when made, because Pinterest's large advertisers were not "leaning in"; the Company was already suffering from reduced demand and a consistent pattern of flat or below-target growth, reduced or paused campaigns, and significant pullbacks by key accounts.

277. Analysts believed these misrepresentations, with Guggenheim, on March 24, 2025, crediting that the Company was "relatively well-positioned for macro uncertainty" and

upgraded Pinterest to a "BUY" rating. Further, other analysts also maintained bullish price targets including TD ($46), Loop Capital ($47), and Goldman Sachs ($47), thereby preserving the artificial inflation of Pinterest's stock price.

**May 8, 2025 Press Release**

278. On May 8, 2025, the Individual Defendants caused the Company to issue a press release titled "Pinterest Announces First Quarter 2025 Results, Delivers 16% Revenue Growth and Record Users." The press release cited Defendant Ready as stating: "Our strong results in the first quarter demonstrate continued momentum in revenue, user growth and engagement." Defendant Ready also stated:

> As the macroeconomic and digital ad landscape evolves, our strategy and consistent execution has made Pinterest more resilient than ever. The fundamentals in the business are strong and we're continuing to see healthy growth. Our AI advancements are helping users take action and make more intentional shopping decisions. We're driving performance for advertisers and winning market share, giving us a solid foundation for long-term, sustainable growth.

279. Defendant Ready's representation that Pinterest's "strategy and consistent execution has made [it] more resilient than ever" even "[a]s the macroeconomic and digital ad landscape evolves" was false and misleading when made, because the Company was already suffering from reduced demand and a consistent pattern of flat or below-target growth, reduced or paused campaigns, and significant pullbacks by key accounts.

**2025 Proxy Statement**

280. On April 9, 2025, the Individual Defendants caused the Company to file with the SEC and disseminate to stockholders its Schedule 14A Annual Proxy Statement (the "2025 Proxy Statement"). Defendants Ready, Bergh, Kilgore, Levine, Rajaram, Reynolds, Schenkel, Silbermann, Smith, Steinberg, and Wishom solicited the 2025 Proxy Statement, pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

281. The 2025 Proxy Statement instructed the Company's stockholders to vote to, inter alia: (1) re-elect Defendants Ready, Kilgore, Silbermann, and Smith to the Board until the 2028 annual meeting of stockholders; (2) approve, on an advisory basis, the compensation of the Company's named executive officers; (3) ratify the Audit and Risk Committee's selection of Ernst & Young LLP ("E&Y") as its independent registered public accounting firm for 2025; and (4) approve an amendment to Pinterest's Amended and Restated Certificate of Incorporation to provide for officer exculpation as permitted by Delaware law.

282. The 2025 Proxy Statement disclosed the following, in pertinent part, regarding "Board's role in risk oversight":

> Our board is responsible for overseeing how we manage risk at Pinterest. This is carried out both at the full board level and through each of the standing committees.
>
> Through our enterprise risk assessment ("ERA") process, we maintain a defined approach to assessing and managing risks and circumstances that could impact our ability to achieve strategic objectives. We refresh our ERA process annually, using the previous year's ERA results as a baseline, researching potential emerging risks and interviewing relevant stakeholders to gather perspectives on the company's top enterprise risks. These insights help direct ongoing risk management conversations with management and the board, including expanding management awareness and oversight on newly identified risks. Board of directors The full board is responsible for monitoring and assessing strategic risk exposure, including determining the nature and level of risk appropriate for the company, and the committees are responsible for monitoring and assessing risks inherent in their respective oversight functions as follows:
>
> Audit Committee oversees our enterprise risk management program and significant financial risk exposures and certain legal, regulatory and operational risk exposures, including with respect to disclosure controls and procedures, information security, data protection and privacy.

283. The 2025 Proxy Statement disclosed the following, in pertinent part, regarding "Governance":

> It is not just what we do that matters but how we do it. Good corporate governance drives accountability, transparency and decision-making that strengthens stakeholder confidence. Our board oversees and reviews the company's strategic direction and objectives, considering (among other things) risk profile and exposure and key stakeholder relationships. Three standing board committees have distinct responsibilities, including ESGspecific responsibilities. The governance committee is responsible for reviewing our ESG strategy, goals, initiatives and reporting on ESG matters. Our management regularly updates the committee on ESG matters. In addition, the compensation committee is responsible for overseeing our inclusion and belonging objectives. Our corporate governance practices are further described throughout this Proxy Statement.
>
> We maintain various publicly available company policies, including a Code of Business Conduct & Ethics that outlines the ethical, lawful conduct we expect from everyone at Pinterest. …

284. The 2025 Proxy Statement disclosed the following regarding the "Code of Ethics":

> We have adopted a Code of Business Conduct and Ethics applicable to our directors, employees and contractors, including our CEO, CFO and other executive officers and all persons performing similar functions. A copy of that code is available on our website (https://investor.pinterestinc.com/governance/governance-documents). We intend to disclose on our website any future amendments to, or material waivers from, the code to the extent applicable to our executive officers or directors and as required by law.

285. The 2025 Proxy Statement disclosed the following regarding the "Audit and risk Committee":

> The audit committee is primarily responsible for:
>
> •overseeing the company's financial and accounting reporting processes, including disclosure controls, internal audit function, internal controls and audits and review of the company's consolidated financial statements;
>
> •appointing or changing the company's auditors and reviewing their independence, qualification and performance;

> •overseeing significant financial matters, including tax planning, treasury policies, financial risk exposure, dividends and share issuances and repurchases; and
>
> •overseeing the company's enterprise risk management program and compliance with applicable legal and regulatory requirements as well as overseeing risk programs in areas such as information security, data protection and privacy

286. Defendants Ready, Bergh, Kilgore, Levine, Rajaram, Reynolds, Schenkel, Silbermann, Smith, Steinberg, and Wishom caused the 2025 Proxy Statement to be false and misleading by failing to disclose, inter alia, that: (1) the Company understated the adverse impact from macroeconomic headwinds on its advertisers; (2) as a result, Pinterest's advertisers decreased spending, causing reduced revenues; and (3) as a result of the impact on its advertising revenues, Pinterest underwent a restructuring. Thus, the public statements in the 2025 Proxy Statement were materially false and misleading at all relevant times.

287. The 2025 Proxy Statement also failed to disclose, inter alia, that: (1) although Pinterest claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the 2025 Proxy Statement's descriptions of the Board's and its committee's risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

288. As a result of Defendants Ready, Bergh, Kilgore, Levine, Rajaram, Reynolds, Schenkel, Silbermann, Smith, Steinberg, and Wishom causing the 2025 Proxy Statement to be false and misleading, the Company's shareholders voted, inter alia, to: (1) re-elect Defendants Ready, Kilgore, Silbermann, and Smith to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; (2) approve on an advisory basis, the compensation of the Company's named executive officers; (3) ratify the Audit and Risk Committee's selection of E&Y as Pinterest's independent registered public accounting firm for 2025; and (4) approve an

amendment to Pinterest's Amended and Restated Certificate of Incorporation to provide for officer exculpation as permitted by Delaware law.

**Q1 2025 Earnings Call**

289. On May 8, 2025, the Company held its Q1 2025 earnings call where Defendant Ready stated the following:

> Before getting into the details of Q1, I'd like to discuss the current macro environment we're operating in. Our business, including our top-line revenue growth, remains healthy. This is an indication that our efforts to build a more engaging and actionable product for our users and a more performant product for our advertisers are working. The strong fundamentals in our business are the result of the strategic priorities we've executed against, taking Pinterest from a platform with declining users and modest revenue growth a few years ago into a secular share taker with a more resilient business than ever before.
>
> [. . .]
>
> As we've made our platform more actionable and generated growing numbers of clicks and conversions, we've become a vital partner for advertisers across a range of categories, seeking to reach our high-intent users and drive sales. In turn, we are increasingly accessing always on performance budgets, which are larger and tend to be more durable. Furthermore, an uncertain macro environment where consumers are more intentional and discerning with their spend presents an opportunity for Pinterest to deliver differentiated utility for our users. Our users are planners and often coming to us for their most considered purchases.

290. Defendant Ready's statements were materially false and misleading because, in the macroeconomic environment then prevailing, Pinterest's business was not "healthy."

291. On the same earnings call, Defendant Donnelly stated the following regarding "current evolving landscape":

> Before addressing specifics, I want to acknowledge the current evolving landscape. As Bill noted, our business trends remain healthy overall, and we feel good that the product investments we've made over the last 3 years are working. While we are not immune to the macro environment, we are confident in our multiple

> revenue initiatives, the steady ongoing execution of our plans, and our ability to compete effectively across a number of scenarios.

292. Defendant Donnelly's description of Pinterest's "business trends" as "healthy," and her professed "confidence" in the Company, did not reflect reality and were therefore materially false and misleading.

293. Later in the call, an analyst from Barclays posed a question to Defendants Donnelly and Ready:

> [J]ust starting with like the guidance, 2Q looks pretty solid, all things considered, just a very modest decel. We know you have Easter in the second quarter this year, which may help a little bit. But just curious what you're seeing in the pipeline, and are any of the kind of high tariff exposed categories in retail and CPG showing any softness thus far? How do you see this playing out throughout the year?

294. In response, Defendant Donnelly reassured stockholders that:

> So first and foremost, as we noted in our prepared remarks, we're seeing strengths in our business, and trends remain healthy both in Q1 and the early signals on Q2. Our products are really working well as we leverage AI to drive gains in relevance, personalization, and actionability for users, and drive increasing performance gains for our advertisers across a range of verticals.

295. Defendant Donnelly's representations touting the Company's "strength" and "healthy" trends were materially false and misleading when made, because the Company was already suffering from reduced demand and a consistent pattern of flat or below-target growth, reduced or paused campaigns, and significant pullbacks by key accounts.

296. Still responding to the question posed by the Barclays analyst, Defendant Donnelly attempted to minimize the impact of tariffs on the Company's revenues:

> There have been small pockets of spend that have been impacted by tariffs in recent weeks. For example, like other platforms, we have observed a reduction in spend from Asia-based e-commerce retailers in the US given the change in the de minimis exemption. However, we've also seen a geographic diversification from some of those Asia-based retailers to our European and Rest of World

> user regions. And that's a theme that has continued to playout over multiple quarters now and continues today.

297. By describing the impact of tariffs as limited to "small pockets of spend," however, Defendant Donnelly failed to disclose the full extent to which tariffs were harming the Company's advertising revenues.

298. On May 9, 2025, analysts recited the misrepresentations concerning the "healthy" and "resilient" business. J.P. Morgan reiterated Defendant Ready's language that "PINS believes trends remain healthy" and recited his statement about capturing "greater share of wallet among the next tranche of advertisers ($1B-$30B sales range)." The J.P. Morgan report also stated that Pinterest "believes improved relevancy, deeper engagement, & improved actionability should provide resilience, w/full-funnel capabilities enabling the company to capture market share." Deutsche Bank recited Defendant Ready's characterization that "despite macro concerns, underlying fundamentals are strong," and described the Company as "[d]emonstrating [d]urability." The same report also emphasized that "PINS progress in driving durable lower-funnel performance advertising outweighed what was perceived as vulnerable category exposure." Oppenheimer parroted Defendant Donnelly that "trends remain healthy both in 1Q and the early signals of 2Q" and raised its price target from $36 to $40, stating results were "better than feared."

299. Analysts also reiterated the statements by Defendants Donnelly and Ready concerning the Company's AI capabilities. On May 8, 2025, RBC Capital stated that "mid-sized UCAN advertisers in the $1-30B sales range are also scaling their investments, driven by results from Performance+, direct links, and CAPI adoption." Further, on May 9, 2025, a Citi report noted that "PINS' investments in AI and ad products are capturing a larger share of more durable, always-on, performance ad budgets across verticals."

300. Analysts raised their price targets following this earnings call with: Goldman Sachs raising its price target from $40 to $42; UBS from $39 to $44; Oppenheimer from $36 to $40; Morgan Stanley from $28 to $37; and Citi from $38 to $41.

301. On May 8, 2025, Defendant Ready was interviewed on CNBC where Defendant Ready participated in the following question and answer exchange:

> Q: On the call just now, there was a brief mention of some pullback in spending from Asian retailers on ads. How concerned are you about weakness in the ad market should these tariffs go forward?
>
> A (Ready): Well, one of the things we noted as others did that, you know, China or Asia, cross-border sellers, you know, there's been, you know, some adjustment there, but we've also seen them start to sell into other markets. And even with consumers here in the U.S., you know, we went through a major supply chain disruption just a few years ago with the pandemic. Consumers were resilient. They'll find other things to shop for, and Pinterest is the place that they go to do it. And as users get more intentional and more considered about their purchases, Pinterest is a platform for those considered purchases. It's not about impulse purchases. It's about things that you go buy when you're being really intentional and planful about what you're doing. And again, I think that lets us just shine through even more in that moment.

302. Defendant Ready did not address the "weakness in the ad market" question and instead turned to consumer behavior to evade directly responding. Defendant Ready failed to disclose that as the Company was being adversely impacted by reduced demand and a consistent pattern of flat or below-target growth, decreased or paused campaigns, and material pullbacks by important accounts.

303. Analysts reiterated Defendant Ready's statement about the impact of cross-border sellers. On May 9, 2025, Deutsche Bank stated that "tariffs have resulted in a reduction in spend from Asia-based e-commerce retailers in the US, but Pinterest appears to be recapturing some of that spend across Europe and ROW" and Jefferies noted that "[t]he change in the de minimis exception was called out as a headwind from Asia retailers in the US, but those same retailers are now allocating ad dollars to different regions." Further, UBS stated "Pinterest continues to see strength in retail offset by policy-change-driven dropoff among APAC-based e-commerce operators, offset by strength in financial services."

304. Moreover, analysts raised price targets following the May 8, Q1 2025 earnings call and this CNBC interview. Additionally, on May 9, 2025, Citi issued the following report "Engagement Gains & Ad Innovations Underscore Healthy Ad Demand as Always-On Ad Budgets Ramp," noting that the first quarter results supported its view that Pinterest's AI and ad-product investments were capturing "a larger share of durable, always-on, performance ad budgets"; Citi maintained a Buy/High Risk rating and raised its price target to $41. Morningstar also stated that Pinterest had disclosed "solid first-quarter earnings" and that, despite a volatile macro environment, "we believe ad spending on Pinterest is remaining quite resilient." Deutsche Bank issued a report, "Demonstrating Durability," and viewed that Pinterest's progress in driving durable lower-funnel performance advertising outweighed perceived category exposure. Loop Capital also observed that many investors had assumed Pinterest would be among the first platforms to lose budget during macro uncertainty because it was smaller and perceived as brand-oriented, but that the strong results and outlook could change that view.

305. On May 20, 2025, CNBC posted an interview with Defendant Ready where Defendant Ready discussed the ad market in context of the macro environment:

> Q: Well, I was going to ask what you're seeing from the advertisers right now, given the spike in uncertainty in corporate America right now, has that actually been reflected in terms of decisions and spending?
>
> A (Ready): Well, you know, consumers. Consumers do shift behaviors quickly. And so advertisers are looking for that insight. And so we're engaging with advertisers on exactly that to help plug them in.
>
> Q: But are advertisers pulling back?
>
> A (Ready): Well, you know, we just recently gave guidance and we gave guidance stronger than what people expected. And I think that's really about our platform being a performance oriented platform. So I think advertisers are demanding more performance, but that's been part of the transformation of our platform over the last three years is to make it really a performance advertising platform.

306. Defendant Ready's response to the question regarding advertisers reducing back ad spend omitted material information necessary to prevent misleading investors, as the Company was being adversely impacted by reduced demand and a consistent pattern of flat or below-target growth, decreased or paused campaigns, and material pullbacks by important accounts. Additionally, Defendant Ready's statements touting advertiser's "demand[]" for "performance" and the "transformation" of Pinterest to a "performance advertising platform" were false and misleading when made.

307. Later in the call, Defendant Ready was asked about Pinterest's exposure to volatility by attempting to downplay any worries: "So if you look at us over the last few years, we've grown much faster than the ad market overall. So we've been a share taker in the market. So as a smaller player in that market, even if the market maybe feels some contraction, we think we can still continue to be a share taker even if the market does tighten a bit."

308. Defendant Ready's assertion that Pinterest is a "share taker" in the ad market, and can "continue to be a share taker even if the market does tighten a bit" was false and misleading when made as the Company was losing advertisers, and consequently revenue, due to failing to deliver sufficient value compared to competitors, its AI products were undermining advertiser performance and failing to retain budgets, and tariffs were placing additional pressure on the Company's retail and CPG advertiser base, which caused the Company's advertisers to substantially reduce ad spend.

**Q2 2025 Earnings Call**

309. On August 7, 2025, Pinterest held its Q2 2025 earnings call, during which Defendant Ready noted:

> We ended the quarter of 578 million MAUs, an 11% increase year-over-year, marking yet another quarter of record high users. At the same time, we generated Q2 revenue of $998 million, up 17% year-over-year as we continue to be a vital partner for advertisers across a range of verticals seeking to reach our leaned-in users. Our consistent performance and ability to take market share demonstrate the effectiveness of our long-term strategy and laser focus on delivering value for our users and advertisers.

310. Defendant Ready's statement was materially false and misleading when as Pinterest was not a vital partner for its advertisers due to Instead, advertisers were actively pulling ad spend during the Relevant Period due to failing to deliver sufficient value compared to competitors, its AI products were undermining advertiser performance and failing to retain budgets, and tariffs were placing additional pressure on the Company's retail and CPG advertiser base, which caused the Company's advertisers to substantially reduce ad spend. Further, the Company's long-term strategy was not "effective[]," as, for the reasons listed above, Pinterest's growth was decelerating.

311. On the same call, Defendant Ready stated that:

> Through countless discussions that I have had directly with the CEOs and CMOs of our top advertisers, I am more convinced than ever that Pinterest is offering unique value as a platform within the ads ecosystem. Advertisers are increasingly recognizing our speed of execution and our consistent ability to deliver on promises with differentiated, data-driven insights, and expanding global scale. More than ever before, advertisers now view Pinterest as a powerful search platform, capable of driving significant lower funnel performance.

312. Defendant Ready's statement that "advertisers now view Pinterest as a powerful search platform, capable of driving significant lower funnel performance" was materially false and misleading when made as Pinterest's advertisers were disappointed in the platform to the point that they were reducing ad spend on Pinterest due to failing to deliver sufficient value compared to competitors, its AI products were undermining advertiser performance and failing to retain budgets, and tariffs were placing additional pressure on the Company's retail and CPG advertiser base, which caused the Company's advertisers to substantially reduce ad spend.

313. Later during the Q2 2025 earnings call, Defendant Donnelly told stockholders that Pinterest was:

> continuing to execute on our multiple ways to win, which are growing users, deepening engagement while simultaneously increasing ad load with relevant ads as content, driving performance for advertisers with lower funnel product innovations,

> and complementing our first-party business with new sources of demand. In doing so, we're taking share in a competitive, but growing end market by building a strong business with sustainable revenue growth, profitability, and free cash flow generation.

314. Defendant Donnelly's statement that Pinterest was "driving performance for advertisers with lower funnel product innovations," was false and misleading when made because Pinterest failed to deliver meaningful value in comparison to competitors.

315. Defendant Donnelly's statement that Pinterest was "taking share in a competitive, but growing end market by building a strong business with sustainable revenue growth, profitability, and free cash flow generation," was also false and misleading when made. Rather than "taking share in a competitive" market, Pinterest was consistently losing its customers to its competitors, as confirmed by FEs.

316. Defendant Donnelly stated: "At the same time, we're also seeing continued revenue growth from our efforts to drive greater performance through AI-driven ad stack improvements and automation, along with deeper actionability through our lower funnel ad formats" and further touted that "[t]he compounding effects of these initiatives, combined with our consistent execution, has resulted in a more resilient business than ever before, and there's certainly more to go as we continue to execute on our strategy."

317. Defendant Donnelly's statement that Pinterest was seeing "revenue growth" from its AI products was false and misleading when made as Pinterest's AI products were undermining advertiser performance and failing to retain budgets, and tariffs were placing additional pressure on the Company's retail and CPG advertiser base, which caused the Company's advertisers to substantially reduce ad spend.

318. Also, on the call an analyst from Goldman Sachs, posed a question regarding the macro environment and demand for ads: "…there's been a lot of volatility year-to-date in the broader macro environment. How would you characterize the current demand state for digital ads broadly? And how are you thinking about the potential for volatility in either direction or nuance around budgets as we progress deeper into the year?" Defendant Ready responded: "Just broadly

speaking, I'd say, as you look at our over-delivery on revenue in Q2, we saw a bit more constructive environment than what we had expected and many others expected at the time of our last call."

319. In responding to the question, Defendant Ready omitted material facts, including that Pinterest's major advertising clients had begun reducing their spending in the first quarter of 2025 and that advertisers were telling the Company they would cut ad spending because of tariffs.

320. Defendant Donnelly also responded to the Goldman Sachs analyst's question, by attempting to downplay the adverse impact of the tariffs: "[W]hile the tariff impact was certainly smaller than we anticipated in Q2, we did still see some impact affecting our UCAN region. For example, Asia-based e-commerce retailers pulled back spend in the US tied to the change in the de minimis exemption."

321. Further Defendant Donnelly went on to state:

> [A]s we talk to advertisers about Q3, we do hear that some of that tariff-related and broader market uncertainty has continued into how they're thinking about spend for Q3, though this varies by advertiser. And again, it's definitely a relatively more constructive environment than feared. So, we're trying to provide an outlook for Q3 that is responsive to that overall environment and we'll have to see how the broader market backdrop plays out. Stepping back, though, we're guiding to a revenue range that is similar to the 17% growth we just delivered in Q2. So we think the consistency of our revenue growth year-to-date really highlights the resilience of our business and, more importantly, the durability of our many revenue growth drivers as we're continuing to execute on our strategy.

322. Defendant Donnelly's statements about the "resilience" of Pinterest's business and the "durability" of its revenue growth were false and misleading as the Company was losing advertisers, and consequently revenue, due to failing to deliver sufficient value compared to competitors, its AI products were undermining advertiser performance and failing to retain budgets, and tariffs were placing additional pressure on the Company's retail and CPG advertiser base, which caused the Company's advertisers to substantially reduce ad spend.

323. On the same call, JPMorgan analyst posed a question to Defendants Ready and Donnelly "about Performance+ adoption." Defendant Ready responded that "We're really pleased with what we're seeing on the rollout of Performance+. So, we've seen notable early adoption from mid-market advertisers. Since the end of last year, the percentage of lower funnel revenue flowing through Pinterest Performance+ campaigns has more than doubled. And so, we've consistently talked about how we see that as a multi-quarter, multi-year cycle, but we feel really good about the adoption and the performance there. And we're continuing to bring the best offerings for bidding, targeting, budgeting, and creative to advertisers."

324. Defendant Ready's statement touting the "rollout of Performance+" was false and misleading when made because, as FEs of Pinterest and Accenture corroborate, Pinterest was not seeing value from Performance+ internally at that time.

325. Multiple analysts noted Defendant Ready and Donnelly's comments about "driving significant lower funnel performance." On August 8, 2025, J.P. Morgan stated that "PINS has effectively diversified into a full-funnel advertising platform & is capturing a greater share of ad spending among the next tranche of advertisers ($1B-$30B in sales)," while RBC wrote, "[t]he era of value capture seems increasingly upon us." In response to comments about "taking share," TD noted in its investment thesis: "we expect Pinterest to be a share gainer in the global digital ad market as we forecast rev to grow from $4.2BN in '25E to $7.8BN in '30E." Barclays also stated that "PINS is doing a solid job of growing faster than the digital ad industry."

326. Further, an analyst with Morgan Stanley, posed a question regarding Pinterest's "forward advertising growth," and whether there are "constraint[s]" to how much Pinterest can accelerate "ad revenue" growth. Defendant Ready responded:

> We've really turned the platform into a performance advertising platform over the last few years and have increasingly broken into those always-on performance budgets, really taking share, growing above the rate of the market overall. And we have continued to consistently deliver on that very much in line with the expectations we set at our Investor Day, delivering above the high end of our guidance range.

> And so, we feel really good about the way that we're delivering there. And we don't see any structural limitations to that. We're a small player in the market, but we're a small player in the market that's growing faster than the market and increasingly relevant in more use cases with more advertisers as we work our way from the largest advertisers down to sort of the mid-market on down. And I think there's a lot of room for growth ahead.

327. Defendant Ready's above statement were false and misleading when made as the Company was losing advertisers, and consequently revenue, due to failing to deliver sufficient value compared to competitors, its AI products were undermining advertiser performance and failing to retain budgets, and tariffs were placing additional pressure on the Company's retail and CPG advertiser base, which caused the Company's advertisers to substantially reduce ad spend.

328. Analysts also recited the Individual Defendants' statements regarding Performance+ and mid-market adoption. Barclays wrote: "Performance+ is driving a doubling of ad revenue among mid-sized and smaller accounts," while J.P. Morgan noted "The percentage of lower funnel revenue flowing through Performance+ Campaigns has more than doubled since the end of 2024, w/particular strength from mid-sized enterprises." Bank of America also stated that "Pinterest's AI enhancements (such as ROAS bidding) are still in the early stages, with significant potential to grow shopping usage, improve ad platform efficiency, and boost monetization over a multi-year period" and Raymond James wrote: "The percentage of lower-funnel revenue flowing through Performance+ has more than doubled since launch with early adoption from mid-market advertisers."

329. In response, analysts mostly maintained or raised their price targets, reflecting continued reliance on the Individual Defendants' representations. For instance, Wolfe Research increased its price target from $40 to $43, Bank of America increased its price target from $41 to $44, HSBC increased its target from $38 to $44.30, TD increased its target from $43 to $44; and Rosenblatt increased its target from $48 to $49, while other analysts such as Evercore, Goldman Sachs, RBC Capital, and Deutsche Bank maintained their ratings.

**Goldman Sachs' Communacopia + Technology Conference**

330. On September 9, 2025, Defendant Ready was interviewed at the Goldman Sachs' Communacopia + Technology Conference where Ready was asked about the advertising environment: "Switching to the advertising environment. What are the key messages you guys are receiving as a company broadly from advertisers about the operating environment today? And how is Pinterest's role in that environment, whether measured by brand spend or performance marketing spend, continuing to evolve?"

331. Defendant Ready responded by emphasizing the Company's AI-based products: "We're able to drive performance increasingly through AI-enabled tools like Pinterest Performance+ that's making it so that we cut their campaign creation time in half, make it easier for them to come on board, those things are working well."

332. Defendant Ready's statements touting Pinterest's AI tools were false and misleading when made as the Company was losing advertisers, and consequently revenue, due to failing to deliver sufficient value compared to competitors, its AI products were undermining advertiser performance and failing to retain budgets, and tariffs were placing additional pressure on the Company's retail and CPG advertiser base, which caused the Company's advertisers to substantially reduce ad spend.

333. Also in response to the question regarding the advertising environment, Defendant Ready touted Pinterest's supposed success even in the face of "peak tariff uncertainty":

> And then I think some of what was embedded in your question also was just you talked about the operating environment, sort of the macro and those things. And my comments here will be very consistent with what Julia and I talked about on our most recent earnings call, which is, I think, the macro, particularly for advertising is more constructive than it was at sort of peak tariff uncertainty… And I think one of the things that we've continued to demonstrate back to that consistent mid-to high teens growth is that we laid out at our Investor Day multiple ways to win. And so when we did face a bit of tariff uncertainty last quarter, you saw us play through that, I think, quite well coming in ahead of top of our guidance ahead of expectations or at least the analyst expectations anyway it doesn't mean everybody's expectations. And a big part

> of that was because we have multiple levers there, where even with a little bit of pressure in the US from tariffs, we saw advertisers redistributing spend to international and international really picking up steam for us.

334. In these remarks, Defendant Ready sought to minimize the true impact of tariffs on Pinterest's business. His statement about the "constructive" environment for advertisers during the tariffs was false and misleading when made, because tariffs were placing added pressure on the Company's retail and CPG advertiser base, causing those advertisers to cut their ad spending substantially.

335. In the Goldman Sachs Conference Takeaway report published the same day analysts directly parroted Defendant Ready's statements, noting that "Pinterest is seeing early success around Performance+, its AI-driven ad automation product" and that despite the macro environment and tariffs, the Company "is creating more operating durability absent different macro environments."

**November 4, 2025 Press Release**

336. On November 4, 2025, the Individual Defendants caused Pinterest to issue a press release titled, "Pinterest Announces Third Quarter 2025 Results, Delivers 17% Revenue Growth and Record Users" which quoted Defendant Ready as stating: "Our investments in AI and product innovation are paying off. We've become a leader in visual search and have effectively turned our platform into an AI-powered shopping assistant for 600 million consumers. In turn, global advertisers are increasingly counting on Pinterest as a go-to search platform to reach their customers and drive sales."

337. Defendant Ready's statement that "global advertisers are increasingly counting on Pinterest" runs counter to the reality that, throughout the Relevant Period, and at the time this statement was made, as the Company was losing advertisers, and consequently revenue, due to failing to deliver sufficient value compared to competitors, its AI products were undermining advertiser performance and failing to retain budgets, and tariffs were placing additional pressure

on the Company's retail and CPG advertiser base, which caused the Company's advertisers to substantially reduce ad spend.

338. Analysts recited the theme that because of AI, global advertisers were "increasingly counting on Pinterest." On November 5, 2025, BofA Global Research parroted that the Company was "growing advertiser traction" while Goldman Sachs noted that "Performance+ continues to gain adoption."

**Q3 2025 Earnings Call**

339. Also on November 4, 2025, after the market closed, Pinterest held its Q3 2025 earnings call. During the earnings call, Defendant Ready told stockholders: "In an evolving competitive environment, Pinterest continues to distinguish itself as a destination for our users and a vital partner for our advertisers."

340. Defendant Ready's statement championing Pinterest as a "vital partner for our advertisers" in an "evolving competitive environment" was false and misleading when made. Instead, Company was losing advertisers, and consequently revenue, due to failing to deliver sufficient value compared to competitors, its AI products were undermining advertiser performance and failing to retain budgets, and tariffs were placing additional pressure on the Company's retail and CPG advertiser base, which caused the Company's advertisers to substantially reduce ad spend.

341. Later in the call, a Goldman Sachs analyst posed a question about the broader ad environment:

> Q: Thanks so much for taking the question. Maybe building on that answer, just Bill, can you characterize more broadly the digital ad environment that you find yourself operating in, representing Q3 and what you just reported and sort of the building blocks of Q4? And Julia gave some really good color there with respect to UCAN. Can you characterize what you're seeing in UCAN relative to the rest of your operations globally against that broader ad environment? Thanks so much.
>
> A(Ready): [I]t's also important to note that we grew 17% despite operating in an environment where some of our largest retailers in

> UCAN pulled back spend across the industry, not specific to us, but pulled pullback across the industry as they navigated tariff-related margin pressure. And we think that's disproportionately impacting large retailers. But that is a segment that we have more exposure to than other platforms given our focus on shopping, though we continue to grow in other verticals and segments of the market in addition to those.

342. Defendant Ready's statement that advertiser pullback was "not specific to us" was false and misleading when made because, as FEs confirm, advertisers were cutting ad spend on Pinterest's platform not just because of tariffs but because the Company failed to demonstrate sufficient value and return to justify continued advertising spend, making Pinterest an increasingly difficult platform for advertisers to prioritize, especially during a time when budgets were already under pressure.

343. Moreover, while touting Pinterest's growth, Defendant Ready failed to disclose the full extent of the tariff headwinds that were actively slowing that growth.

344. Later in the call, a Stifel analyst posed a question regarding customer concentration and Performance+:

> Great. Thanks very much for taking my questions. Bill, I appreciate the extra caller on Performance+ tonight. I was hoping maybe we could drill into the SMB and kind of mid-market opportunity just a little bit more. I know you threw out that stat, the 24% higher conversion rate, is that pretty like standard whether you're a smaller advertiser versus a more sophisticated and larger brand? And a second maybe just to clarify, that 10% to 15% of revenue running through P+, was that just an SMB and mid-market stat and where might that go over time? Thank you. A (Ready): The expansion into the full catalog with the largest retailers driven by more granular bidding, like ROAS bidding from Performance+. And so, we've got good results with that. We're just a couple of quarters in. A lot more to do there that can get us deeper into the catalogs of largest retailers. And then, secondly, it's mid-market and SMB driven by Performance+. We're just getting started in that segment of the market, but seeing really good, promising early results.

345. Defendant Ready's statements touting "really good, promising early results" for Performance+ were demonstrably false when made as noted above, FEs stated that the Company failed to demonstrate value to advertisers in comparison to competitors regarding Performance+.

346. Contemporaneous analyst reports confirm that Pinterest partially revealed the truth regarding Pinterest's actual demand, AI capabilities, and ability to withstand tariffs. Accordingly, following the Q3 2025 Earnings Call, there was a multiple price target reductions across analyst firms. For example, Goldman Sachs lowered its price target from $43 to $36; Deutsche Bank lowered its target from $42 to $36; BofA Global Research lowered its target from $44 to $39; and Citi lowered its target from $50 to $38. Yet, Pinterest's strongly-worded denial of serious impact prevented the market from fully digesting the truth, so that these firms, and many others, retained a "BUY" rating and continued to parrot Ready and Donnelly's misleading statements about the expansion of wallet share and success of Performance+. On November 5, 2025, Morgan Stanley directly cited Defendant Ready's statements that Pinterest has "broken into performance budgets, including achieving 5% to 10% share of total ad spend for some of the world's largest, most sophisticated advertisers." In response to Defendant Ready's statement "[t]hrough continued product innovation, we see meaningful runway to expand our share of wallet," on November 5, 2025, Mizuho paraphrased that "Product and ad innovation are rampant. Performance+ is driving increasing spend from adopters."

347. On tariff impact, Bank of America reflected Defendant Ready's statements regarding withstanding the tariff storm, such that "3Q US revenue growth at 9% was a disappointment in the quarter, reflecting tariff related ad cuts by large-retailers, and Pinterest's higher vertical concentration," yet this only amounted to "near-term revenue drag, but underlying usage intact." Deutsche Bank similarly remarked on November 5, 2025, that "despite these near-term headwinds, we believe investor concerns are overblown given Pinterest's demonstrable progress in driving advertiser performance and deepening commercial intent."

**False And Misleading Risk Factor Disclosures**

348. The Individual Defendants issued the same materially false and misleading risk factor in the Company's three Relevant Period quarterly SEC filings: (a) Form 10-Q filed May 8, 2025 (for the fiscal quarter ended March 31, 2025) (the "1Q 2025 Form 10-Q"); (b) Form 10-Q filed August 7, 2025 (for the fiscal quarter ended June 30, 2025) (the "2Q 2025 Form 10-Q"); and (c) Form 10-Q filed November 4, 2025 (for the fiscal quarter ended September 30, 2025) (the "3Q 2025 Form 10-Q").

349. In each of these Company filings with the SEC, beneath a heading titled "Risks Related to Our Business Strategy and Growth," the Individual Defendants disclosed to stockholders the following risks:

> We generate substantially all of our revenue from advertising. The failure to attract new advertisers, the loss of advertisers or a reduction in how much they spend could harm our business, revenue and financial results. Substantially all of our revenue is generated from third-party advertising. However, we may not be able to continue to grow and scale this revenue model. Our growth strategy depends on, among other things, attracting more advertisers (including expanding our sales efforts to reach advertisers in international markets), retaining and scaling our business with existing advertisers and expanding our advertising product offerings.
>
> As is common in our industry, most of our advertisers do not have long-term advertising commitments with us. Many of our advertisers spend a relatively small portion of their overall advertising budget with us. To increase the number of advertisers and increase the portion of the advertising budget that our existing advertisers spend with us, we must invest in new tools and technology and/or expand our sales force, and there can be no assurance that those efforts will be successful. The insights on user behavior we provide to advertisers may not yield effective results for the advertisers and as a result, they may reduce or stop their spend on our platform. In addition, unless we improve existing and develop new measurement tools that better showcase our platform's effectiveness, some advertisers may view our products or platform as experimental and may devote less advertising spend on our platform. In addition, many advertisers do not have advertising creative content in a format that would be successful on

> our platform and may be unable or unwilling to devote the technical or financial resources required to develop content for our platform. Further, we may not always be able to develop tools that effectively and efficiently meet the needs of advertisers. Advertisers will not do business with us if they do not believe that advertisements on our platform are effective in meeting their campaign goals, if we cannot measure the effectiveness of our advertising products or if they do not believe that their investment in advertising with us will generate a competitive return relative to other alternatives.
>
> A substantial portion of our revenue is derived from a small number of advertisers and is currently concentrated in certain verticals, particularly CPG and retail. We either contract directly with advertisers or with advertising agencies on behalf of advertisers, many of which are owned by large media corporations that exercise varying degrees of control over the agencies. Our business, revenue and financial results could be harmed by the loss of, or a deterioration in our relationship with, any of our largest advertisers or with any advertising agencies or the large media corporations that control them.
>
> […]
>
> Our advertising revenue could be harmed by many other factors, including, but not limited to:
>
> […]
>
> • the macroeconomic conditions and the status of the advertising industry, such as fear of recession, inflation, the impact of tariffs and related retaliatory actions and other trade protection measures, supply chain issues and inventory and labor shortages, which could cause businesses to spend less on advertising and/or direct their advertising spend to larger companies that offer more traditional and widely accepted advertising products; […]
>
> These and other factors could reduce the amount that advertisers spend on our platform, or cause advertisers to stop advertising with us altogether.

350. In these risk disclosure statements, the Individual Defendants represented and/or caused the Company to represent that each of the following conditions remained a contingent future possibility rather than a present reality:

(a) that Pinterest "may not be able to continue to grow and scale this revenue model";

(b) that "[t]he insights on user behavior we provide to advertisers may not yield effective results for the advertisers and as a result, they may reduce or stop their spend on our platform";

(c) that, because "most of our advertisers do not have long-term advertising commitments with us," advertisers were free to curtail spend;

(d) that "some advertisers may view our products or platform as experimental and may devote less advertising spend on our platform";

(e) that, although "[a] substantial portion of our revenue is derived from a small number of advertisers and is currently concentrated in certain verticals, particularly CPG and retail," Pinterest's "business, revenue and financial results could be harmed by the loss of, or a deterioration in our relationship with, any of our largest advertisers"; and

(f) that the Company's "advertising revenue could be harmed by" "the macroeconomic conditions and the status of the advertising industry… the impact of tariffs and related retaliatory actions and other trade protection measures … which could cause businesses to spend less on advertising and/or direct their advertising spend to larger companies that offer more traditional and widely accepted advertising products."

351. Each of these disclosures was phrased in conditional, forward-looking terms such as "may," "could," and "there can be no assurance," and each conveyed that the described risk had not yet come to pass.

352. The Individual Defendants caused the Company to issue these disclosures, in materially identical form, in each of three consecutive periodic SEC filings spanning more than six months of the Relevant Period. The Individual Defendants' operative language—that advertiser insights "may not yield effective results for the advertisers and[,] as a result, they may reduce or stop their spend on our platform"; that "some advertisers may view our products or platform as experimental and may devote less advertising spend on our platform"; that Pinterest's

results "could be harmed by the loss of, or a deterioration in our relationship with, any of our largest advertisers"; and that Pinterest's "advertising revenue could be harmed by" "the impact of tariffs"—appears verbatim or near-verbatim in each of the May 8, August 7, and November 4, 2025 Forms 10-Q.

353. That repetition was not a neutral byproduct of routine disclosure practice. The Individual Defendants had three separate opportunities to update the Company's risk disclosures to reflect what its internal systems were tracking in real time, and they took none of them. With each successive filing, the gap between the unchanged disclosures and Pinterest's actual condition grew wider, and the disclosures became correspondingly more misleading.

354. Those representations were false and misleading when made on May 8, 2025, August 7, 2025, and November 4, 2025, because on each of those dates the risks being warned of were not mere possibilities. They had already materialized, and Pinterest's largest advertisers had already begun cutting their spending on the platform.

355. FE-14, a Partner Manager employed through Accenture who worked as a contractor for Pinterest from December 2023 until April 2025 and who managed an established book of U.S. business, states that he began seeing a decline in his sales and in user engagement in February 2025—the very month the Form 10-K was filed and the Relevant Period began. FE-14 attributed that decline to Pinterest's AI-related features and to advertisers going elsewhere because comparable AI capabilities were becoming available on competing platforms. FE-14 further recounts that, during this same period, selling advertising became measurably more difficult, inbound leads declined, lower-funnel demand as measured by closed deals was low, and customers ultimately went to a competitor.

356. FE-5, a senior member of the sales team responsible for a selection of advertisers that were responsible for millions of dollars in revenue, confirms that the pullback was under way in the same period and was not confined to any single account or vertical. According to FE-5, retailers began reducing advertising spend in approximately the first quarter of 2025, coinciding with the introduction of tariffs, with Temu particularly affected. FE-5 further states that reductions

in spend extended beyond his own cohort and that the reduction in spend among Pinterest's top five advertisers—the very "small number of advertisers" from which the Form 10-K acknowledged Pinterest derived "[a] substantial portion of our revenue"—was "widely known" among Pinterest's sales personnel. FE-5 identifies Pinterest's top five advertisers as concentrated entirely in the retail sector, including Temu, Amazon, Walmart, and Target.

357. These FE accounts are confirmed by the tariff timeline itself. The Executive Orders imposing a 25% tariff on imports from Canada and Mexico and a 10% tariff on all goods from China took effect on February 4, 2025—two days before the Form 10-K was filed—and CPG advertisers had already begun curtailing advertising spend both in anticipation of and in the wake of those measures. Additional FE accounts confirm that advertisers began reducing spend as soon as the tariffs were announced in early 2025.

358. Thus, at the moment the Individual Defendants told stockholders that advertisers "may reduce or stop their spend," that advertisers "may view our products or platform as experimental," and that Pinterest's results "could be harmed by the loss of, or a deterioration in our relationship with, any of our largest advertisers," advertisers—including advertisers within Pinterest's top five accounts—were already reducing spend, were already treating the platform as failing to deliver measurable return, and had already begun reallocating budgets to Meta, Google, TikTok, and YouTube.

359. At a minimum, Defendants Ready and Donnelly knew, or were severely reckless in not knowing, that the risks described in conditional terms had already materialized by each filing date, and that they were materializing more acutely with each passing quarter.

360. First, Ready and Donnelly have admitted that they were in direct and recurring communication with the most senior executives of Pinterest's largest advertisers about those advertisers' spend: Defendant Ready has stated that he had "countless discussions . . . directly with the CEOs and CMOs of our top advertisers," and Defendant Donnelly has stated that Pinterest's revenue outlook reflected "what we are hearing from our advertising partners directly about their spend expectations."

361. Second, the internal reporting structure carried advertiser-spend information directly to Defendant Ready: FE-7 explains that teams were arranged into "pods" for the various advertiser groups, that pod managers determined each account's expected spend based on their conversations with advertisers and brought those figures to leadership, and that Defendant Ready himself set the annual revenue target and determined how it was allocated among the pods.

362. Third, by the time of the statement, Pinterest was already operating in the recurring "code red war rooms" convened to close revenue gaps—meetings that, according to FE-1, consumed approximately two of every three months of each quarter beginning in approximately October 2024, occurred often daily, involved the CTO and CRO, and generated spreadsheets, slide decks, agendas, and notes accessible to Pinterest's VP-level executives.

363. A risk disclosure is materially misleading when it warns that a risk "could" or "may" occur after that risk has already materialized. The Individual Defendants did not simply fail to foresee a downturn; they portrayed as hypothetical a deterioration in Pinterest's relationships with its largest advertisers that was already under way, while also representing that the Company's risk profile had not materially changed. Once a company knows that a risk has materialized, a statement that no material changes have occurred is misleading.

## SUBSEQUENT DEVELOPMENTS

364. Defendant Donnelly resigned on August 26, 2026 "to pursue another opportunity" but would remain with the Company until October 30, 2026 according to a Form 8-K filed by Pinterest on August 28, 2026. In its Form 8-K, Pinterest stated that "Ms. Donnelly's departure is not the result of any disagreement with the Company on any matter relating to the Company's operations, policies, or practices, including accounting principles and practices."

365. Nonetheless, Pinterest's stock fell 3% on this news, with outlets like Yahoo Finance characterizing the exit as "a surprise finance chief departure" and CFODive noted that Donnelly's departure "puts a spotlight on Pinterest's future growth." Other publications such as 24/7 Wall St reported that "Pinterest stock is sliding" after news of Donnelly's resignation came

to light, stating that "the reaction looks isolated" with "one direct rival ticking higher on the same session."

## INSIDER SALES

366. While the Company's common stock was the regarding a deceleration in demand for Pinterest ads caused the Company's stock to trade at artificially inflated values, certain top Company executives and insiders unloaded millions shares of their personally-held common stock, pocketing proceeds of almost $100 million.

367. During the Relevant Period, Defendant Donnelly sold 82.9% of her Pinterest holdings, earning more than $4.7 million.[24] Defendant Donnelly sold 143,449 shares at prices as high as $34.85 per share when she knew, or deliberately disregarded the truth surrounding Pinterest's advertising demand. Besides being lucrative, Donnelly's trades were suspiciously timed. Indeed, just one day after the Morgan Stanley Technology, Media & Telecom Conference on March 6, 2025, during which Defendant Ready misleadingly assured stockholders that Pinterest's advertising demand could withstand the macroeconomic environment, Donnelly sold 38,596 shares at $34.27 per share, generating over $1.3 million. Donnelly's base salary in 2025 was $625,000, a fraction of the value she generated through her Relevant Period stock sales. The following are Defendant Donnelly's sales:

| Date | Shares Sold | Average Price Per Share | Proceeds |
|---|---|---|---|
| March 7, 2025 | 38,596 | $34.27 | $1,322,685 |
| March 24, 2025 | 29,605 | $33.95 | $1,005,090 |
| June 24, 2025 | 29,606 | $34.25 | $1,013,997 |
| September 24, 2025 | 22,821 | $34.85 | $795,401 |

[24] The percent of shares Defendant Donnelly sold during the Relevant Period was calculated by taking the sum of open market sales reported on Donnelly's Form 4s filed with the SEC during the Relevant Period ("Donnelly's Relevant Period Sales"), divided by the sum of Donnelly's Relevant Period Sales and the number of shares that Donnelly beneficially owned at the end of the Relevant Period, as reported on Pinterest's 2026 Proxy Statement filed with the SEC. Although the Proxy Statement reports shares held as of March 27, 2026, this figure represents Donnelly's end of Relevant Period holdings, because no trades were made in the intervening time. Donnelly offloaded 54.7% of her total holdings, including RSUs subject to vesting after 60 days, if calculated by dividing Donnelly's Relevant Period Sales by the number of shares reportedly held on Donnelly's December 20, 2024 Form 4, the final Form 4 filed in her name before the Relevant Period.

| | | | |
|---|---|---|---|
| December 24, 2025 | 22,821 | $25.86 | $590,099 |

368. Defendant Silbermann, Pinterest's co-founder and former CEO, generated a striking $84.5 million in proceeds from selling the Company's stock during the Relevant Period. In total, he sold 2.45 million shares at prices as high as $37.95 per share, constituting a disposal of 6.2% of his Class A and Class B holdings. In contrast, Defendant Silbermann sold zero shares in the prior 12 months.[25] The following are Defendant Silbermann's sales[26]:

| **Date** | **Shares Sold** | **Average Price Per Share** | **Proceeds** |
|---|---|---|---|
| March 19, 2025 | 83,333 | $31.16 | $2,596,998 |
| March 26, 2025 | 73,689 | $33.62 | $2,477,350 |
| March 26, 2025 | 9,644 | $34.37 | $331,481 |
| April 2, 2025 | 39,427 | $30.99 | $1,221,906 |
| April 2, 2025 | 43,906 | $31.53 | $1,384,347 |
| May 14, 2025 | 333,332 | $33.16 | $11,054,722 |
| May 21, 2025 | 83,333 | $32.13 | $2,677,748 |
| May 22, 2025 | 6,274 | $32.17 | $201,847 |
| May 28, 2025 | 83,333 | $31.47 | $2,622,506 |
| June 4, 2025 | 83,333 | $33.21 | $2,767,272 |
| June 11, 2025 | 83,333 | $34.81 | $2,900,947 |
| June 18, 2025 | 83,333 | $34.83 | $2,902,513 |
| June 25, 2025 | 83,333 | $35.99 | $2,998,930 |
| July 2, 2025 | 38,445 | $35.17 | $1,352,222 |
| July 2, 2025 | 44,888 | $35.61 | $1,598,534 |
| July 9, 2025 | 83,333 | $35.50 | $2,958,172 |
| July 16, 2025 | 83,333 | $36.01 | $3,000,796 |
| July 23, 2025 | 83,333 | $37.95 | $3,162,546 |
| August 13, 2025 | 83,333 | $35.11 | $2,925,947 |
| August 20, 2025 | 83,333 | $34.96 | $2,913,538 |

---

[25] Donnelly, Silbermann, Chief Product and Technology Officer Matthew Madrigal, and Chief Accounting Officer Andrea Acosta's Relevant Period trades implemented pursuant to Rule 10b5-1 trading plans, however, they adopted their plans between November 20, 2024 and December 13, 2024, a time when the prospect of tariffs was already known to the general public, and the Company's insiders would have understood the vulnerability of the Company's ad revenue if such tariffs were implemented. Walcott also made three trades pursuant to a Rule 10b5-1 trading plan adopted in August 2024, selling 30,453 shares. However, she adopted a new plan on August 12, 2025, and thereafter executed just one additional sale in the Relevant Period on November 11, 2025, the earliest possible trading date after adopting her new plan given the SEC's 90-day cool off period, selling over 70,047 shares and receiving nearly $2 million in proceeds before any further revelations of truth were disclosed to the market.

[26] These trades were made by the Benjamin and Divya Silbermann Family Trust. According to the 2026 Proxy Statement, Defendant Silbermann and Divya Silbermann have sole voting and dispositive power over the shares held by the trust and may therefore be deemed to beneficially own such shares.

| | | | |
|---|---|---|---|
| August 27, 2025 | 83,333 | $36.03 | $3,002,380 |
| September 3, 2025 | 83,333 | $37.04 | $3,086,379 |
| September 10, 2025 | 63,864 | $34.80 | $2,222,384 |
| September 10, 2025 | 19,469 | $35.18 | $684,968 |
| September 17, 2025 | 35,319 | $36.49 | $1,288,670 |
| September 17, 2025 | 48,014 | $36.80 | $1,766,838 |
| September 24, 2025 | 83,333 | $34.86 | $2,904,638 |
| October 1, 2025 | 8 | $31.86 | $254.88 |

369. Defendant Levine sold 56,809 shares, or approximately 4.7% of his holdings, pocketing approximately $1.93 million at prices as high as $34.33 per share. He executed a majority of his trades on March 7, 2025, one day after Defendant Ready's misleading statements at the Morgan Stanley conference all of his trades were executed before the November 4, 2025 partial corrective disclosure. In contrast, Levine sold no shares in the year before the Relevant Period. The following are Defendant Levine's sales:

| **Date** | **Shares Sold** | **Average Price Per Share** | **Proceeds** |
|---|---|---|---|
| March 7, 2025 | 24,735 | $33.63 | $831,714 |
| March 7, 2025 | 25,800 | $34.33 | $885,637 |
| June 6, 2025 | 6,274 | $34.11 | $213,989 |

370. Defendant Rajaram sold 8,050 shares generating proceeds of approximately $271,297 while the Company's stock price was artificially inflated. The following are Defendant Rajaram's sales:

| **Date** | **Shares Sold** | **Average Price Per Share** | **Proceeds** |
|---|---|---|---|
| February 19, 2025 | 1,150 | $39.19 | $45,069 |
| March 19, 2025 | 1,150 | $31.35 | $36,053 |
| April 23, 2025 | 1,150 | $27.00 | $31,050 |
| May 21, 2025 | 1,150 | $31.97 | $36,766 |
| June 18, 2025 | 1,150 | $34.52 | $39,698 |
| July 16, 2025 | 1,150 | $36.88 | $42,412 |
| August 20, 2025 | 1,150 | $35.00 | $40,250 |

371. Moreover, other members of Pinterest's senior management team also sold shares during the Relevant Period while the stock price was artificially inflated. Chief Legal and Business Affairs Officer Wanjiku Juanita Walcott disposed of 104,500 shares, or 46.6% of her holdings, pocketing over $3 million. She sold her shares at prices as high as $35.68 per share. In contrast, she sold only 46,708 shares in the year before the Relevant Period.

372. Chief Product and Technology Officer Matthew Madrigal sold 20,000 shares, or 7.5% of his holdings on July 21, 2025, at $38.58 per share, for total proceeds of $771,680. He had sold no shares during the preceding 12 months.

373. Finally, Chief Accounting Officer Andrea Acosta sold 18,885 shares, or 12.14 % of her holdings, pocketing more than $623,000. She sold her shares at prices as high as $37.46 per share, and made more than 80% of her Relevant Period sales before the November 4, 2025 partial corrective disclosure when share prices fell precipitously.

**SHARE REPURCHASES**

374. During the Relevant Period, the Individual Defendants caused the Company to repurchase its own common stock at artificially inflated prices, causing the Company substantial harm. In total, from February 2025 through November 2025, the Individual Defendants caused the Company to spend approximately $927 million of Company (i.e., stockholders') funds to buy back approximately 30.1 million shares of its own common stock at artificially inflated prices.

375. According to 1Q 2025 Form 10-Q, between February 1, 2025 through February 28, 2025, the Company repurchased 2,748,536 shares of its own common stock at an average price per share of $36.75, for a total cost to the Company of $101,008,698.[27]

376. As the Company's stock was actually worth only $15.42 per share, the price at closing on February 13, 2026, the Company overpaid by approximately $58,626,273 for repurchases of its own stock between February 1, 2025 and February 28, 2025.

377. According to 1Q 2025 Form 10-Q, between March 1, 2025 through March 31, 2025, the Company repurchased 2,249,356 shares of its own common stock at an average price per share of $32.90, for a total cost to the Company of $74,003,812.

378. As the Company's stock was actually worth only $15.42 per share, the price at closing on February 13, 2026, the Company overpaid by approximately $39,318,743 for repurchases of its own stock between March 1, 2025 and March 31, 2025.

---

[27] Upon information and belief these repurchases were made during the Relevant Period.

379. According to the 2Q 2025 Form 10-Q, between May 1, 2025 through May 31, 2025, the Company repurchased 376,344 shares of its own common stock at an average price per share of $31.89, for a total cost to the Company of $12,001,610.

380. As the Company's stock was actually worth only $15.42 per share, the price at closing on February 13, 2026, the Company overpaid by approximately $6,109,386 for repurchases of its own stock between May 1, 2025 and May 31, 2025.

381. According to the 2Q 2025 Form 10-Q, between June 1, 2025 through June 30, 2025, the Company repurchased 1,182,943 shares of its own common stock at an average price per share of $34.34, for a total cost to the Company of approximately $40,622,263.

382. As the Company's stock was actually worth only $15.42 per share, the price at closing on February 13, 2026, the Company overpaid by approximately $22,381,282 for repurchases of its own stock between June 1, 2025 and June 30, 2025.

383. According to the 3Q 2025 Form 10-Q, between July 1, 2025 through July 31, 2025, the Company repurchased 1,900 shares of its own common stock at an average price per share of $36.99, for a total cost to the Company of $70,281.

384. As the Company's stock was actually worth only $15.42 per share, the price at closing on February 13, 2026, the Company overpaid by approximately $40,983 for repurchases of its own stock between July 1, 2025 and July 31, 2025.

385. According to the 3Q 2025 Form 10-Q, between August 1, 2025 through August 31, 2025, the Company repurchased 4,455,757 shares of its own common stock at an average price per share of $35.46, for a total cost to the Company of approximately $158,001,143.

386. As the Company's stock was actually worth only $15.42 per share, the price at closing on February 13, 2026, the Company overpaid by approximately $89,293,370 for repurchases of its own stock between August 1, 2025 and August 31, 2025.

387. According to the 3Q 2025 Form 10-Q, between September 1, 2025 through September 30, 2025, the Company repurchased 1,166,068 shares of its own common stock at an average price per share of $35.44, for a total cost to the Company of approximately $41,325,450.

388. As the Company's stock was actually worth only $15.42 per share, the price at closing on February 13, 2026, the Company overpaid by approximately $23,344,681 for repurchases of its own stock between September 1, 2025 and September 30, 2025.

389. According to the Form 10-K filed on February 12, 2026 (the "2025 Form 10-K"), between October 1, 2025 through October 31, 2025, the Company repurchased 3,140,751 shares of its own common stock at an average price per share of $31.85, for a total cost to the Company of approximately $100,032,919.

390. As the Company's stock was actually worth only $15.42 per share, the price at closing on February 13, 2026, the Company overpaid by approximately $51,602,539 for repurchases of its own stock between October 1, 2025 and October 31, 2025.

391. According to the 2025 Form 10-K, between November 1, 2025 through November 30, 2025, the Company repurchased 14,786,360 shares of its own common stock at an average price per share of $27.05, for a total cost to the Company of approximately $399,971,038.

392. As the Company's stock was actually worth only $15.42 per share, the price at closing on February 13, 2026, the Company overpaid by approximately $171,965,369 for repurchases of its own stock between November 1, 2025 and November 30, 2025.

393. In total, therefore, the Individual Defendants caused the Company to overpay by more than $462.8 million for repurchases of its own stock during the Relevant Period.

## DAMAGES TO THE COMPANY

394. As a direct and proximate result of the Individual Defendants' breaches of fiduciary duty, violations of the Exchange Act, and other serious misconduct, Pinterest has incurred, and will continue to incur, losses and expenditures amounting to many millions of dollars.

395. Such losses include over $462.7 million that the Company overpaid when the Individual Defendants caused Pinterest to repurchase its own common stock at artificially inflated prices during the Relevant Period before the Individual Defendants' scheme was exposed.

396. Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

397. Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

398. Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

399. These expenditures also include, but are not limited to, unwarranted compensation, benefits, and other payments made to the Individual Defendants who breached their fiduciary duties to the Company.

400. As a direct and proximate result of the Individual Defendants' misconduct, Pinterest has also suffered, and will continue to suffer, a loss of reputation and goodwill, as well as a "liar's discount" that will weigh on the Company's stock price in the future because of the Company's and the Individual Defendants' misrepresentations.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

401. Plaintiff brings this action derivatively, for the benefit of Pinterest, to redress the injuries the Company has suffered and will suffer as a result of the Individual Defendants' breaches of fiduciary duty as directors and/or officers of Pinterest, unjust enrichment, waste of corporate assets, and violations of the Exchange Act.

402. Pinterest is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

403. Plaintiff is a Pinterest shareholder and has been at all relevant times. Plaintiff will fairly and adequately represent the Company's interests in enforcing and prosecuting its rights and has retained counsel experienced in shareholder derivative litigation for that purpose.

404. Plaintiff incorporates by reference and realleges each and every allegation stated above as if fully set forth herein.

405. Plaintiff did not make a pre-suit demand on the Board because such a demand would have been futile and is therefore excused. At the time this action was filed, the Board consisted of twelve members: Defendants Ready, Bergh, Kilgore, Rajaram, Reynolds, Schenkel, Silbermann, Smith, Steinberg, and Wishom, and non-parties Reuter and Steelman. Under Delaware law, demand is excused if at least half of the directors (here, six of twelve) (i) received a material personal benefit from the alleged misconduct, (ii) face a substantial likelihood of liability on any of the claims, or (iii) lack independence from someone who received such a benefit or who faces such liability. United Food & Com. Workers Union v. Zuckerberg, 262 A.3d 1034, 1059 (Del. 2021). As set forth below, that standard is readily met.

406. Each of the Director Defendants faces, individually and collectively, a substantial likelihood of liability for knowingly or recklessly participating in the scheme to make, and/or cause the Company to make, false and misleading statements and omissions of material fact. Directors who would be investigating their own conduct cannot impartially evaluate these claims or decide whether the Company should pursue them against themselves and the other participants in the scheme. Demand is therefore excused as to every Director Defendant.

407. Abdicating their fiduciary duties, the Director Defendants knowingly or recklessly caused or allowed Pinterest to issue materially false and misleading statements designed to portray the Company as growing its revenues and as an attractive investment, and they caused the Company to fail to maintain adequate internal controls. Having breached their fiduciary duties in this way, the Director Defendants face a substantial likelihood of liability and are not disinterested, and a demand on them would be futile.

408. Demand is also futile as to Defendant Ready for the following additional reasons. Defendant Ready has served as Pinterest's CEO and as a member of the Board since 2022. Pinterest is his principal employer and pays him substantial compensation, and the Company itself concedes that he is not an independent director. As the Company's most senior officer, he exercised little, if any, oversight over the Company's participation in the scheme to issue false and misleading statements, and he consciously disregarded both his duty to monitor the relevant reporting controls and his duty to protect corporate assets. During the Relevant Period, he not only failed to correct the false and misleading statements alleged herein, but personally made many of them. Defendant Ready also solicited the 2025 Proxy Statement, which contained false and misleading statements and led to, inter alia, his own re-election and that of Defendants Kilgore, Silbermann, and Smith, enabling them to continue breaching their fiduciary duties. He is also a named defendant in the Securities Action and therefore faces personal exposure for the very conduct at issue here. Accordingly, Defendant Ready breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand on him is futile and excused.

409. Demand is also futile as to Defendant Bergh. A Company director since 2024, Defendant Bergh chairs the Nominating and Corporate Governance Committee and sits on the Talent Development and Compensation Committee, and he receives substantial compensation from Pinterest for his Board service. Despite these positions, he exercised little, if any, oversight over the scheme to cause the Company to issue false and misleading statements, and he consciously disregarded his duties to monitor the relevant reporting controls and to protect corporate assets. Defendant Bergh also solicited the 2025 Proxy Statement, which contained false and misleading statements and led to, inter alia, the re-election of Defendants Ready, Kilgore, Silbermann, and Smith, enabling them to continue breaching their fiduciary duties. As the chair of the committee charged with Board governance, he bore particular responsibility for ensuring that the Board's oversight functions operated as the 2025 Proxy Statement described.

Accordingly, Defendant Bergh breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand on him is futile and excused.

410. Demand is also futile as to Defendant Kilgore. Defendant Kilgore has served on the Board since 2019, chairs the Talent Development and Compensation Committee, and receives substantial compensation from Pinterest for her Board service. As a long-tenured director, she exercised little, if any, oversight over the scheme to cause the Company to issue false and misleading statements, and she consciously disregarded her duties to monitor the relevant reporting controls and to protect corporate assets. Defendant Kilgore also solicited the 2025 Proxy Statement, which contained false and misleading statements and led to, inter alia, her own re-election and that of Defendants Ready, Silbermann, and Smith, enabling them to continue breaching their fiduciary duties. As chair of the compensation committee, she also approved the compensation paid to the very officers who made the misstatements alleged herein. Accordingly, Defendant Kilgore breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand on her is futile and excused.

411. Demand is also futile as to Defendant Rajaram. Defendant Rajaram has been a Company director since September 2020, sits on the Talent Development and Compensation Committee, and receives substantial compensation from Pinterest for his Board service. As a long-tenured director, he exercised little, if any, oversight over the scheme to cause the Company to issue false and misleading statements, and he consciously disregarded his duties to monitor the relevant reporting controls and to protect corporate assets. Defendant Rajaram also solicited the 2025 Proxy Statement, which contained false and misleading statements and led to, inter alia, the re-election of Defendants Ready, Kilgore, Silbermann, and Smith, enabling them to continue breaching their fiduciary duties. Moreover, Defendant Rajaram sold 8,050 shares of Pinterest stock for approximately $271,297 while in possession of material nonpublic information and while the stock price was artificially inflated by the false and misleading statements alleged herein. Those sales confer on him a material personal benefit not shared with other stockholders and demonstrate his motive to facilitate and participate in the scheme. Accordingly, Defendant

Rajaram breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand on him is futile and excused.

412. Demand is also futile as to Defendant Reynolds. Defendant Reynolds has served on the Board since 2007, making him one of its longest-serving members, sits on the Audit and Risk Committee, and receives substantial compensation from Pinterest for his Board service. He exercised little, if any, oversight over the scheme to cause the Company to issue false and misleading statements, and he consciously disregarded his duties to monitor the relevant reporting controls and to protect corporate assets. Defendant Reynolds also solicited the 2025 Proxy Statement, which contained false and misleading statements and led to, inter alia, the re-election of Defendants Ready, Kilgore, Silbermann, and Smith, enabling them to continue breaching their fiduciary duties. Accordingly, Defendant Reynolds breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand on him is futile and excused.

413. Demand is also futile as to Defendant Schenkel. Defendant Schenkel has served on the Board since 2023, chairs the Audit and Risk Committee, and receives substantial compensation from Pinterest for his Board service. As the director charged with leading the Board's oversight of financial reporting, disclosure controls, and enterprise risk, he exercised little, if any, oversight over the scheme to cause the Company to issue false and misleading statements, and he consciously disregarded his duties to monitor the relevant reporting controls and to protect corporate assets. Defendant Schenkel also solicited the 2025 Proxy Statement, which contained false and misleading statements and led to, inter alia, the re-election of Defendants Ready, Kilgore, Silbermann, and Smith, enabling them to continue breaching their fiduciary duties. Accordingly, Defendant Schenkel breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand on him is futile and excused.

414. Demand is also futile as to Defendant Silbermann. Defendant Silbermann co-founded Pinterest, has served on the Board since 2008, and is currently the Non-Executive Chair

of the Board. He previously served as the Company's CEO from 2008 until June 2022 and as its President from 2012 until June 2022. Pinterest pays him substantial compensation for his Board service. As the Company's former top executive and current Board chair, he exercised little, if any, oversight over the scheme to cause the Company to issue false and misleading statements, and he consciously disregarded his duties to monitor the relevant reporting controls and to protect corporate assets. Defendant Silbermann also solicited the 2025 Proxy Statement, which contained false and misleading statements and led to, inter alia, his own re-election and that of Defendants Ready, Kilgore, and Smith, enabling them to continue breaching their fiduciary duties. Most significantly, Defendant Silbermann sold approximately 2.45 million shares during the Relevant Period for proceeds of approximately $84.5 million while in possession of material nonpublic information and while the stock price was artificially inflated, after selling no shares in the preceding twelve months. Those sales confer on him a material personal benefit not shared with other stockholders, expose him to liability for the claims asserted herein, and demonstrate his motive to facilitate and participate in the scheme. Accordingly, Defendant Silbermann breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand on him is futile and excused.

415. Demand is also futile as to Defendant Smith. Defendant Smith has served on the Board since 2020, sits on both the Audit and Risk Committee and the Nominating and Corporate Governance Committee, and receives substantial compensation from Pinterest for her Board service. As a long-tenured director, she exercised little, if any, oversight over the scheme to cause the Company to issue false and misleading statements, and she consciously disregarded her duties to monitor the relevant reporting controls and to protect corporate assets. Defendant Smith also solicited the 2025 Proxy Statement, which contained false and misleading statements and led to, inter alia, her own re-election and that of Defendants Ready, Kilgore, and Silbermann, enabling them to continue breaching their fiduciary duties. Accordingly, Defendant Smith breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand on her is futile and excused.

416. Demand is also futile as to Defendant Steinberg. Defendant Steinberg has served on the Board since 2022, sits on the Audit and Risk Committee, and receives substantial compensation from Pinterest for his Board service. He exercised little, if any, oversight over the scheme to cause the Company to issue false and misleading statements, and he consciously disregarded his duties to monitor the relevant reporting controls and to protect corporate assets. Defendant Steinberg also solicited the 2025 Proxy Statement, which contained false and misleading statements and led to, inter alia, the re-election of Defendants Ready, Kilgore, Silbermann, and Smith, enabling them to continue breaching their fiduciary duties. Accordingly, Defendant Steinberg breached his fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand on him is futile and excused.

417. Demand is also futile as to Defendant Wishom. Defendant Wishom has served on the Board since 2020 and as its Lead Independent Director since 2021, sits on the Talent Development and Compensation Committee and the Nominating and Corporate Governance Committee, and receives substantial compensation from Pinterest for her Board service. As Lead Independent Director, she was charged with providing a check on management, yet she exercised little, if any, oversight over the scheme to cause the Company to issue false and misleading statements, and she consciously disregarded her duties to monitor the relevant reporting controls and to protect corporate assets. Defendant Wishom also solicited the 2025 Proxy Statement, which contained false and misleading statements and led to, inter alia, the re-election of Defendants Ready, Kilgore, Silbermann, and Smith, enabling them to continue breaching their fiduciary duties. Accordingly, Defendant Wishom breached her fiduciary duties, faces a substantial likelihood of liability, is neither independent nor disinterested, and demand on her is futile and excused.

418. At all relevant times, Defendants Schenkel (as Chair), Reynolds, Smith, and Steinberg served on the Audit and Risk Committee (collectively, the "Audit and Risk Committee Defendants"). Under the Audit and Risk Committee Charter, they were responsible for overseeing the effectiveness of the Company's internal controls, the accuracy of its financial statements and

earnings guidance, its enterprise risk management program, and its compliance with applicable laws and regulations. During the Relevant Period, they violated that Charter by engaging in, or permitting the Company to engage in, the scheme to disseminate materially false and misleading statements and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Exchange Act; by failing to adequately perform their risk assessment and risk management functions; and by failing to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Ethics. The Audit and Risk Committee Defendants therefore breached their fiduciary duties, face a substantial likelihood of liability, are neither independent nor disinterested, and demand is excused as to them.

419. The Director Defendants also violated the Code of Ethics. They exercised little, if any, oversight over the Company's participation in the Individual Defendants' scheme to issue materially false and misleading statements and to facilitate and conceal the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of the Exchange Act. They further failed to comply with laws and regulations, keep accurate Company records and reports, avoid conflicts of interest, conduct business honestly and ethically, and properly report violations of the Code of Ethics. For this reason as well, the Director Defendants face a substantial likelihood of liability, and demand on them is futile.

420. Although Pinterest has suffered, and will continue to suffer, significant losses as a result of the wrongdoing alleged herein, the Director Defendants have not caused the Company to sue themselves or anyone else responsible for that misconduct to recover any portion of those damages. Their inaction confirms that any demand on them would be futile.

421. The Director Defendants' conduct described above was not, and could not have been, a valid exercise of business judgment, because it was undertaken in bad faith and reflects intentional, reckless, or disloyal misconduct. As a result, none of the Director Defendants may invoke any exculpatory provision in the Company's charter (to the extent one exists) to avoid

liability for these breaches of duty. Because a majority of the Director Defendants face a substantial likelihood of liability, they are interested in the conduct challenged herein and cannot be presumed capable of exercising independent and disinterested judgment as to whether to pursue this action on the Company's behalf. Demand is therefore excused as futile.

422. The misconduct alleged herein constitutes breaches of the fiduciary duties owed by Pinterest's officers and directors and cannot be ratified.

423. The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Pinterest. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of Pinterest, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

424. If there is no directors' and officers' liability insurance, then the Director Defendants will not cause Pinterest to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

425. For all of the foregoing reasons, all of the Director Defendants, or at a minimum six of the twelve Directors, are incapable of impartially considering a demand. A demand on the Board is therefore excused as futile.

## CLAIMS FOR RELIEF

## COUNT I

**Against Defendants Ready, Bergh, Kilgore, Levine, Rajaram, Reynolds, Schenkel, Silbermann, Smith, Steinberg, and Wishom for Violations of Section 14(a) of the Exchange Act**

426. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

427. Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

428. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Pinterest not misleading.

429. Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9. Under the direction and watch of Defendants Ready, Bergh, Kilgore, Levine, Rajaram, Reynolds, Schenkel, Silbermann, Smith, Steinberg, and Wishom, the 2025 Proxy Statement failed to disclose, inter alia, that: (1) although the Company claimed its officers and directors adhered to the Code of Ethics, the Individual Defendants

violated these policies either without waivers or without such waivers being disclosed; and (2) contrary to the descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

430. The 2025 Proxy Statement also failed to disclose that: (1) the Company understated the impact deteriorating macroeconomic conditions would have on its advertising partners; (2) as a result, Pinterest's advertising partners slowed spending, causing decreased revenues; and (3) as a result of the impact on its advertising revenues, Pinterest underwent a restructuring. As a result of the foregoing, the Company's public statements in the 2025 Proxy Statement were materially false and misleading at all relevant times.

431. In the exercise of reasonable care, Defendants Ready, Bergh, Kilgore, Levine, Rajaram, Reynolds, Schenkel, Silbermann, Smith, Steinberg, and Wishom knew or should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement including, but not limited to, the re-election of Defendants Ready, Kilgore, Silbermann, and Smith.

432. As a result of Defendants Ready, Bergh, Kilgore, Levine, Rajaram, Reynolds, Schenkel, Silbermann, Smith, Steinberg, and Wishom causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, inter alia, to: (1) re-elect Defendants Ready, Kilgore, Silbermann, and Smith; (2) approve on an advisory basis, the compensation of the Company's named executive officers; (3) ratify the Audit and Risk Committee's selection of E&Y as Pinterest's independent registered public accounting firm for 2025; and (4) approve an amendment to Pinterest's Amended and Restated Certificate of Incorporation to provide for officer exculpation as permitted by Delaware law.

433. The Company suffered damages as a result of the material misrepresentations and omissions in the 2025 Proxy Statement.

434. Plaintiff, on behalf of Pinterest, has no adequate remedy at law.

**COUNT II**

**Against the Individual Defendants for Violations of Section 10(b) and Rule 10b-5 of the Exchange Act**

435. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

436. The Individual Defendants participated in a scheme to defraud with the purpose and effect of defrauding Pinterest. Not only is Pinterest now forced to defend itself against claims that it violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, but the Company itself is also one of the largest victims of the unlawful scheme perpetrated upon Pinterest by the Individual Defendants. With the price of its common stock trading at artificially inflated prices due to the Individual Defendants' misconduct, the Individual Defendants caused the Company to repurchase millions of its own shares at artificially inflated prices, damaging Pinterest.

437. During the Relevant Period, the Individual Defendants also individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct designed to falsify the Company's press releases, public statements made in earnings calls, and periodic and current reports filed with the SEC.

438. The Individual Defendants employed devices, schemes, and artifices to defraud while in the possession of adverse, material, non-public information and engaged in acts, practices and a course of conduct that included the making of, or participation in the making of, untrue and/or misleading statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Pinterest not misleading.

439. The Individual Defendants as top executives acted with scienter during the Relevant Period, in that they either had actual knowledge of the scheme and the misrepresentations and/or omissions of material facts set forth herein or acted with reckless

disregard for the truth in that they failed to ascertain and to disclose the true facts, even though they were available to them. The Individual Defendants were the top executives of the Company, or received direct briefings from them, and were therefore directly responsible for the scheme set forth herein and for the false and misleading statements and/or omissions disseminated to the public through filings with the SEC.

440. By virtue of the foregoing, the Individual Defendants have violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder

**COUNT III**

**Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

441. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

442. The Individual Defendants, by virtue of their positions with Pinterest and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Pinterest and each of its officers and directors who made the false and misleading statements alleged herein within the meaning of §20(a) of the Exchange Act. The Individual Defendants had the power and influence and exercised the same to cause Pinterest to engage in the illegal conduct and practices complained of herein.

443. Plaintiff, on behalf of Pinterest, has no adequate remedy at law.

**COUNT IV**

**Against the Individual Defendants for Breach of Fiduciary Duties**

444. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

445. Each Individual Defendant owed the Company a duty to act with candor, good faith, and loyalty in managing and administering Pinterest's business and affairs.

446. Each Individual Defendant violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

447. The Individual Defendants' misconduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, including their failure to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of Pinterest's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

448. These actions were not a good-faith exercise of prudent business judgment undertaken to protect and advance the Company's interests.

449. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Pinterest has suffered and continues to suffer significant damages, for which the Individual Defendants are liable to the Company.

450. Plaintiff, on behalf of Pinterest, has no adequate remedy at law.

## COUNT V

### Against the Individual Defendants for Unjust Enrichment

451. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

452. Through their wrongful acts, violations of law, and the false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at Pinterest's expense and to its detriment.

453. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Pinterest that was tied to the performance or artificially inflated valuation of Pinterest or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes

lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

454. Plaintiff, as a shareholder and a representative of Pinterest, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

455. Plaintiff, on behalf of Pinterest, has no adequate remedy at law.

**COUNT VI**

**Against the Individual Defendants for Waste of Corporate Assets**

456. The Individual Defendants caused the Company to pay them excessive salaries and fees, to the detriment of the Company and its shareholders.

457. As a result of the foregoing, and by failing to properly consider and put first the best interests of the Company and its public shareholders, the Individual Defendants have caused Pinterest to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend its unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

458. As a result of this waste of corporate assets, each of the Individual Defendants is liable to the Company.

459. Plaintiff, on behalf of Pinterest, has no adequate remedy at law.

**COUNT VII**

**Against Defendants Ready and Donnelly for Contribution Under Sections 10(b) and 21(D) of the Exchange Act**

460. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

461. Pinterest and Defendants Ready and Donnelly are named as defendants in the Securities Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendant Ready's and Defendant Donnelly's willful and/or reckless violations of their obligations as officers and/or directors of the Company.

462. Defendants Ready and Donnelly, because of their positions of control and authority as officers and/or directors of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Action.

463. Accordingly, Defendants Ready and Donnelly are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

464. As such, Pinterest is entitled to receive all appropriate contribution or indemnification from Defendants Ready and Donnelly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

A. Declaring that Plaintiff may maintain this action on behalf of Pinterest, and that Plaintiff is an adequate representative of the Company;

B. Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to Pinterest;

C. Determining and awarding to Pinterest the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon

D. Directing Pinterest and the Individual Defendants to take all necessary actions to reform and improve Pinterest's corporate governance and internal procedures to comply with applicable laws and to protect Pinterest and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws and/or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

i. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the board;

ii. a provision to permit the shareholders of Pinterest to nominate at least six candidates for election to the Board;

iii. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E. Awarding Pinterest restitution from Individual Defendants, and each of them;

F. Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

G. Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: November 11, 2026

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/*Laurence M. Rosen*
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

*Counsel for Plaintiff*

# VERIFICATION

I, Joseph Pragay am a plaintiff in the within action. I have reviewed the allegations made in this shareholder derivative complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true. I declare under penalty of perjury that the foregoing is true and correct.

Executed this: 11/10/2026

DocuSigned by:

771340DB9AF44E8...

Joseph Pragay